1  SHERRIE M. FLYNN, SBN 240215
   sflynn@ch-law.com
2  AISHA O. OTORI, SBN 342273
   aotori@ch-law.com
3  COLEMAN & HOROWITT, LLP
   Attorneys at Law
4  499 W. Shaw Avenue, Suite 116
   Fresno, California 93704
5  Telephone: (559) 248-4820
   Facsimile: (559) 248-4830
6

7  Attorneys for Plaintiffs, HYPHY MUSIC, INC.,
   DOMINGO TORRES and ALFONSO VARGAS
8

9

10

11              UNITED STATES DISTRICT COURT

12             EASTERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| 14  HYPHY MUSIC INC., a California corporation; DOMINGO TORRES, an individual; and ALFONSO VARGAS, an individual, | Case No. |
| 15 | |
| 16 | **COMPLAINT FOR FALSE AND DECEPTIVE ADVERTISING UNDER 15 U.S.C. § 1125 (SECTION 43 OF THE LANHAM ACT); RECTIFICATION OF TRADEMARK REGISTRATIONS UNDER 15 U.S.C. § 1119; UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200 ET SEQ.; FALSE ADVERTISING AND PROFESSIONS CODE § 17500; INTENTIONAL INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE: BREACH OF FIDUCIARY DUTY IN VIOLATION OF CALIFORNIA CORPORATIONS CODE §§16401 ET SEQ: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY:AND MONEY HAD AND RECEIVED** |
| 17                        Plaintiffs, | |
| 18  vs. | |
| 19  YELLOWCAKE, INC., a California corporation; COLONIZE MEDIA, INC., a California corporation, KEVIN BERGER, an individual, JOSE DAVID HERNANDEZ, an individual; JESUS CHAVEZ, SR, an individual; JESUS CHAVEZ, JR, an individual: PEDRO CHAVEZ, an individual and JORGE GARCIA. an individual. | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24                        Defendants. | |
| 25 | |
| 26 | |
| 27 | **JURY TRIAL DEMANDED** |
| 28 | |

COMPLAINT

Plaintiffs, HYPHY MUSIC INC. ("Hyphy"), DOMINGO TORRES ("Torres"), and ALFONSO VARGAS ("Vargas"; collectively "Plaintiffs") allege as follows:

### PRELIMINARY STATEMENT

This is an action for false and deceptive advertising arising under Section 43 of the Lanham Act, 15 U.S.C. §§ 1125(a)(1)(B), rectification of trademark registrations to indicate correct trademark ownership pursuant to 15 U.S.C. § 1119, and for the substantial and related claims of unfair competition and false advertising under California Business and Professions Code §§ 17200 et seq. and 17500, respectively, Intentional Interference with Prospective Business Advantage, Breach of Fiduciary Duty in violation of California Corporations Code §§ 16401 et seq., Aiding and Abetting Breach of Fiduciary Duty, and Money Had and Received, all arising in connection with defendants unauthorized altering of photographs and/or advertisements intended to deceive the consuming public into believing all of the artists shown in the altered photographs/advertisements are original members of the musical group known as Los Originales de San Juan (the "Los Originales Band") when they are not.

### JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331 because this action involves a federal question arising under the trademark laws of the United States. Supplemental jurisdiction over the state law claims is proper pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal question claim that they form part of the same case and controversy.

2.     Venue is proper with this Court pursuant to 28 U.S.C. §§ 1391(b), 1391(c) and 1391(d) because a substantial part of the events or omissions giving rise to the claims occurred within this district and because defendants reside or may be found in this district.

**PARTIES**

3.      Hyphy is a California Corporation with its principal place of business located at 2727 North Grove Industrial Drive #155, Fresno, CA 93727.

4.      Torres is an individual residing in the City of Sanger, County of Fresno, California.

5.      Vargas is an individual residing in the City of Dinuba, County of Tulare, California.

6.      Plaintiffs are informed and believe and thereon allege that defendant YELLOWCAKE, INC. ("Yellowcake") is, and at all relevant times herein, was a California corporation with its principal place of business in the City of Turlock, County of Stanislaus, State of California.

7.      Plaintiffs are informed and believe and thereon allege that defendant COLONIZE MEDIA, INC. ("Colonize") is, and at all relevant times herein, was a California corporation with its principal place of business in the City of Turlock, County of Stanislaus, State of California.

8.      Plaintiffs are informed and believe and thereon allege that defendant KEVIN BERGER, an individual ("Berger"), is, and at all relevant times herein, was residing in the County of Stanislaus, State of California.

9.      Plaintiffs are informed and believe and thereon allege that defendant JOSE DAVID HERNANDEZ, an individual ("Hernandez"), is, and at all relevant times herein, was residing in the County of Stanislaus, State of California.

10.      Plaintiffs are informed and believe and thereon allege that defendant JESUS CHAVEZ, SR., an individual ("Chavez Sr.") is, and at all relevant times herein, was residing in the County of Fresno, State of California.

11.      Plaintiffs are informed and believe and thereon allege that defendant JESUS CHAVEZ, JR., an individual ("Chavez Jr.") is, and at all relevant times herein, was residing in the County of Fresno, State of California.  Defendants Yellowcake, Colonize, Berger, Hernandez, Chavez Sr., and Chavez Jr. are at times

collectively referred to herein as "Defendants," or individually, as a "Defendant."

12.     Plaintiffs are informed and believe and thereon allege that defendant PEDRO CHAVEZ, an individual ("P. Chavez.") is, and at all relevant times herein, was residing in the County of Fresno, State of California.

13.     Plaintiffs are informed and believe and thereon allege that defendant JORGE GARCIA, an individual ("Garcia") is, and at all relevant times herein, was residing in the County of Fresno, State of California.

14.     Plaintiffs are informed and believe and thereon allege that at all relevant times herein, each of the defendants was and now is the agent, servant, employee, representative and/or alter ego of each of the remaining defendants and, in doing the things hereinafter alleged, was acting within the scope of its authority as such agent, servant, employee and/or representative with the permission and consent of the remaining defendants.

## FACTS COMMON TO ALL CLAIMS

### A.     Hyphy's Agreements with Los Originales Band Members

15.     Hyphy has been duly registered as a corporation in the State of California since January 14, 2014, and, among other things, produces and distributes musical recordings, and promotes live music at venues around the United States.

16.     Torres and Vargas are original members of the Los Originales Band.

17.     On or about January 10, 2023, Hyphy and Torres signed a 360 Exclusive Multi Rights Recording Agreement (the "Torres 360 Agreement") whereby Hyphy engaged Torres to render services exclusively to Hyphy, including the services of a musical performer, and Torres engaged Hyphy to provide various branding services, including but not limited to record production, music video production, public relations, and media promotion.  A true and correct copy of the Torres 360 Agreement is attached hereto as **Exhibit 1**.

18.     The 360 Agreement grants Hyphy the exclusive right to publish, and permit others to use and publish, Torres' name, including all professional, group, and

other assumed or fictitious names or trademarks used by Torres, as well as an exclusive right to use Torres' name, likeness, and other identifying information for use in any promotion, marketing, or advertising.  Torres is known professionally as a member of the Los Originales Band.  Thus, the Torres 360 Agreement grants Hyphy the right to publish that Torres is an original member of the Los Originales Band.

19.     Also, on or about January 10, 2023, Hyphy and Vargas signed a 360 Exclusive Multi-Rights Recording Agreement (the "Vargas 360 Agreement"), essentially the same as the Torres 360 Agreement, wherein Hyphy engaged Vargas to render exclusively to Hyphy services that of a musical performer, and Vargas engaged Hyphy to provide branding services. A true and correct copy of the Vargas 360 Agreement is attached hereto as **Exhibit 2**.

20.     The Vargas 360 Agreement grants Hyphy the exclusive right to publish, and permit others to use and publish, Vargas' name, including all professional, group and other assumed or fictitious names or trademarks used by Vargas, as well as an exclusive right to use Vargas' name, likeness, and other identifying information for use in any promotion, marketing, or advertising.  Vargas is known professionally as a member of the Los Orginales Band. Thus, the Vargas 360 Agreement grants Hyphy the right to publish that Vargas is an original member of the Los Originales Band.

**B.      The Original Los Originales de San Juan Band**

21.     On or about June 1, 1991, when the Los Originales Band was formed, the band consisted of four main members and featured artists: (i) Torres, (ii) Vargas, (iii) Chavez Sr., and (iv) Jose Castro Humberto (now deceased).

22.     As original/surviving members of the Los Originales Band, Torres, Vargas and Chavez Sr., all own rights in the Los Originales Band's business, including revenues from personal appearances and live performances, audio and video recordings to which the members contributed, as well as property rights in the name, trademarks and goodwill associated with the Los Originales Band.

23.     Torres and Vargas were not and are not employees of the Chavez Sr.

24.    Torres and Vargas did not create any of their works for Chavez Sr., nor does an explicit written agreement signed by the parties defining their works as a works made for hire exist.

25.    For several years, Torres, Vargas, and Chavez Sr., acted in conformity as equal partners of the Los Originales band and they held themselves out to the public as equal owners.

26.    Torres, Vargas, and Chavez Sr., provided their time, effort, skill, and experience to help establish the band and their style of music in the music industry.

27.    As a result, the original Los Originales Band became extremely popular with consumers of the Los Originales Band's style of music, and as such, there is substantial goodwill associated with the Los Originales name and trademarks.

**C.    Misappropriation and Conversion of Partnership Assets Comes to Light**

28.    Without the knowledge of Vargas and Torres, Chaves Sr. registered the Band with SoundExhange, a collective rights management organization.

29.    In the SoundExchange registration application, Chavez Sr. falsely represented that he was the sole performing artist of the LOS ORIGINALES Band and as such, was entitled to receive one hundred percent (100%) of the performance royalties from SoundExchange.

30.    As a result of this false representation, SoundExchange remitted royalties meant for the original members of LOS ORIGINALES solely to Chavez Sr.

31.    The amount of royalties received by Chavez Sr. is unknown, but is believed to be tens of thousands of dollars.

32.    Upon receiving the royalties, Chavez Sr. did not report them to Vargas and Torres.

33.    Vargas and Torres are informed and believe that Chavez Sr., secretly collected the royalty payments and distributed a significant portion of these royalty payments to himself, and others rather than in accordance with the agreement that revenues and profits from the Band's activities be equally shared.

**D.     The Deal with YELLOW CAKE, INC., COLONIZE MEDIA, and KEVIN BERGER**

34.     Vargas and Torres are informed that in addition to secretly collecting royalty payments from SoundExchange, Chavez Sr. with the help, assistance, and encouragement of Chavez Jr., brokered a business deal with Yellow Cake, Inc., Colonize Media, and Kevin Berger, wherein Defendants would profit from the Band's brand without consent from, and to the exclusion of Vargas and Torres (the "Yellow Cake Transaction").

35.     Vargas and Torres are informed and believe that Chavez Jr. knew that the original LOS ORIGINALES band had four members: Chavez Sr., Torres, Vargas, and Humberto.

36.     Vargas and Torres are informed and believe that Chavez Sr. and/or Chavez. Jr. received sums of money totaling approximately $500,000 from the Yellow Cake Transaction.

37.     Vargas and Torres are informed and believe that Chavez Sr., and Chavez Jr., engaged in other schemes, yet undiscovered at time of this complaint to secretly misappropriate partnership funds belonging to the original LOS ORIGINALES Band.

**E.     The LOS ORIGINALES Trademarks**

38.     Without the knowledge of Vargas or Torres, Chavez Sr. applied for and was granted two trademark registrations for the LOS ORIGINALES DE SAN JUAN trademarks, one a standard character mark (U.S. Reg. No. 3,598,263, registered March 31, 2009) and one a combination word/design mark (U.S. Reg. No. 3,598,310, also registered March 31, 2009; together, the "LOS ORIGINALES Marks").  True and correct copies of the file histories for the LOS ORIGINALES Marks are attached collectively hereto as **<u>Exhibit 3</u>**.

39.     The registrations were granted to Chavez Sr. as the sole registrant, even though Chavez Sr. knew that the LOS ORIGINALES Marks were also jointly owned

by Vargas, Torres and Humberto because the Los Originales Band was formed jointly, all were original band members, and all had created and agreed on the name "Los Originales de San Juan."

40.    Torres and Vargas have used the LOS ORIGINALES Marks in U.S. commerce in connection with audio and video recordings and live appearances and performances since June 1, 1991, and because of this use, consumers in the United States have come to associate the LOS ORIGINALES Marks with the original Los Originales Band, and the original band members, including Torres and Vargas. Thus, Torres and Vargas have common law rights in the LOS ORIGINALES Marks.

41.    Pursuant to respectively, the Torres 360 Agreement and the Vargas 360 Agreement, Torres and Vargas granted to Hyphy the rights to use, exploit, publish and exhibit Torres and Vargas' names, fictitious names, and trademarks, including but not limited to, the LOS ORIGINALES Marks.

**F.    Registration of the LOS ORIGINALES Marks Was Procured Based on Fraud**

42.    In each of Chavez Sr.'s applications for registration for the LOS ORIGINALES Marks, Chavez Sr. declared as follows:

> The undersigned, being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. Section 1001, and that such willful false statements, and the like, may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application on behalf of the applicant; *he/she believes the applicant to be the owner of the trademark/service mark sought to be registered… to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive*; and that all statements made of his/her own knowledge are true; and that all statements made on information and belief are believed to be true. (Emphasis added.)

43.    The representations in Chavez Sr.'s trademark applications were false at the time Respondent made the representations, because Respondent knew that

Vargas and Torres, as founding members and joint owners of the LOS ORIGINALES Marks, also had the right to use the mark in commerce, yet Chavez Sr. declared in the applications that "no other person… has the right to use the mark in commerce…"

44.     Chavez Sr. knew that Vargas and Torres had the right to use the mark in commerce at the time Respondent executed the declarations in the applications and, as such, Chavez Sr. knew the representations were false at the time the representations were made.

45.     As evidenced by Chavez Sr.'s knowledge of Vargas and Torres' joint ownership of the LOS ORIGINALES' Marks, Chavez Sr. made the representation to mislead the USPTO and to cause the USPTO to issue the registrations solely in the name of Chavez Sr.

46.     The false representations described above were material because, but for the false representations, the USPTO would not have granted the registrations in the LOS ORIGINALES Marks solely to Chavez Sr.

**G.     Chavez Sr. Attempts to Preclude Torres and Vargas from Using the LOS ORIGINALES Marks**

47.     On or around February 2022, a disagreement arose between Torres, Vargas, and Chavez Sr., concerning a replacement for lead vocalist Chaves Sr., who could no longer continue due to ill health. Chavez Sr. suggested that Chavez Jr. succeed him as the lead vocalist of the Band, but Torres and Vargas declined to accept Chavez Jr. as the new lead vocalist.  Instead, Torres and Vargas opted to continue with another new lead vocalist. Shortly after the disagreement, Vargas and Torres discovered that Chavez Sr. had registered the LOS ORIGINALES Marks, solely in his own name, thereby attempting to preclude Vargas and Torres from utilizing the LOS ORIGINALES Marks to their own benefit.

48.     On March 2, 2022, Vargas received a letter from counsel for Chavez Sr. asserting Chavez Sr.'s exclusive rights in the LOS ORIGINALES Marks, including

Chavez Sr.'s registrations for the LOS ORIGINALES Marks, and demanding that Torres and Vargas cease use of the Marks based on these alleged rights.  In the letter, Chavez Sr. threatened to take further action against Vargas and others acting in concert with Vargas to collect compensatory and punitive damages, profits, procure an injunction, attorneys' fees, and costs, if Vargas and others acting in concert with Vargas did not discontinue use of the LOS ORIGINALES Marks.

49.     From about August 2022 to the present time, Defendants, P. Chavez and Garcia, on behalf of Chavez Sr., have contacted and threatened action against venues in this judicial district and around the United States in attempts to interfere with, and disrupt the business relationship between the owners of those venues, and Torres, and Vargas by demanding that the owners of those venues cancel scheduled performances with Torres and Vargas and refrain from doing business with Torres and Vargas based on Chavez Sr's alleged rights in the LOS ORIGINALES Marks.

50.     Garcia on behalf of Chavez Sr. has and continues to engage in a smear campaign in this judicial district and around the United States in attempts to intentionally disrupt the business relationship between owners of venues and Torres and Vargas by sending threatening letters to Torres, Vargas, and venue owners and leaving false and negative comments on the social media pages of Vargas and Torres with a view of obstructing any economic benefit due to Torres and Vargas based on Chavez Sr's alleged rights in the LOS ORIGINALES Marks.

51.     Chavez Sr.'s threats and demands and the actions of P. Chavez and Garcia are interfering with Torres and Vargas' use of and right to use the LOS ORIGINALES Marks, and Chavez Sr. and the other Defendants are continuing to profit from the use of the LOS ORIGINALES Marks, without compensation to and to the detriment of Plaintiffs.  Therefore, Plaintiffs have a real interest in seeking rectification of the registrations of the LOS ORIGINALES Marks and have entitlement to a statutory cause of action to bring this action.

///

**H.   Defendants' False Advertising**

52.   Subsequently, Plaintiffs discovered that Defendants were advertising and promoting the Los Originales Band using the LOS ORIGINALES Marks with new band members in place of Vargas and Torres. The new advertisements, however, do not just replace Vargas and Torres in advertisements using the LOS ORIGINALES Marks for new songs, recordings, or live performances by the members of the new band but, instead, use altered graphics and/or images to remove Vargas and Torres from advertisements promoting previous recordings and/or live performances in which Vargas and Torres were featured artists, replacing them with new band members that were not performers on the recordings and/or in the live shows in the advertisements.

53.   For example, advertisements published by Defendants for an album recorded in 2014 by the Los Originales Band, "50 Mentadas," on which Vargas and Torres were featured artists, no longer show Vargas and Torres, but instead show new members that did not perform on the 50 Mentadas album in 2014.  Attached hereto as **Exhibit 4** is a true and correct copy of the original advertisement for the 50 Mentadas record album correctly showing images of Torres and Vargas as contributors to the album.  Also attached hereto as **Exhibit 5** is a true and correct copy of the altered advertisement with images replacing the images of Torres and Vargas.

54.   The altered images/advertisements used by Defendants to promote the Los Originales Band and recordings using the LOS ORGINALES Marks are intentionally designed to deceive the consuming public into believing that the new band members were the original members, which is not the case to the detriment of Plaintiffs.

55.   Unless Defendants actions are enjoined by this Court, Plaintiffs have been and will continued to be harmed because such advertisements deceive the consuming public into believing that Torres and Vargas are not original Los

Originales Band members and decrease the value of Torres and Vargas' names, images, and likenesses to Plaintiffs' detriment.

## COUNT ONE

For False Advertising Under 15 U.S.C. § 1125(a)(1)(B)

(Against Yellowcake, Colonize, Berger, Hernandez, Chavez Sr., and Chavez Jr.)

56. Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 51 as if fully set forth herein.

57. Defendants' false advertisements on websites, in social media and/or print incorrectly omit Torres and Vargas as part of the original band and replace their images with images of other individuals who are not original members of the Los Originales Band. Defendants' wrongful altering of the images of the Los Orginales Band is likely to cause confusion, mistake, and deception among the consuming public as to what members were in the original Los Originales Band.

58. Defendants knowingly or recklessly misrepresented the original band members of the Los Originales Band thereby preventing Plaintiffs from capitalizing on the fact that Torres and Vargas were members of the original Los Originales Band.

59. Defendants' advertising is aimed at an audience, a substantial number of them being actual and potential consumers of Plaintiffs' musical recordings and live performances in the United States and beyond and has and will continue to deceive a substantial segment of potential consumers.

60. The deception is material because it has and is likely to continue to influence consumers' purchasing decisions and has and is likely to continue to cause diminished support and reduced business opportunities for Plaintiffs with consumers and potential business partners.

61. Defendants' false advertising has injured and is likely to continue to injure Plaintiffs, and as a result, Plaintiffs are entitled to monetary damages and injunctive relief.

1

<u>**COUNT TWO**</u>

2

For Rectification of the Registrations of the LOS ORIGINALES Marks

3

(Against Chavez, Sr.)

4

62.     Plaintiffs reallege and incorporate by reference the allegations set forth

5

in paragraphs 1 through 57 as if fully set forth herein.

6

63.     The LOS ORIGINALES Marks were procured based on fraud because

7

Chavez Sr. knowingly and intentionally indicated to the U.S. Patent and Trademark

8

Office ("USPTO") in his trademark applications that he was the sole owner of the

9

LOS ORIGINALES Marks when he knew such statement was false.

10

64.     Chavez Sr. made the false representations to fraudulently obtain

11

registrations for the LOS ORIGINALES Marks in his sole name, and to preclude

12

Torres and Vargas from rightfully using the marks in commerce.

13

65.     Registration of the LOS ORIGINALES Marks solely in Chavez Sr.

14

name is causing damage to Plaintiffs because Defendants' threats and demands are

15

interfering with Torres and Vargas' use of and right to use the LOS ORIGINALES

16

Marks, and Chavez Sr. and the other Defendants are continuing to profit from the use

17

of the LOS ORIGINALES Marks.

18

66.     Pursuant to 15 U.S.C. § 1119, this Court should rectify the register with

19

respect to ownership of the LOS ORIGINALES Marks to show that the LOS

20

ORIGINALES Marks are owned jointly by Chavez Sr., Torres, Vargas and

21

Humberto.

22

<u>**COUNT THREE**</u>

23

For Unfair Competition Under California Business and

24

Professions Code §§17200 et seq.

25

(Against All Defendants)

26

67.     Plaintiffs reallege and incorporate by reference the allegations set forth

27

in paragraphs 1 through 62.

28

68.     California Business and Professions §§ 17200 et seq. prohibits any

unlawful, unfair, or fraudulent business acts or practices.

69.     The actions of Defendants, and each of them, in falsely representing the members of the original Los Originales Band constitutes "unlawful, unfair or fraudulent business acts[s] or practice[s] and unfair, deceptive, untrue or misleading advertising" within the meaning of California Business and Professions Code §§ 17200 et seq.

70.     Upon information and belief, the actions of Defendants in knowingly, surreptitiously, and unlawfully removing Vargas and Torres images from the original Los Originales Band advertisements and promotions, and using the altered advertisements/promotions constitutes unfair and/or fraudulent business practices under California Business and Professions Code §§ 17200 et seq.

71.     As a result of Defendants' unlawful business practices, Plaintiffs have suffered monetary damages and injury and are entitled to monetary compensation and injunctive relief.

72.     If Defendants' unlawful business practices continue, Plaintiffs will suffer irreparable harm, and thus, Plaintiffs are entitled to an injunction.

## **COUNT FOUR**

For False Advertising Under California Business Code §§17500

(Against Yellowcake, Colonize, Berger, Hernandez, Chavez Sr., and Chavez Jr.)

73.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 68.

74.     Defendants' advertisements promoting previously-recorded live performances of the original Los Originales Band, which live performances included Vargas and Torres, but removing Vargas and Torres' images and inserting new band members' images deceive consumers into believing, falsely, that the defendant band members were all original members and Vargas and Torres were never members of the Los Originales Band.

///

75.   Defendants use of false advertising through Internet website(s), social media pages and/or printed flyers and promotions that remove the images of Vargas and Torres to legitimize the new band members as the real/original Los Originales Band constitutes false and deceptive advertising pursuant to Business and Professions Code § 17500.

76.   Defendants false advertising has resulted declining revenues for Plaintiffs in the form of reduced ticket sales and revenues.

## COUNT FIVE

For Intentional Interference with Prospective Business Advantage

(Against All Defendants)

77.   Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 72.

78.   Plaintiffs had a high probability of future business opportunities and economic benefit in connection with both (a) its relationship with consumers; and (b) its relationship with other sellers, online platforms, and musical venues for live performances of previously recorded works.

79.   Defendants had knowledge of such opportunities, and by using the false and deceptive advertising described herein intended to and did intentionally interfere with and disrupt Plaintiffs' opportunities in violation of federal and state law.

80.   Defendants knew that their conduct was certain or substantially certain to disrupt Plaintiffs relationships with consumers, sellers, online platforms and musical venues.

81.   Defendants committed these tortious acts with deliberate and actual malice, ill-will and oppression in conscious disregard of Plaintiffs' rights.

82.   Defendants' actions have disrupted Plaintiff's relationship with its customers and other sellers, online platforms, and musical venues thereby causing Plaintiffs to receive reduced revenues from its recordings and live performances.

///

**COUNT SIX**

For Breach of Fiduciary Duty in Violation of California

Corporations Code §§16401 et seq.

(Against Chavez Sr.)

83.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 78.

84.     As an original member of the Los Originales band, Chavez Sr. defendant was in a general partnership with Torres and Vargas.

85.     As general partner, Chavez Sr. owed Torres, Vargas, and The Los Originales Band certain fiduciary duties including: a duty of loyalty and a duty of care in dealing with Band matters.

86.     Chavez Sr. had the duty to account to the partnership and hold as trustee for the Los Originales Band any property, profit, or benefit derived by him in the conduct of partnership business or derived from a use by him of partnership property or information, including the appropriation of a partnership opportunity.

87.     Chavez Sr.'s fiduciary duties to the Band required that he discharge his duties to the partnership and the other partners consistently with the obligation of good faith and fair dealing.

88.     Chavez Sr.'s false representation to SoundExchange that he was the sole performer on the recordings and his eventual receipt of all the performance royalties generated by the Band from SoundExchange violated the duty of loyalty, the duty of care, and the obligation to act in good faith and deal fairly with Vargas and Torres.

89.     Chavez Sr.'s business transaction with Yellow Cake, Colonize Media, and Kevin Berger was an attempt to (1) seize control of the Band's business assets without the knowledge and consent of Torres and Vargas; (2) block and/or delay general partnership distributions to which Torres and Vargas were entitled and (3) divert business assets to Chavez's Sr.'s personal accounts. All three acts violated

the duty of loyalty, duty of care, and the obligation to act in good faith and deal fairly with Vargas and Torres.

90.     Chavez Sr.'s breach of fiduciary duties has caused Torres and Vargas to suffer damages.

## COUNT SEVEN

### For Aiding and Abetting Breach of Fiduciary Duty

### (Against Chavez Jr.)

91.     Plaintiffs reallege and incorporate by reference the allegations set forth in paragraphs 1 through 86.

92.      As set forth above, Chavez Sr. owed Torres and Vargas a fiduciary duty.

93.     By virtue of the close familial and business relationship between Chavez Sr. and Chavez Jr., Chavez Jr. had actual knowledge that the original Los Originales Band had four members, and that Chavez Sr. was violating his fiduciary duties to the other members when Chavez Sr. entered into the business deal with Yellow Cake on his own accord and without the knowledge and consent of the other Band members.

94.     Chavez Jr. provided substantial assistance and encouragement to Chavez Sr. by acting as an agent for Chavez Sr. in brokering the business deal with Yellow Cake, Colonize Media, and/or Kevin Berger.

95.     Chavez Jr.'s actions in providing substantial assistance to the Chavez Sr. was a substantial factor in causing Torres and Vargas to suffer damages.

## COUNT EIGHT

### For Money Had and Received

### (Against Chavez Sr. and Chavez Jr.)

96.     Plaintiff reallege and incorporate by reference the allegations set forth in paragraphs 1 through 91.

97.     Chavez Sr. received 100% of the performance royalties from

SoundExchange, and the royalties received should have been for the benefit of the performing band members of the Los Originales Band.

98.    Chavez Sr. failed to account to or pay Vargas or Torres their equal share of such royalties and/or use such royalties for the benefit of Vargas or Torres.

99.    Plaintiffs and informed and believe that Chavez Sr. and Chavez Jr. received money from the Yellow Cake Transaction that should have been for the benefit of Vargas and Torres.

100.   Chavez Sr. and Chavez Jr. did not account to or pay Vargas or Torres their equal share of the monies received from the Yellow Cake transaction.

101.   The money received from the Yellow Cake transaction was not remitted to or used for the benefit of Vargas and Torres.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray for judgment as follows:

### **On the First Count**

1.    For actual and compensatory damages in an amount according to proof at trial;

2.    For Defendants' profits;

3.    For exemplary and punitive damages;

4.    For issuance of a preliminary and permanent injunction barring Defendants from (i) advertising, promoting, offering tickets to and/or conducting live performances;

5.    For reasonable attorney's fees.

### **On the Second Count**

1.    For an order that the Director of the USPTO rectify the registrations of the LOS ORIGINALES Marks to show correctly that the LOS ORIGINALES Marks are owned by Chavez Sr., Torres, and Vargas.

### **On the Third Count**

1.    For actual and compensatory damages according to proof at trial;

1    2.    For Defendants' profits;

2    3.    For issuance of a preliminary and permanent injunction barring

3  Defendants from (i) falsely advertising that the original Los Originales Band did not

4  include Torres or Vargas, (ii) from altering photographs, advertisements and/or other

5  marketing and promotional materials to remove Torres and Vargas from the

6  recordings and/or live performances for which they performed; and (iii) from

7  representing that the LOS ORIGINALES Marks are solely owned by Chavez, Sr.

8  and/or that the LOS ORIGINALES Marks are not co-owned by Torres and Vargas.

9                        **On the Fourth Count**

10   1.    For actual and compensatory damages for advertising by Plaintiffs

11  necessary to respond to Defendants' false advertising; and

12   2.    For issuance of a preliminary and permanent injunction barring

13  Defendants from (i) falsely advertising that the original Los Originales Band did not

14  include Torres or Vargas, (ii) from altering photographs, advertisements and/or other

15  marketing and promotional materials to remove Torres and Vargas from the

16  recordings and/or live performances for which they performed; and (iii) from

17  representing that the LOS ORIGINALES Marks are solely owned by Chavez, Sr.

18  and/or that the LOS ORIGINALES Marks are not co-owned by Torres and Vargas.

19                        **On the Fifth Count**

20   1.    For lost profits;

21   2.    For punitive damages;

22   3.    For attorney's fees; and

23   4.    For a temporary restraining order, preliminary injunction and permanent

24  injunction preventing Defendants from (i) falsely advertising that the original Los

25  Originales Band did not include Torres or Vargas to unfairly compete against

26  Plaintiffs; (ii) from altering photographs, advertisements and/or other marketing and

27  promotional materials to remove Torres and Vargas from the recordings and/or live

28  performances for which they performed; and (iii) from representing that the LOS

ORIGINALES Marks are solely owned by Chavez, Sr. and/or that the LOS ORIGINALES Marks are not co-owned by Torres and Vargas.

## On the Sixth Count

1.    For actual and compensatory damages in an amount according to proof at trial;

2.    For exemplary and punitive damages; and

3.    For an accounting of all revenues earned by the Band.

## On the Seventh Count

1.    For actual and compensatory damages in an amount according to proof at trial; and

2.    For punitive damages.

## On the Eight Count

1.    For restitution.

## On All Counts

1.    For interest thereon at the legal rate from the date such damages accrued;

2.    For costs of suit herein; and

3.    For such other and further relief as this Court deems just and proper.

DATED: May 3, 2023                    COLEMAN & HOROWITT, LLP

By:   /s/ Sherrie M. Flynn
SHERRIE M. FLYNN
AISHA O. OTORI
Attorneys for Plaintiffs,
HYPHY MUSIC INC.;
DOMINGO TORRES and
ALFONSO VARGAS

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2

Plaintiffs hereby demand a trial by jury.

3

DATED: May 3, 2023                    COLEMAN & HOROWITT, LLP

4

5

By: __/s/ Sherrie M Flynn__

6

SHERRIE M. FLYNN
AISHA O. OTORI

7

Attorneys for Plaintiffs,
HYPHY MUSIC INC.,

8

DOMINGO TORRES and
ALFONSO VARGAS

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

# CONTRATO DE GRABACIÓN 360 CON MÚLTIPLES DERECHOS EXCLUSIVOS

Se celebra este Contrato (el "CONTRATO") el día _10/12/22_ entre Hyphy Music, Inc., con domicilio en 2727 N. Grove Industrial Drive, #155, Fresno, California 92727 (en lo sucesivo, la "EMPRESA"), y _Domingo Torres_ (individual y colectivamente profesionalmente conocidos como "_Los originales de San Juan_", localizados _2378 Lorena Ave Singer CA_ (referidos individual y colectivamente de aquí en adelante como "ARTISTA") con respecto a la prestación exclusiva de los servicios de entretenimiento del ARTISTA (los "SERVICIOS DE ENTRETENIMIENTO") a la EMPRESA por parte del ARTISTA.

## 1. CONTRATACIÓN

### A. SERVICIOS DE GRABACIÓN

Por medio del presente, la EMPRESA contrata al ARTISTA para la prestación exclusiva de servicios a la EMPRESA como intérprete musical en la realización de Grabaciones Originales (el "MÁSTER") y el ARTISTA acepta por el presente dicha contratación y conviene en prestar tales servicios en forma exclusiva a la EMPRESA dentro del territorio durante la vigencia de este CONTRATO y de todas las prórrogas y renovaciones del mismo.

### B. VALOR DE LA MARCA

(1) Por este medio, el ARTISTA contrata a la EMPRESA para que (1) proporcione diversos servicios de desarrollo de imagen de marca, por ejemplo y de manera enunciativa, desarrollo de artistas y productos, relaciones públicas y promoción en prensa, radio, medios en línea, medios digitales, medios sociales y televisión, y producción de videos musicales; y para que (2) efectúe su mayor esfuerzo por participar y apoyar el tipo de actividades necesarias para el avance de la carrera del ARTISTA en la industria del entretenimiento.

(2) Por este medio, la EMPRESA acepta dicha contratación a cambio de que el ARTISTA otorgue y ceda a la EMPRESA un porcentaje, según se defina acá, de los ingresos de o surgidos por o en relación con cualquiera de las actividades del ARTISTA en la industria del entretenimiento, incluyendo sin limitación las siguientes actividades (colectivamente denominadas "ACTIVIDADES CUBIERTAS"): (A) edición de música, (B) contrataciones para giras y presentaciones en vivo, (C) servicios del ARTISTA (o de cualquiera de sus integrantes) como actor o intérprete (en cualquier medio, incluyendo sin limitación, cine, televisión, cable, digital, internet, IP TV), (D) uso del nombre o la imagen del ARTISTA (o del nombre e imagen de cualquiera de sus integrantes) y similares o de logotipos en la mercancía (excepto discos) y (E) respaldos, patrocinios, apariciones y alianzas estratégicas, como se establecen en el presente contrato.

1

**C.   TERRITORIO**

Los derechos aquí conferidos a la EMPRESA y las obligaciones del ARTISTA tendrán validez en el Universo (el "TERRITORIO").

**D.   VIGENCIA**

(1) La VIGENCIA de este CONTRATO será por un período inicial de un (1) año a partir de la fecha del presente ("PERÍODO INICIAL"). Por este medio, el ARTISTA otorga a la EMPRESA seis (6) opciones consecutivas independientes para prolongar esta vigencia por períodos adicionales de un (1) año cada uno ("PERIODOS OPTATIVOS"), cada uno se regirá por términos y condiciones iguales a los aplicables al PERÍODO INICIAL, salvo que en lo sucesivo se estipule algo distinto. El PERÍODO INICIAL y cada PERÍODO OPTATIVO ejercido por la EMPRESA se denominarán ocasionalmente en lo sucesivo de manera conjunta como "VIGENCIA".

(2) Cada período optativo se ejercerá, si fuera el caso, mediante el envío al ARTISTA de una notificación en cualquier momento antes de la fecha en que expiraría el período de VIGENCIA.

No obstante, si la EMPRESA no ejerce la opción de prórroga de la vigencia de manera oportuna, la EMPRESA igualmente tendrá el derecho de ejercerla, a menos que el ARTISTA entregue a la EMPRESA una notificación por escrito de falta de ejercicio del período optativo y que, luego de eso, la EMPRESA no la ejerza dentro de los treinta (30) días hábiles siguientes al recibo de dicha notificación.

2.   **SERVICIOS DE GRABACIÓN**

**A.   COMPROMISOS DE GRABACIÓN**

(1)   Durante el PERÍODO INICIAL, el ARTISTA en su conjunto grabará y entregará a la EMPRESA suficientes grabaciones sonoras originales (el "máster") equivalentes a un mínimo de un (1) álbum con un máximo de dos (2) álbumes de larga duración (el "ÁLBUM"), donde cada Álbum incluirá al menos 30 minutos en tiempo de reproducción y contendrá al menos diez (10) composiciones musicales consonantes con el estilo y la forma de los máster grabados previamente por el ARTISTA.

(2)   Durante cada PERÍODO OPTATIVO, el ARTISTA en su conjunto grabará y entregará a la EMPRESA suficientes máster equivalentes a un mínimo de un (1) álbum con un máximo de dos (2) álbumes de larga duración (el "ÁLBUM") donde cada Álbum incluirá al menos 30 minutos en tiempo de reproducción y contendrá al menos diez (10) composiciones musicales, las que incluirán Composiciones no grabadas hasta ese entonces por el ARTISTA (el "ÁLBUM") y serán consonantes con el estilo y la forma de los máster grabados previamente por el ARTISTA.

2

(3)    El primer Álbum que se requiera entregar durante el PERÍODO INICIAL será entregado dentro de los sesenta (60) días siguientes a la respectiva solicitud de la EMPRESA. Los Álbumes adicionales que se requieren entregar durante cualquier PERÍODO OPTATIVO serán entregados a la EMPRESA dentro de los sesenta (60) días siguientes a la respectiva solicitud de la EMPRESA. Se entiende que el ARTISTA no entregará ningún Álbum dentro de los nueve (9) meses siguientes a la fecha de entrega del Álbum anterior. No obstante cualquier disposición de este CONTRATO que indique lo contrario, la EMPRESA contará con al menos sesenta (60) días tras la fecha de entrega del ARTISTA y de aceptación de la EMPRESA, de conformidad con la totalidad de los términos y las condiciones de este CONTRATO, para ejercer la opción de prórroga de la VIGENCIA inmediatamente siguiente, en virtud del párrafo D de la Sección 1 del presente, y todos los Períodos posteriores se considerarán prorrogados de manera acorde.

(4)    Los MÁSTER que abarquen cada Álbum que requiere ser grabado y entregado en virtud del presente se denominarán ocasionalmente "Primer Álbum", "Segundo Álbum", "Tercer Álbum", "Cuarto Álbum" y "Quinto Álbum", respectivamente, en lo sucesivo de acuerdo con el orden en que sean aceptados por la EMPRESA en virtud de este CONTRATO.

B.    **PRESUPUESTO DE GRABACIÓN:**

(1)    Con respecto al primer ÁLBUM que se debe entregar conforme al PERÍODO INICIAL y a cada ÁLBUM Comprometido tras la entrega del primer ÁLBUM, la **EMPRESA** y el ARTISTA se reunirán y prepararán un presupuesto de grabación (el "PRESUPUESTO"). La EMPRESA dará la aprobación definitiva al PRESUPUESTO. La EMPRESA contratará los servicios de todo el personal necesario y procurará todo el equipo y los demás servicios necesarios en relación con la grabación de los MÁSTER que se van a producir en virtud del presente. No obstante, la EMPRESA puede autorizar al ARTISTA a que incurra en costos asociados con la grabación de uno o más MÁSTER. Sin embargo, el ARTISTA no incurrirá en ningún costo asociado con el o los MÁSTER, a menos que la EMPRESA apruebe los costos respectivos. Todos los Costos de Grabación aprobados (según se define dicho término más adelante) los pagará la EMPRESA, con arreglo a las disposiciones de la sección 3 del párrafo B (2) siguiente.

(2)    Si el ARTISTA incurre de manera directa en algún costo pre-aprobado en relación con el o los MÁSTER, el ARTISTA entregará o gestionará que se entreguen a la EMPRESA copias de cada factura, recibo, comprobante y prueba documental probatoria similar que acredite los Costos de Grabación y si el ARTISTA no lo hace, se suspenderá la obligación de la EMPRESA de pagar tales costos hasta que ocurra dicha entrega. En la medida en que alguno de los Costos de Grabación asociados con cualquier MÁSTER que se produzca en virtud del presente sea superior al PRESUPUESTO respectivo aprobado, el ARTISTA será el único responsable de pagar por tales costos en exceso. Ningún contenido de este CONTRATO obligará a la EMPRESA a permitir la continuación de alguna sesión de grabación si la EMPRESA prevé en forma razonable que los Costos de Grabación asociados serán superiores a los especificados en el PRESUPUESTO aprobado o que los MÁSTER que se están grabando no serán satisfactorios para la EMPRESA en un sentido técnico y comercial. Si la EMPRESA, por libre albedrío, paga alguno de tales costos en exceso (sin que la EMPRESA tenga obligación de hacerlo), el ARTISTA le reembolsará a la EMPRESA a pedido con prontitud. Aún más, la EMPRESA no tendrá obligación alguna de pagar (i) ningún costo de grabación con respecto a cualquier MÁSTER que no se grabe de conformidad

3

con la totalidad de los términos y las condiciones de este CONTRATO, (ii) ningún cargo de grabación o cargo de arreglos que supere el arancel sindical, a menos que el PRESUPUESTO propuesto y aprobado por la EMPRESA especifique tal exceso y el beneficiario propuesto del mismo ni (iii) sanciones, multas, cargos por demora u otros costos incurridos debido al pago tardío de los costos de grabación, si dicho (s) pago (s) tardío (s) no es (son) culpa de la EMPRESA. Si la EMPRESA paga algún costo o cargo descrito en el párrafo anterior (sin que la EMPRESA tenga obligación de hacerlo), se considerará que el ARTISTA será responsable de los costos o cánones pagados de este modo por la EMPRESA y el ARTISTA le reembolsará a la EMPRESA a pedido con prontitud. A elección de la EMPRESA y sin por ello restringir los demás derechos o recursos de la EMPRESA, cualquier suma pagada por la EMPRESA y no reembolsada por el ARTISTA en forma puntual según lo estipulado en el párrafo B (2) de esta Sección puede ser descontada por la EMPRESA a cualquier regalía o a otras sumas pagaderas al ARTISTA de acuerdo con este Contrato.

(3)    Los **"COSTOS DE GRABACIÓN"** se considerarán como Anticipos para fines de este Contrato y abarcarán todos los costos incurridos con respecto a la producción de los MÁSTER que recogen las presentaciones del ARTISTA, incluidas las grabaciones audiovisuales, y que se suelen reconocer como Costos de Grabación en la industria fonográfica, tales como todos los gastos incurridos en relación con la producción, mezcla y masterización de máster sonoros o visuales y todos los pagos o anticipos realizados al ARTISTA en virtud del presente, así como los pagos a todos los músicos (incluyendo sin limitación, instrumentistas, líderes, arreglistas, orquestadores, copistas y contratistas), vocalistas y productores, si los hay, que presten servicios asociados a cualquier grabación en virtud del presente, pagos a los fondos sindicales de pensión y bienestar, costos de traslado y contratación de instrumentos, alquiler de estudios o salas, costos de edición, impuestos sobre la nómina y otros pagos a terceros en nombre del ARTISTA que se relacionen con costos de grabación, honorarios de productores externos o ARTISTAS secundarios, gastos de repetición o licencia de muestreo y los demás gastos razonables en que incurra la EMPRESA al producir los MÁSTER; los costos, impuestos o pagos a terceros en relación con la producción de los MÁSTER producidos según este CONTRATO.

C.    **PRODUCCIÓN DE DISCOS**

(1)    Los MÁSTER grabados por el ARTISTA en virtud del presente se grabarán en un estudio de grabación seleccionado por la EMPRESA en los horarios en que el ARTISTA y la EMPRESA designen o aprueben por mutuo acuerdo. Cada MÁSTER que se entregue en virtud del presente constará de las interpretaciones del ARTISTA para el material seleccionado por el ARTISTA y la EMPRESA, grabadas recientemente en un estudio y no grabadas previamente por el ARTISTA. Cada MÁSTER estará condicionado a la aprobación de la EMPRESA como comercialmente satisfactorio. El ARTISTA le entregará a la EMPRESA un máster estéreo con dos pistas de cada MÁSTER. Cada MÁSTER será terminado, editado y mezclado en forma total antes de su entrega a la EMPRESA de un modo adecuado para la producción de las partes necesarias para fabricar y distribuir digitalmente discos comerciales. Cuando así lo solicite la EMPRESA, el ARTISTA volverá a grabar cualquier selección, hasta generar un MÁSTER comercialmente satisfactorio. Cada MÁSTER será entregado a la EMPRESA en el lugar designado o aprobado por la EMPRESA. La EMPRESA aprueba sus propias oficinas en San Jose, California, para la entrega de los MÁSTER en virtud del presente.

4

(2)    Si el ARTISTA no asiste a alguna sesión de grabación de la cual se haya avisado al ARTISTA por escrito, por cualquier motivo, sin que el ARTISTA notifique a la EMPRESA con cuarenta y ocho (48) horas de anticipación su incapacidad para presentarse según lo previsto, entonces el ARTISTA será personalmente responsable de restituir a la EMPRESA en un plazo de treinta (30) días desde el envío de la factura el costo en que incurriera la EMPRESA debido a la ausencia sin aviso del ARTISTA.

## D.    MATERIAL GRÁFICO:

La EMPRESA será propietaria de los derechos de autor de todo el material gráfico creado para e incorporado en los envoltorios de los Productos Audiovisuales del ARTISTA que se lancen en virtud del presente Contrato o que use la EMPRESA en los materiales de comercialización o promoción ("MATERIAL GRÁFICO"). Todos los costos de preparación de dicho MATERIAL GRÁFICO o todos los costos pagados por la EMPRESA por concepto de preparación y derechos del MATERIAL GRÁFICO se considerarán como Adelantos, según lo establece el presente contrato. La EMPRESA conviene en consultar con el ARTISTA con respecto a la preparación del MATERIAL GRÁFICO. El ARTISTA deberá aprobar el MATERIAL GRÁFICO. Sin embargo, en caso de desacuerdos, prevalecerá la decisión de la EMPRESA.

## E.    DERECHOS AUDIOVISUALES:

Durante la VIGENCIA del presente, la EMPRESA tendrá el derecho mundial exclusivo de producción, fabricación y distribución de los programas audiovisuales y videos ("VIDEOS") del ARTISTA con fines comerciales o promocionales, lo cual incluye cualquier venta comercial u otra explotación comercial de los llamados Videos extendidos, así como el derecho mundial exclusivo de autorizar que otros produzcan, fabriquen y distribuyan Videos. Todos los costos de grabación y producción incurridos en forma directa o indirecta con respecto a la creación de VIDEOS deberán ser aprobados y pagados por la EMPRESA y se considerarán como Adelantos, según lo establece el presente contrato. El ARTISTA otorga a la EMPRESA una licencia de sincronización por el derecho a utilizar cualquier composición controlada en un VIDEO y renuncia al derecho de ser pagado una cuota de sincronización separada para el uso de la Composición Controlada incorporada en un VIDEO así como a cualquier licencia mecánica por la distribución y venta del Video.

## F.    LICENCIA MECÁNICA:

Por este medio se autoriza perpetuamente a la EMPRESA a utilizar bajo licencia la totalidad de las composiciones o los materiales musicales que se graben en virtud de este CONTRATO o "Composiciones Controladas", según este documento (composiciones o materiales musicales que escriba o componga en forma integral o parcial el ARTISTA o que pertenezcan o estén bajo el control directo o indirecto del ARTISTA o de cualquier productor de un MÁSTER supeditado) que aparezcan en los MÁSTER y que se lancen en Productos de Audio en virtud del presente, autorización de uso bajo licencia que se confiere a la EMPRESA dentro del

TERRITORIO y con respecto a las Composiciones Controladas que aparecen en los Productos de Audio que edita la EMPRESA. La EMPRESA será responsable de pagar todas las regalías mecánicas que se adeuden a terceros por concepto de composición (la "Composición"), incluidos los coautores de Composiciones Controladas de autoría compartida, y el pago de tales regalías mecánicas se considerará como un Gasto. El ARTISTA conviene en no grabar ninguna Composición Controlada o Composición ya grabada y entregada a la EMPRESA en virtud del presente durante cinco (5) años a contar de la fecha de término de este contrato.

G.  **PROPIEDAD DE LOS DERECHOS DE AUTOR**

(1)  Durante la VIGENCIA, todos los MÁSTER grabados y entregados por el ARTISTA y cualquier VIDEO como los descritos en este documento, a contar del inicio de su grabación, al igual que todas las reproducciones derivadas de los mismos, junto con las interpretaciones incluidas en ellos, se considerarán como obra "ejecutada por contrato" para la EMPRESA desde el comienzo de su creación, conforme a lo definido en la Ley de Derechos de Autor de los Estados Unidos. Si se determina que un MÁSTER o un VIDEO en particular no corresponde a esto, entonces se considerará que se cede y se transfiere de manera irrevocable a la EMPRESA por medio de este CONTRATO tal MÁSTER o tal VIDEO, junto con todos los derechos de los mismos (incluidos los derechos de autor de la grabación sonora y los derechos de autor del Audio y el Vídeo y todos los derechos de renovación). Desde el principio de su creación o entrega, todos los MÁSTER y Videos que se produzcan en virtud del presente serán por completo de propiedad de la EMPRESA en perpetuidad en todo el mundo y estarán exentos de toda reclamación del ARTISTA o de cualquier persona que derive derechos o intereses del o a través del Productor. Sin limitar la generalidad de lo antedicho, la EMPRESA y los licenciatarios y designados de la EMPRESA tendrán el derecho único y exclusivo a perpetuidad y en todo el mundo de:

(2)  Sin limitar la generalidad de lo antedicho, la EMPRESA y los licenciatarios y designados de la EMPRESA tendrán el derecho único y exclusivo a perpetuidad y en todo el mundo de:

(i)  fabricar, publicitar, vender, autorizar bajo licencia, distribuir o disponer de otro modo de los MÁSTER, VIDEOS y discos derivados de los mismos en alguno o todos los campos de uso por cualquier método o medio que se conozca ahora o en el futuro, así como de discos que contengan los MÁSTER regulados por el presente documento, todo lo anterior según los términos y las condiciones que elija la EMPRESA o, a su criterio, decida abstenerse de esto;

(ii)  alterar, cambiar, modificar o editar cualquiera de los MÁSTER, VIDEOS y la totalidad de los discos y las reproducciones de los mismos. No obstante lo anterior,

6



(iii)   lanzar discos y VIDEOS que incluyan las interpretaciones que se grabarán en virtud del presente con cualquier nombre, marca registrada o EMPRESA que elijan de manera periódica la EMPRESA o las sociedades subsidiarias, las filiales o los licenciatarios de la EMPRESA.

(iv)   realizar los MÁSTER y VIDEOS en forma pública y permitir la ejecución de los mismos en público por cualquier método que se conozca ahora o en el futuro;

(v)   utilizar y editar, así como permitir que otros utilicen y editen, el nombre (*incluidos todos los nombres profesionales, grupales, de fantasía o ficticios que se adopten o usen ahora o en el futuro*) y las fotografías y similares del ARTISTA, al igual que el material biográfico relativo al ARTISTA en la promoción, explotación y venta de discos derivados de los MÁSTER y los VIDEOS. Si así lo solicita la EMPRESA, el ARTISTA facilitará a la EMPRESA fotografías y biografías aprobadas referentes al ARTISTA con prontitud tras la respectiva petición de la EMPRESA;

(vi)   procurar los derechos de autor y las renovaciones de los mismos en grabaciones sonoras (a diferencia de las composiciones musicales incorporadas en lo anterior) y en los VIDEOS grabados por el ARTISTA durante la VIGENCIA, en nombre de la EMPRESA como propietario a través de una cesión válida por escrito o de una externalización válida de tales grabaciones sonoras y VIDEOS.

## 3.   VALOR DE LA MARCA

La EMPRESA tendrá derecho a recibir y el ARTISTA pagará a la EMPRESA, de conformidad con el párrafo F de la Sección 4 siguiente, la cantidad ("PORCIÓN DE LA EMPRESA") que se define a continuación como Ingresos Cubiertos. "INGRESOS CUBIERTOS" significa todas las sumas de dinero (incluyendo sin limitación, regalías, adelantos, ganancias, honorarios, finiquitos de auditorías y recuperaciones legales) pagaderas al ARTISTA (o a cualquier Persona que represente al ARTISTA) durante la VIGENCIA o de conformidad con cualquier acuerdo, compromiso o contrato celebrado o asegurado durante la VIGENCIA que surjan de o en relación con cualquiera de las actividades del ARTISTA en la industria del entretenimiento, incluyendo sin limitación las siguientes ACTIVIDADES CUBIERTAS:

## A.   OTORGAMIENTO DE DERECHOS DE EDICIÓN DE MÚSICA:

(1)   Con sujeción a los requisitos o a las restricciones que establece este documento, el ARTISTA concede, vende y transmite por medio del presente a la EMPRESA la porción íntegra (100%) de su participación en los derechos de autor del ARTISTA con respecto a todas las canciones que sean de autoría individual o compartida del ARTISTA y que escriba el ARTISTA

7

durante la VIGENCIA de este contrato, (denominadas en lo sucesivo de manera colectiva "Composiciones Controladas") y la EMPRESA tendrá los derechos exclusivos de administración de la participación del ARTISTA en las Composiciones Controladas durante toda la existencia del derecho de autor para cada caso dentro del Territorio.

(2)   La EMPRESA y las sociedades subsidiarias, las filiales y los licenciatarios de la EMPRESA en el extranjero poseen los más amplios derechos exclusivos para administrar y explotar las Composiciones Controladas; imprimir, editar, vender, dramatizar, crear obras derivadas, usar y autorizar bajo licencia todos los usos de las Composiciones Controladas; ejecutar en nombre propio todas las licencias y todos los convenios de cualquier tipo que afecten a las Composiciones Controladas, por ejemplo y de manera enunciativa, licencias para reproducción mecánica, interpretación en público, obras derivadas, usos dramáticos, usos de sincronización y subedición; al igual que para ceder o autorizar bajo licencia tales derechos a terceros; utilizar el nombre del ARTISTA y similares en relación con lo anterior; y tramitar solicitudes de registro de derecho de autor (y otros documentos de rutina de derecho de autor) en nombre del ARTISTA y en nombre del apoderado de hecho del ARTISTA (cuya designación se vincula a una participación y, por tanto, es irrevocable).

(3)   RECAUDACIÓN DE REGALÍAS POR INTERPRETACIÓN:

En la medida que así lo permita la ley, los derechos pequeños por interpretación de Composiciones Controladas serán cedidos y autorizados bajo licencia para la sociedad de derechos de interpretación a la que pertenezcan ambas partes. Se autoriza por este medio a dicha sociedad a cobrar y recibir todo el dinero percibido por la interpretación en público de las Composiciones Controladas y se le ordena a dicha sociedad por el presente que pague directamente a la EMPRESA el cien por ciento (100%) de la porción de la casa discográfica en los cánones por interpretación en público de las Composiciones Controladas en que el ARTISTA no tenga ningún derecho a recibir ingreso alguno. La sociedad de derechos de interpretación a la cual esté afiliado el ARTISTA le pagará al ARTISTA el cien por ciento (100%) de la porción del compositor que sea pagadera y la EMPRESA no tendrá ningún derecho a recibir ingreso alguno por esta porción del compositor.

(4)   RECAUDACIÓN DE REGALÍAS POR PARTE DE SOUND EXCHANGE Y OTORGAMIENTO DE GANANCIAS:

En la medida en que así lo permita la ley, los derechos pequeños por interpretación en presentaciones públicas digitales, incluidas la distribución y transmisión, de los MÁSTER entregados en virtud de este CONTRATO serán cedidos y autorizados bajo licencia por Sound Exchange, una sociedad de derechos de interpretación digital a la que pertenecen ambas partes. Se autoriza por este medio a Sound Exchange a cobrar y recibir todo el dinero percibido por la interpretación digital en público de los MÁSTERS y se le ordena a Sound Exchange por el presente (1) que pague directamente a la EMPRESA el cien por ciento (100%) de la porción de la EMPRESA en los cánones por interpretación digital en público de los MÁSTERS en que el ARTISTA no tenga ningún derecho a recibir ingreso alguno, y (2) que pague directamente al

8

ARTISTA o a la EMPRESA el cien por ciento (100%) de la porción del ARTISTA en los cánones por interpretación digital en público de los MÁSTERS en que el ARTISTA tenga derecho a recibir setenta por ciento (70%) de la porción del ARTISTA y que confiere y cede irrevocablemente a la EMPRESA por este medio y en que la EMPRESA tenga derecho a recibir, cobrar y conservar por cuenta propia de la EMPRESA, durante toda la existencia del derecho de autor en los MÁSTERS y durante cualquier extensión del mismo, una cantidad equivalente a treinta por ciento (30%) de los ingresos de la porción del ARTISTA.

### (5)   OTORGAMIENTO DE LICENCIAS Y RECAUDACIÓN DE REGALÍAS MECÁNICAS:

Las regalías mecánicas en las Composiciones Controladas para los Estados Unidos y Canadá pueden ser recaudadas por The Harry Fox Agency, Inc. o por cualquier otro agente de cobranzas que sea designado. Si la EMPRESA· emite directamente alguna licencia mecánica, deberá hacerlo conforme a la tarifa reglamentaria vigente en ese momento (con los descuentos por tipos especiales de venta o distribución que la EMPRESA otorgue de forma habitual a los sellos discográficos no afiliados).

### (6)   CONTRATOS DE SUBEDICIÓN:

La EMPRESA podrá celebrar contratos de subedición o recaudación con cualquier persona, empresa o corporación dentro del Territorio, así como autorizar bajo licencia o ceder este contrato y cualquiera de los derechos del mismo o delegar cualquiera de sus obligaciones en virtud del presente a cualquier persona, empresa o corporación dentro del Territorio.

### B.   OTORGAMIENTO DE GANANCIAS POR GIRAS Y PRESENTACIONES EN VIVO

(1)   Por medio del presente, el ARTISTA confiere y cede irrevocablemente a la EMPRESA y la EMPRESA adquiere el derecho a recibir, recaudar y conservar para sí durante la VIGENCIA una cantidad equivalente al cuarenta por ciento (40%) de los réditos brutos de las giras del ARTISTA y el ARTISTA pagará o gestionará que se pague dicha a la EMPRESA. "Recibos brutos de la gira del ARTISTA" en la oración anterior significará todo dinero en bruto, sin embargo caracterizados (que incluyen, pero no se limitan a, ingresos por venta de entradas, ganancias de eventos privados y tarifas por actuación, y excluyen la mercancía de la gira que de otra manera se regirá por el Contrato de Grabación en conexión con todo TRABAJO ARTÍSTICO DEL ÁLBUM y la sección 3, párrafo D en la parte inferior) como pagables al ARTISTA (o cualquier otra entidad de otra manera controlada parcial o completamente por el ARTISTA) con respecto a los servicios o esfuerzos del ARTISTA como músicos vocalistas o intérpretes en relación con una o más actuaciones en vivo o compromisos, difusión, transmisión por internet, películas, concierto únicos, giras, eventos privados u otros, y de lo anterior tanto llevado a cabo por el ARTISTA como apoyo para realizar un álbum bajo el Contrato de Grabación o de otra manera (colectivamente "Conciertos") y de lo anterior tanto llevado a cabo por el ARTISTA como apoyo para realizar un ÁLBUM bajo el Contrato de Grabación o de otra

manera tanto solo o con una o más personas y en relación con un Concierto único o una serie de Conciertos.

(2) Nada de lo contenido en el presente contrato limitará los derechos de la EMPRESA, durante la VIGENCIA del Contrato de Grabación, para grabar, filmar o grabar en cinta, por completo o en parte y de otra manera si la EMPRESA lo decide, los conciertos en interpretaciones en escenarios públicos de todo tipo, transmisiones por internet, patrocinios, difusión televisiva o transmisiones por cable (que incluyen transmisiones televisivas pay-per-view), películas, conciertos únicos, eventos privados, giras de conciertos, IP TV y otros por sí mismos o en conjunto con otros (incluyendo sin limitación, material de entre bastidores y ensayos). La totalidad de esas grabaciones, de ese material filmado o de esas cintas se considerarán como VIDEOS regidos por el párrafo (E) de la Sección 3.

(3) El ARTISTA cooperará en los esfuerzos publicitarios y promocionales de la EMPRESA para apoyar las ventas de los Productos de Audio con apariciones o interpretaciones cada cierto tiempo a pedido de la EMPRESA. Tras su término, pero previo al lanzamiento de un ÁLBUM bajo este contrato, el ARTISTA y la EMPRESA se deberán consultar con respecto al apoyo al lanzamiento del ÁLBUM a través de Presentaciones en Vivo y apariciones del ARTISTA. El ARTISTA cooperará con la EMPRESA en la planificación de una serie de Presentaciones en Vivo y apariciones durante cada Período de Contrato ("Período de Apoyo al Álbum"). El ARTISTA deberá cooperar y realizar sus mayores esfuerzos para agendar, o autorizar a su agente de contratación, el representante del ARTISTA, para agendar Presentaciones en Vivo suficientes durante el Período de Apoyo al ÁLBUM y acordar aparecer en esas Presentaciones en Vivo agendadas durante el Período de Apoyo al Álbum. Si el ARTISTA solicita que la EMPRESA pague los Gastos de la Gira, previo al inicio del Apoyo al Álbum, la EMPRESA y el ARTISTA se deberán consultar y acordar mutuamente la cantidad que deberá pagar la EMPRESA como Gastos de la Gira durante el Período de Apoyo al ÁLBUM, si lo hubiera. Si es necesario viajar por un esfuerzo publicitario o promocional al que asistir a pedido de la EMPRESA, fuera de la ciudad de residencia del ARTISTA por el que al ARTISTA no se le pague, la EMPRESA deberá pagar los costos de transporte y alojamiento, si fuera necesario. La EMPRESA deberá pagar dichos costos con anticipación al viaje del ARTISTA. Sin embargo, si los costos aprobados por la EMPRESA por escrito los paga el ARTISTA, la EMPRESA deberá reembolsarle al ARTISTA dichos costos relacionados con el viaje y alojamiento dentro de catorce (14) días hábiles a contar de la presentación de dichos costos de combustible y transporte. En caso de que el ARTISTA necesite viajar en avión, para una aparición o interpretación publicitaria o promocional a pedido de la EMPRESA, la EMPRESA deberá pagar previamente dicho viaje y alojamiento por la extensión completa de dicho esfuerzo promocional. Los gastos de las Presentaciones en Vivo a donde el ARTISTA tenga que asistir a pedido de la EMPRESA se consideran Gastos bajo este contrato. Todos los otros Gastos de Gira no recuperados a partir de los Réditos Brutos de las Presentaciones y Giras del ARTISTA se considerarán un Adelanto.

C.   **OTORGAMIENTO DE GANANCIAS POR SERVICIOS DE ACTUACIÓN**

Por medio del presente, el ARTISTA confiere y cede irrevocablemente a la EMPRESA y la EMPRESA adquiere el derecho a recibir, recaudar y conservar para sí durante la VIGENCIA una cantidad equivalente al cuarenta por ciento (40%) de los réditos brutos de las actuaciones del

ARTISTA, y el ARTISTA pagará o gestionará que se pague dicha cantidad a la EMPRESA como se estipula en los subpárrafos F de la Sección 4 más adelante. En la oración anterior, "Réditos Brutos de las Actuaciones del ARTISTA" significará todos en dineros bruto como sea que se caractericen pagaderos al ARTISTA por servicios en que participe como creador, actor, o como sí mismo (o trabaje en calidad creativa como director, guionista productor) en cualquier serie televisiva dramática o no dramática (o uno o más episodios a partir de entonces), películas, series de reality televisivas, videos y cualquier otro material visual, de audio y audiovisual presentados por el ARTISTA, la EMPRESA o por terceros para su carga y explotación en alguna o todas las plataformas de redes sociales ahora en existencia o que se conozcan ahora o en el futuro, como, entre otras, la plataforma de YouTube (o algún servicio sucesor), o producciones similares (se excluyen Grabaciones Audiovisuales hechas por la EMPRESA conforme al Contrato de Grabación) o producciones en escenario para audiencias públicas o exhibición en cualquiera de todos los medios conocidos ahora o por crearse (sin embargo se excluyen comerciales o respaldo a productos que estarían cubiertos por el párrafo (E) más adelante). No obstante lo anterior, el ARTISTA no prestará dichos servicios ni aceptará compromisos que requieran que el ARTISTA lo haga en una manera que pueda interferir o interfiera con el cumplimiento de las obligaciones del ARTISTA bajo el Contrato de Grabación. Para evitar dudas, con el propósito de calcular los Réditos Brutos de las Actuaciones del Artista, todas las sumas recibidas o acreditadas por el ARTISTA (o sus afiliados) y el valor económico de de otras consideraciones no monetarias que haya recibido se deben incluir, tanto si las recibió antes o después de la VIGENCIA (que incluye cuentas residuales), en tanto el acuerdo en relación a los Réditos Brutos de las Actuaciones del ARTISTA se haya ingresado durante o haya estado en negociación de manera previa al vencimiento o término de la VIGENCIA estipulada

## D.   DERECHOS DE LICENCIA DE MERCANCÍA CON NOMBRE, IMAGEN Y SEMEJANZA

(1)    Por medio del presente, el ARTISTA confiere y cede irrevocablemente a la EMPRESA y la EMPRESA adquiere el derecho a recibir, recaudar y conservar para sí durante la VIGENCIA una cantidad equivalente al cincuenta por ciento (50%) de los réditos brutos de las actuaciones del ARTISTA, y el ARTISTA pagará o gestionará que se pague dicha cantidad a la EMPRESA como se estipula en los subpárrafos F de la Sección 4 más adelante. En la oración anterior, "Recibos Brutos por Mercancías del ARTISTA" significará todo el dinero bruto de cualquiera caracterización pagador al ARTISTA (o a cualquier entidad que el ARTISTA controle de manera total o parcial) con respecto a la reproducción o explotación comercial del Nombre, la Imagen y la Figura del ARTISTA de cualquier manera y en cualquier medio, conocido o desconocido en la actualidad, incluyendo sin limitación, con respecto a la fabricación, distribución o venta de reproducciones del Nombre, la Imagen y la Figura del ARTISTA en cualquiera de todos los productos, por ejemplo, camisetas, pósters, insignias, etc. ("Mercancías"). No obstante lo antedicho, el ARTISTA no autorizará dicha explotación o una reproducción que interferiría o que podría interferir con el cumplimiento del ARTISTA de sus demás obligaciones estipuladas en el Contrato de Grabación. Para evitar dudas, con el propósito de calcular los Réditos Brutos por Mercancías del Artista, todas las sumas recibidas o acreditadas por el ARTISTA (o sus afiliados) y el valor económico de de otras consideraciones no monetarias que haya recibido se deben incluir, tanto si las recibió antes o después de la VIGENCIA (que incluye cuentas residuales), en tanto el acuerdo en relación a los Réditos Brutos

por Mercancías del ARTISTA se haya ingresado durante o haya estado en negociación de manera previa al vencimiento o término de la VIGENCIA estipulada.

(2)   La EMPRESA tendrá el derecho exclusivo de explotar comercialmente y de autorizar a otros a explotar comercialmente la Mercancía creada a partir de algún elemento perteneciente a la EMPRESA de acuerdo con este documento, tales como fotografías, material gráfico de la carátula u otros diseños gráficos creados que se incorporen al MATERIAL GRÁFICO DEL ÁLBUM o a los Productos de Audio distribuidos y vendidos en virtud del presente o que la EMPRESA utilice en los materiales de comercialización o promoción. Con respecto a cualquier diseño de Mercancía creado y vendido que contenga el MATERIAL GRÁFICO, la EMPRESA contabilizará y pagará al ARTISTA una regalía según lo que establece la Sección 5 (C) de este Contrato.

### E.   OTORGAMIENTO DE GANANCIAS POR RESPALDO, VINCULACIONES A MARCAS, PRESENTACIONES Y PATROCINIOS

Por medio del presente, el ARTISTA confiere y cede irrevocablemente a la EMPRESA y la EMPRESA adquiere el derecho a recibir, recaudar y conservar para sí durante la VIGENCIA una cantidad equivalente al cincuenta por ciento (50%) de los réditos brutos de ganancias por respaldo, vinculaciones a marcas, presentaciones y patrocinios del ARTISTA, y el ARTISTA pagará o gestionará que se pague dicha cantidad a la EMPRESA como se estipula en los subpárrafos F de la Sección 4 más adelante. En la oración anterior, "réditos brutos de ganancias por respaldo, vinculaciones a marcas, apariciones y patrocinios del ARTISTA" significará todo dinero en bruto como sea que se caractericen pagaderos al ARTISTA o relacionados con el ARTISTA (o cualquier otra entidad de otra manera controlada en forma parcial o completa por el ARTISTA) sin limitaciones, el uso, las licencias, la explotación, la reproducción, la publicación o la exhibición de los nombres, la imagen y la figura del ARTISTA (lo que incluye, sin limitaciones, todos los nombres o las marcas registradas ficticias o nombres de fantasía, nombres profesionales o nombres grupales del pasado, presente o futuro que use el ARTISTA) y los derechos de personalidad relacionados en conjunto o por separado o en conjunto con otros elementos, para propósitos de respaldos, especial a terceros, patrocinios (que incluyen patrocinios de las giras) o productos, servicios, colocaciones, apariciones, vinculaciones a marcas o creación, dirección y mantenimiento de los sitios de "clubes de seguidores" del ARTISTA, el uso de propiedad intelectual relacionada al ARTISTA en relación a libros no de ficción, revistas y otros materiales de publicaciones de no ficción, en juegos, que incluyen videojuegos y dramatizaciones que incluyen, sin limitaciones, dibujos animados y doblajes.

### F.   PAGO DEL ARTISTA A LA EMPRESA DE GANANCIAS POR VALOR DE MARCA

(1)   Sin limitar lo dicho anteriormente, si el ARTISTA recibe la PORCIÓN de la EMPRESA en relación con las Ganancias Cubiertas percibidas durante la VIGENCIA, el ARTISTA rendirá cuentas y pagará a la EMPRESA la PORCIÓN de la EMPRESA dentro de los diez (10) días posteriores a la recepción de dicho pago por parte del ARTISTA . Sin limitar la generalidad de la oración anterior, el ARTISTA indicará irrevocablemente, de conformidad con

12

una carta escrita con indicaciones según el formulario adjunto como Anexo A al presente, al actual representante de negocios del ARTISTA y a cualquier representante de negocios posterior o Agente de Talentos que rinda cuentas y pague la PORCIÓN de la EMPRESA en forma directa a la EMPRESA, de acuerdo con la oración anterior y de acuerdo con los términos y las condiciones del presente. El ARTISTA notificará oportunamente a la EMPRESA del cambio en la identidad del representante de negocios actual o el subsiguiente o el Agente de Talentos del ARTISTA. El ARTISTA proporcionará a la EMPRESA una copia de cada contrato con cualquier Persona ("Tercero") de quien el ARTISTA, los ARTISTAS u otra Persona tengan derecho a recibir Ganancias Cubiertas (cada uno, un "Contrato de Ganancias Cubiertas"), dentro de diez (10) días tras la firma de dichos contratos. Cada estado de contabilidad que se envíe a la EMPRESA incluirá el cálculo específico de la Porción de la EMPRESA para la VIGENCIA respectiva con detalles razonables, incluyendo sin limitación, un desglose pormenorizado de todas las Ganancias Cubiertas y de todos los gastos. Todos los estados de contabilidad y los pagos contemplados en este subpárrafo F se enviarán a la EMPRESA al domicilio que se indica arriba, dirigidos al CEO. El ARTISTA se asegurará de que la EMPRESA tenga derecho a examinar los libros y registros de cada Tercero bajo cada Contrato de Ganancias Cubiertas del mismo modo que aplica a los informes contables al ARTISTA, al ARTISTA o a la Persona correspondiente que reciba los Ingresos Cubiertos en nombre del ARTISTA o de los ARTISTAS. Sin limitar lo antedicho, la EMPRESA tendrá derecho a examinar al ARTISTA y a los libros y registros del ARTISTA únicamente en cuanto al cálculo de la PORCIÓN DE LA EMPRESA (pero no más de una vez a cada doce (12) meses y tras dar aviso al ARTISTA con anticipación razonable y solo una vez por período contable) en las oficinas del ARTISTA en que se mantengan los registros en cuestión. (Dicha revisión puede incluir, sin limitaciones, un examen de todos los Contratos de Ganancias Cubiertas y cualquier estado recibido por el ARTISTA, los ARTISTAS u otra Persona en virtud de dichos contratos). Si la EMPRESA tiene objeciones al estado, la EMPRESA le avisará al ARTISTA de esa objeción dentro de 3 años posteriores a la fecha en que la EMPRESA recibiera el estado de contabilidad del ARTISTA con respecto al periodo de contabilidad comprometido. Nada de lo mencionado en el presente liberará al ARTISTA de su obligación como ARTISTA de pagar a la EMPRESA la PORCIÓN DE LA EMPRESA, si la EMPRESA no recibe ese pago a través del representante de negocios correspondiente y el ARTISTA será responsable ante la EMPRESA por todos los pagos no realizados a la EMPRESA tal como lo requiere este subpárrafo F (1). El ARTISTA firmará los documentos que la EMPRESA solicite de manera razonable para ejecutar y asegurar los derechos de la EMPRESA conforme al subpárrafo F (1) de esta Sección 4. (2) El ARTISTA garantiza y manifiesta que: El ARTISTA no concederá derechos ni afectará de otro modo la PORCIÓN de la EMPRESA en las Ganancias Cubiertas y (2) el ARTISTA será el único responsable de todos los costos y las obligaciones en relación con las Actividades Cubiertas. El ARTISTA también reconoce que la EMPRESA no es un agente de empleo, agente teatral o agente de talentos con licencia bajo este contrato. El ARTISTA acuerda consultar a un agente de talentos con licencia respecto a asuntos que comúnmente maneja un agente de talentos y será el único responsable por los pagos de todas las comisiones necesarias de dichos agentes de talentos y para agencias de contratación o similares.

4. **REGALÍAS:**

Condicionado por el completo y fiel cumplimiento de todos y cada uno de los términos

13

materiales aquí presentado, la EMPRESA deberá pagarle al ARTISTA las siguientes regalías sujetas a este contrato: La EMPRESA acuerda pagarle las siguiente regalías ("Regalías o Regalías del ARTISTA") al ARTISTA:

A. **Explotación de los MÁSTERS y Ventas de Productos de Audio y Videos:** La EMPRESA pagará al ARTISTA por concepto de regalía el veinticinco por ciento (25 %) de las Utilidades Netas de Grabación que reciba la EMPRESA de todas las ventas de Productos de Audio derivados de los MÁSTER u otros y de las explotaciones de los MÁSTER, lo cual incluye en forma no taxativa ventas y licencias de los MÁSTER, ventas y licencias de los Productos de Audio, tales como Formatos Digitales, licencias con tarifa plana, etc., y la licencia de venta o la explotación de VIDEOS, (en lo sucesivo, se denominarán como "Regalías de grabación") con un tope de 3 % para los bienes libres que se usen exclusivamente con fines promocionales.

i. Como se usa en adelante, el término "Ganancias Netas" significa que todos los ingresos brutos que la EMPRESA recibe de dicha explotación, menos todos los costos y gastos que en incurra la EMPRESA en relación con dicha explotación del Álbum ("Gastos"). Los gastos incluyen, sin limitaciones, Costos de Grabación, promoción independiente, comercialización, publicidad, publicidad cooperativa, artículos gratuitos, envíos postales, fabricación, distribución y costos de edición.

ii. No se le pagarán regalías al ARTISTA hasta el momento en que todos los Adelantos y otras cantidades reembolsables según el presente u de otra manera, por ejemplo y de manera enunciativa los Costos de Grabación, se le hayan reembolsado o pagado a la EMPRESA.

iii. Con respecto a los Discos que no consistan solo en MÁSTERS producidos bajo el presente, las regalías del ARTISTA que se paguen bajo el presente, las regalías del ARTISTA pagaderas bajo el presente se medirán en base al número total de dichos MÁSTERS que estén en dicho Álbum y que contengan las interpretaciones del ARTISTA bajo el presente comparadas con el número total de MÁSTERS que haya en dicho Álbum.

iv. La regalía del ARTISTA bajo el presente es "Todo incluido", lo que significa que la regalía incluye todas las regalías dado que el ARTISTA como cualquier otro ARTISTA, productor, ingeniero u otro tercero que realice servicios para el ARTISTA y a quien el ARTISTA haya acordado contratar en relación con los MÁSTERS o este contrato, el ARTISTA será el único responsable de pagarle a esos terceros.

B. **Ingreso Editorial**: A excepción de las regalías recibidas por la sociedad de derechos de interpretación de la EMPRESA para la porción de los derechos de interpretación de la casa discográfica, según se indicó en la Sección 3, párrafo A de este contrato, la EMPRESA deberá pagar al ARTISTA, como autor de la canción, el cincuenta por ciento (50 %) de los Ingresos Netos de Edición recibidos por la EMPRESA por cualquier explotación o licencia emitida por la misma para las Composiciones Controladas y deberá retener la cantidad restante para sí.

14

**Explotación de Derechos Especiales y sobre Mercancías:** La EMPRESA pagará al ARTISTA el veinticinco por ciento (25 %) de los Ingresos Netos de Comercialización recibidos por la EMPRESA como resultado de las explotaciones y licencias emitidas por la EMPRESA por los Derechos de Comercialización o por una Licencia Especial de MATERIAL GRÁFICO.

      D.    **Ingresos Cubiertos**: Sin limitar lo anteriormente mencionado, si la EMPRESA recibe la Porción del ARTISTA en relación con los ingresos Cubiertos obtenidas durante la VIGENCIA, la Empresa rendirá cuentas y pagará al ARTISTA la Porción del ARTISTA dentro de los treinta (30) días posteriores a la recepción de la EMPRESA de dicho pago.

      E.    **Regalía Mecánica:**

          i.   Todas las Composiciones Controladas que aparecen en los MÁSTER y lanzados a la venta como Productos de Audio en Formato Digital para Transmisiones Digitales serán y, por medio del presente, son permanentemente autorizados a la EMPRESA para el TERRITORIO a cambio de una Regalía Mecánica por selección equivalente al Setenta y cinco por ciento (75 %) de la tarifa mecánica reglamentaria por selección (en relación con el tiempo de reproducción, en vigencia a partir de la fecha del lanzamiento comercial inicial en EE. UU. de los MÁSTER, en relación con, en lo sucesivo, denominado en ocasiones como la "Tarifa por Selección".

         ii.  Todas las Composiciones Controladas que aparecen en los MÁSTER y lanzados a la venta como configuraciones físicas de Productos de Audio (por ej., CD, discos de vinilo, etc.) o Productos Audiovisuales en virtud del presente, serán y, por medio del presente, son permanentemente autorizados a la EMPRESA para el TERRITORIO en una Regalía Mecánica por selección equivalente al Setenta y cinco por ciento (75 %) de la tarifa mecánica reglamentaria por selección (en relación con el tiempo de reproducción, en vigencia a partir de la fecha del lanzamiento comercial inicial en EE. UU. de los MÁSTERS, en relación con, en lo sucesivo, lo en ocasiones denominado como la "Tarifa por Selección".

         iii. Sin perjuicio de lo anterior, la Regalía Mecánica total máxima que la EMPRESA tendrá la obligación de pagar en relación con cualquier sencillo, E. P o L. P en un Producto de Audio en cualquier formato físico, sin importar la cantidad de composiciones que contenga el mismo, no excederá al Doble (2), al Quíntuple (5) o al Décuplo (10) de la "Tarifa por Selección", respectivamente. Para evitar dudas, esta restricción no se aplicará a los Productos de Audio vendidos en un Formato Digital a través de Transmisión Digital.

         iv. Todas las Regalías Mecánicas pagaderas en virtud del presente, se pagarán en base a los Productos de Audio netos vendidos en virtud del presente, por los cuales son pagaderas las regalías al ARTISTA de acuerdo con este

15



CONTRATO.

v. El ARTISTA acuerda no grabar ninguna Composición Controlada ni ninguna otra canción en virtud de este CONTRATO sin el consentimiento por escrito de la EMPRESA, por hasta lo que sea posterior entre lo siguiente i) cinco (5) años después de la fecha de lanzamiento por parte de la EMPRESA de cualquier Composición Controlada o canción grabada en virtud del presente o ii) dos (2) años después del vencimiento o término de la VIGENCIA de este CONTRATO.

vi. Los pagos realizados por concepto de Regalías Mecánicas de acuerdo con este CONTRATO se consideran como Gasto.

## 5. GARANTÍA MÍNIMA:

A. De acuerdo con el Código Civil de California § 3423, se aplicará la siguiente disposición en relación con la remuneración mínima garantizada para el ARTISTA. Durante la VIGENCIA de este contrato y cualquier prórroga de este, la EMPRESA garantiza que el ARTISTA recibirá la siguiente indemnización mínima garantizada, la que constará de la liquidación de las regalías, el pago de cualquier cantidad adeudada al ARTISTA de acuerdo con este contrato y cualquier pago complementario hecho por la EMPRESA al ARTISTA para que el ARTISTA reciba la cantidad mínima garantizada en el año correspondiente:

(a) La cantidad de nueve mil ($9.000) en el primer año de VIGENCIA del contrato.

(b) La cantidad de doce mil ($12.000) en el segundo año de VIGENCIA del contrato.

(c) La cantidad de quince mil ($15.000) en el tercer año de VIGENCIA del contrato y por cada año subsecuente del contrato (hasta el séptimo año. inclusive).

(d) Si durante cualquier año de este contrato el ARTISTA recibe menos que la cantidad mínima correspondiente, el ARTISTA deberá informar a la EMPRESA, no menos de 15 días y no más de 30 días antes del último día del año correspondiente; luego de informar a la EMPRESA, la EMPRESA tendrá un período de 30 días para solucionarlo.

(e) Si durante cualquier año de la VIGENCIA de este CONTRATO, el ARTISTA recibe más de la cantidad mínima correspondiente a ese año, dicho excedente se aplicará a los próximos años durante el período Contractual para reducir la cantidad mínima aplicable a cualquier año subsecuente.

(f) El no pago del mínimo garantizado no se considerará como incumplimiento sustancial de las obligaciones de la EMPRESA derivadas de este CONTRATO.

16

**6. CONTABILIDAD DE REGALÍAS SEMESTRALES:**

A.     La EMPRESA dará cuenta al ARTISTA de las Regalías o las Regalías mecánicas del ARTISTA (en conjunto, denominadas "Regalías" para fines de este párrafo) pagaderas de conformidad con este Contrato en períodos semestrales todos los años, el 30 de junio y el 31 de diciembre, respectivamente, durante los cuales las Grabaciones, por las que se pagan regalías de acuerdo con el presente, se venden, pagan y no se devuelven.

B.     Dentro de noventa (90) días después del último día de cada período semestral, la EMPRESA le proporcionará al ARTISTA un informe de regalías que especifica las regalías ganadas por el ARTISTA, si las hay, durante el período semestral y cada informe de regalías se acompañará con el pago de todas las sumas que sean pagaderas de acuerdo con el informe, después de aplicar las deducciones de cualquiera y todos los adelantos u otras deducciones correspondientes que la EMPRESA pueda tener el derecho de recuperar en virtud de este Contrato.

C.     La EMPRESA tendrá derecho a mantener una reserva de regalías por concepto de las ganancias esperadas que se generarán por los Álbumes en virtud del presente. Dicha reserva para regalías no se establecerá para ningún Álbum durante ningún período contable semianual por una cantidad mayor al veinticinco por ciento (25 %) de la cantidad de Álbumes despachados. Dicha reserva se conservará por dos períodos y luego se liquidará al término del período contable, cuando la reserva haya sido liberada a la EMPRESA.

D.     Las Regalías (incluye las regalías mecánicas) pagadas en relación con los Discos, que luego se devuelven, deben considerarse como pago excesivo. Si la EMPRESA realiza cualquier pago excesivo (según la oración anterior o de otra forma, en virtud del presente) o si la EMPRESA paga cualquier cantidad en nombre del ARTISTA o incurre en cualquier costo como consecuencia del no cumplimiento de los términos de este contrato por parte del artista, entonces, sin limitar ninguno de los otros derechos y recursos de la EMPRESA, dichas cantidades constituirán una deuda directa del ARTISTA con la EMPRESA y el ARTISTA deberá reembolsar a la EMPRESA dichas cantidades, y la EMPRESA tendrá el derecho de deducir dichas cantidades de cualquier dinero, de otra forma, pagadero al ARTISTA en virtud de este o de cualquier otro contrato.

E.     Ninguna regalía será pagadera al ARTISTA en relación con la venta de Discos o MÁSTER por cualquier licenciatario o distribuidor de la EMPRESA hasta que la EMPRESA haya recibido el pago en los EE. UU. por dichas ventas y se considerará que dichas ventas ocurrieron en el período contable semianual durante el cual el licenciatario o distribuidor haya rendido cuentas y pagos a la EMPRESA



17

por dichas ventas.

F.    La EMPRESA mantendrá libros de contabilidad relacionados con las ventas de Productos de Audio en virtud del presente. El ARTISTA o un contador público certificado, en nombre del ARTISTA, puede, a su propio cargo, examinar los libros de la EMPRESA en relación con las ventas de Productos de Audio en virtud del presente, exclusivamente con el propósito de verificar la exactitud del mismo, solo durante el horario hábil normal de la EMPRESA y con un aviso razonable por escrito. Los libros de la EMPRESA relacionados con cualquier cuenta de regalías en particular pueden ser examinados como se mencionó anteriormente solo dentro de dos (2) años después de la fecha de rendición y la EMPRESA no tendrá la obligación de autorizar al ARTISTA para examinar dichos libros de la EMPRESA relacionados con cualquier cuenta de regalías en particular más de una vez.

G.    Las Regalías relacionadas con la venta de Productos de Audio fuera de los Estados Unidos se calcularán en la moneda nacional con la que los licenciatarios de la EMPRESA pagan a la EMPRESA, se abonarán a la cuenta de regalías del ARTISTA en virtud del presente a la misma tasa de cambio con que se paga a la EMPRESA y estarán sujetas, de forma proporcional, a cualquier impuesto sobre la transferencia u otro similar, los que pueden ser impuestos a los ingresos de la EMPRESA.

H.    Se considerará que el ARTISTA ha aceptado todas las cuentas de regalías y todas las otras cuentas rendidas por la EMPRESA en virtud del presente y cada una de dichas cuentas de regalías u otras cuentas serán definitivas, finales y vinculantes, constituirán un estado de cuenta y no estarán sujetas a ninguna objeción de ninguna naturaleza, a menos que sea una objeción específica por escrito que establezca el fundamento de la misma y que sea presentada por el ARTISTA a la EMPRESA dentro de dos (2) años después de la fecha de rendición.

7.    **NOMBRE Y SEMEJANZA, MARCAS COMERCIALES Y SITIOS WEB:**

A.    Durante la VIGENCIA de este contrato y por el tiempo que la EMPRESA tenga derecho a los derechos otorgados a ella en virtud de este contrato, como la venta de Productos de Audio o la venta o distribución de Mercancía o explotación de las Composiciones Controladas, del ARTISTA, por medio del presente, otorga a la EMPRESA el derecho exclusivo y otorga a otros el derecho no exclusivo de usar el nombre, la figura aprobada, la voz, el material biográfico aprobado u otra identificación del ARTISTA en asociación con cualquier promoción, marketing o publicidad,

B.    en cualquier medio ahora conocido y existente o que se cree en el futuro. No obstante, durante la VIGENCIA de este contrato, el ARTISTA no otorgará permiso ni consentimiento para el uso del Nombre y semejanza del ARTISTA para, o en relación con, la grabación o explotación de Productos de Audio en conformidad con este contrato por parte de cualquiera que no sea la EMPRESA. Este párrafo no limitará los derechos que han sido otorgados a la EMPRESA en este contrato, en relación con los Derechos de Comercialización o Licencia Especial establecidos en este contrato.

18

B.      El ARTISTA solicitará y obtendrá, en nombre propio y a cargo del ARTISTA, el registro federal de una marca comercial y/o marca de servicio del nombre profesional o logo del ARTISTA, en relación con el uso del mismo en todas las áreas de la industria del entretenimiento, incluyendo sin limitación y en relación con la grabación y venta de discos fonográficos, la creación de clubes de fans, la realización de conciertos y presentaciones en vivo y la venta de ropa y otra mercancía. Si el ARTISTA no solicita ni obtiene la inscripción federal de ninguna de dichas marcas comerciales o marcas de servicio, la EMPRESA tendrá, a partir de entonces, el derecho de solicitar y obtener la inscripción federal de dichas marcas comerciales o marcas de servicio en nombre del ARTISTA, cuyos costos se considerarán un Adelanto y, por medio del presente, el ARTISTA designa a la EMPRESA como su abogado debidamente autorizado, para fines de la solicitud y obtención de dicha inscripción. Dicha autoridad está relacionada con un interés y, por lo tanto, es irrevocable.

C.      La EMPRESA o sus designados tienen el derecho exclusivo y perpetuo de crear y mantener un sitio web ("Sitio Web") para fines de promoción del ARTISTA y de venta de los Productos de Audio del ARTISTA. La EMPRESA tendrá el derecho del Nombre y Figura del ARTISTA en el Sitio Web. La EMPRESA será la propietaria de todos los materiales que contengan el Nombre y la Figura del ARTISTA, creados e incorporados en el Sitio Web del ARTISTA, sujetos a la aprobación del ARTISTA, como se establece en este contrato. La EMPRESA tendrá el derecho de inscribir como propio, cualquier nombre de dominio que incorpore el uso del nombre del ARTISTA o cualquier variación del nombre del ARTISTA. La EMPRESA tendrá derecho a designar cualquier Sitio Web del ARTISTA como el sitio web "oficial". No obstante, el ARTISTA tendrá derecho a crear un (1) Sitio Web relacionado con los servicios del ARTISTA como ARTISTA de grabación e interpretación. No obstante, el ARTISTA no estará limitado en cuanto a la creación de cualquier cantidad de sitios de redes sociales (por ej., MySpace, Facebook, etc.).

## 8.      SERVICIOS EXCLUIDOS

**LA EMPRESA HA INFORMADO AL ARTISTA QUE LA EMPRESA NO ES UN REPRESENTANTE DE TALENTOS NI UN AGENTE DE EMPLEO. EL ARTISTA RECONOCE QUE LA EMPRESA NO TIENE NI TENDRÁ OBLIGACIÓN Y NO HA OFRECIDO NI HA INTENTADO OBTENER, BUSCAR O PROCURAR EMPLEO O CONTRATACIONES PARA EL ARTISTA Y QUE, SALVO EN LA MEDIDA QUE LA LEY LO PERMITA, LA EMPRESA NO TIENE PERMISO, OBLIGACIÓN, AUTORIZACIÓN NI EXPECTATIVA DE HACERLO. SIN EMBARGO, SE ENTIENDE Y SE CONVIENE EN QUE LA EMPRESA PUEDE, SEGÚN LO EXIJA LA LEY, ACTUAR A SOLICITUD DE Y EN CONJUNTO CON REPRESENTANTES DE TALENTO CON LICENCIA EN DIVERSAS MATERIAS PARA EL ARTISTA, POR EJEMPLO Y INCLUYENDO SIN LIMITACION, ADQUISICIÓN O INTENTO DE ADQUISICIÓN, ACEPTACIÓN DE SOLICITUDES Y NEGOCIACIÓN DE CONTRATOS DE TRABAJO PARA EL ARTISTA EN ZONAS DETERMINADAS CON EL FIN DE PROMOCIONAR LA CARRERA DEL ARTISTA Y QUE ESE ARTISTA GESTIONARÁ QUE EL REPRESENTANTE DE TALENTOS CON LICENCIA CON QUIEN CONTRATE EL ARTISTA CONVENGA POR ESCRITO EN AUTORIZAR Y**

19

PERITO TRADUCTOR
INGLÉS - ESPAÑOL
JAIME
SALVADOR
...
DE JUSTICIA DE LA

**EN PEDIR QUE LA EMPRESA ACTÚE EN CONJUNTO CON DICHO REPRESENTANTE DE TALENTOS CON LICENCIA EN LAS ÁREAS EN QUE SE ESPERA QUE LA EMPRESA BRINDE DICHOS SERVICIOS.**

9.  **DEFINICIONES:**

Para fines de este CONTRATO, los términos a continuación tendrán el siguiente significado:

"**Adelanto**" se referirá a un pago anticipado de Regalías, Costos de Grabación, costos de Videos Musicales, costos de MATERIAL GRÁFICO. A menos que se especifique algo distinto en este contrato, ningún Adelanto es Gasto y es reembolsable de las Regalías pagaderas del ARTISTA en virtud del presente.

"**Productos de Audio,**" se referirá a todos los formatos de reproducción de sonido, conocidos o por conocer, en los que, o por medio de los cuales, se puede grabar sonido para transmitirlo después a los oyentes, que incorpora sonido, incluyendo sin limitación, discos de cualquier velocidad o capacidad, vinilos, discos compactos, cintas de carrete, cápsulas, casetes, grabaciones audiovisuales, Formatos Digitales, Transmisiones Digitales, etc.

"**Video Musical**" ("**Videos**") se referirá a los dispositivos que reproducen interpretaciones o grabaciones de audio del ARTISTA, en conjunto con una imagen visual para el uso doméstico u otro, que incorpore las Presentaciones del ARTISTA.

"**Composiciones**" se referirá a cualquier composición musical individual, independiente de su duración, que incluya todas las palabras habladas, un interludio y un popurrí.

"**Período Contractual**" se referirá a cualquier período del contrato en el que una vigencia o una obligación pueden ser aplicables ya sea en el PERÍODO INICIAL o en cualquier PERÍODO OPTATIVO subsecuente.

"**Composiciones Controladas**" se referirá a todas las Composiciones musicales o al material grabado en virtud de este contrato, que estén escritas o compuestas, en su totalidad o en parte, o que sean propiedad de o sean controladas directamente por el ARTISTA o por cualquier productor de MÁSTER sujetas al mismo.

"**Entrega**" se referirá a la recepción, por parte de la EMPRESA, del Máster recién grabado y técnicamente satisfactorio para constituir el Disco que se debe entregar a la EMPRESA según este contrato (mezclado y masterizado), junto con todas las licencias, aprobaciones, consentimientos y permisos necesarios y todo el MATERIAL GRÁFICO que se usará, en relación con la producción y distribución de Productos de Audio derivados de la Grabación Original en virtud del presente.

20

"**Formato Digital**" se referirá a una configuración digital de una Grabación de Máster que se usa como respaldo de la entrega de la Grabación Original a través de una Transmisión Digital, por ejemplo y de manera enunciativa, archivos digitales como MP3, MPEG, WAV, RAM, etc. o cualquier otro archivo digital conocido en la actualidad o creado en el futuro.

"**Transmisiones Digitales**" se referirá a la transmisión y distribución al consumidor de los Formatos Digitales u otras configuraciones distintas a los Productos de Audio físicos, ya sea solo sonido, sonido en conjunto con una imagen o sonido en conjunto con datos, de cualquier forma, por ejemplo y de manera enunciativa, descarga u otro tipo de transferencia de la interpretación del ARTISTA en el MÁSTER o en Grabaciones Audiovisuales grabadas en virtud del presente por teléfono, satélite, cable, transmisión directa por cable o por aire y computadoras en línea, ya sea que se cobre o no un cargo por recepción de la transmisión.

"**Servicios de Entretenimiento**" se referirá a los servicios exclusivos del artista prestados en la industria de la música, actualmente existentes o que se desarrollen en el futuro, por ejemplo y de manera enunciativa, las áreas de Derechos de Grabación, Edición, Comercialización, Servicios de Actuación y Presentaciones en Vivo, como se establece en este contrato.

"**Gastos**" se referirá a todos los gastos incurridos de acuerdo con este contrato, excepto por los Costos de Grabación, los costos de Videos Musicales y los costos del MATERIAL GRÁFICO, según se definen esos términos en el presente; los derechos de distribución; los cánones de licencias y otros pagos a terceros en nombre del ARTISTA; Gastos de Gira pendientes de pago no pagados de los Ingresos Brutos cobrados por la EMPRESA atribuibles a Presentaciones en Vivo; Gastos extraordinarios relacionados con la creación, producción o fabricación de Mercancía no pagados de los Ingresos Brutos atribuibles a Derechos de Comercialización; honorarios legales o contables pagaderos al asesor legal o contador del ARTISTA en virtud del presente (si esos pagos los realiza la EMPRESA), material gráfico habitual, impuestos, regalías mecánicas pagaderas a terceros o pagaderas al ARTISTA en virtud del presente; gastos de fabricación o envoltorio, pagaderos en nombre del ARTISTA o tarifas asociadas con las tasas de tramitación de derechos de autor; honorarios de abogados o contadores u otros gastos administrativos pagados por la creación, cumplimiento, otorgamiento de licencias o explotación de los derechos del ARTISTA O ARTISTAS otorgados a la empresa por medio del presente y cualquier otro costo, tasa, cuota o gasto directamente relacionado con la representación o explotación del ARTISTA, de conformidad con los términos de este contrato; regalías pagadas por la EMPRESA al ARTISTA por su parte de las regalías de edición como autor; gastos administrativos y de explotación de la EMPRESA relacionados con las Composiciones Controladas, incluyendo sin limitación, tasas de inscripción de derechos de autor, gastos de promoción y publicidad directamente relacionados con las Composiciones Controladas, costos de transcripción de las partituras principales y costos de producción de las grabaciones de demostración y cualquier otro costo, tasa, cuota o gasto directamente relacionado con la representación o explotación de los derechos del ARTISTA otorgados a la EMPRESA en este contrato, lo que incluye aquellos gastos pagados al ARTISTA o en nombre del ARTISTA por la EMPRESA antes de la fecha de vigencia de este contrato. .

21

"**Ingresos Brutos**" se referirá a cualquiera y a todas las ganancias, ingresos y sumas derivadas y actualmente recibidas por la EMPRESA de la explotación de los Servicios de Entretenimiento del ARTISTA y de los derechos otorgados a la EMPRESA por el ARTISTA según este contrato.

"**Álbum**" ("**Álbum**") se referirá a un Disco que tiene al menos diez (10) Composiciones y al menos cuarenta (30) minutos de duración.

"**Grabación Original**" ("**Máster**" o "**Másters**") se referirá a cualquier grabación original, grabada bajo este contrato junto con cualquier derivado de la misma. Toda referencia al Máster, Máster o Grabación Original incluirá los Máster Grabados Previamente.

"**Nombre y Figura**" se referirá a los nombres individuales del ARTISTA (el nombre profesional y el nombre legal, ya sea el que usa actualmente o el que el ARTISTA usará en el futuro) imagen, figura, logos y otro material de identificación y bibliográfico relacionado con el ARTISTA, y cualquier nombre comercial, marca registrada o marca de servicio que usen los miembros individuales del ARTISTA (colectivamente, "Nombre y Figura").

"**Ingresos Netos de Mercancías**" significará los Ingresos Brutos que recibe la EMPRESA según los términos de este contrato por los Derechos de Mercancías o Licencias Especiales tras la deducción de todos los gastos atribuidos a las autorizaciones de los mismos o al costo de crear, producir, fabricar o distribuir las Mercancías del ARTISTA. En caso de que los Gastos atribuibles a los Derechos de Mercancía o Licencias Especiales no se recuperen a partir de los Ingresos Netos de Mercancía, la EMPRESA puede tratar dicha cantidad no recuperada como un gasto recuperable en virtud del presente, a partir de los Ingresos Brutos.

"**Ingresos Netos por Interpretación**" se referirá a todos los Ingresos Brutos que recibe el ARTISTA o la EMPRESA en nombre del ARTISTA por las Presentaciones en Vivo, menos los Gastos de Gira y las tasas que deduzca el agente de contratación del ARTISTA.

"**Ingresos Netos por Edición**" se referirá a los Ingresos Brutos que recibe la EMPRESA de acuerdo con los términos de este contrato atribuibles a la explotación de la edición de las canciones del ARTISTA grabadas en virtud del presente, después de deducir cualquier y todos los Gastos.

"**Ingresos Netos por Grabación**": se referirá a todos los Ingresos Brutos recibidos por la EMPRESA de acuerdo con los términos de este contrato atribuibles a la explotación de las Grabaciones Originales del Artista grabadas o autorizadas en virtud del presente y de la venta de Productos de Audio derivados de las Grabaciones Originales del ARTISTA, tras deducir cualquiera y todos los gastos.

Los "**costos de grabación**" se considerarán como Anticipos para fines de este Contrato y abarcarán todos los costos incurridos con respecto a la producción de los MÁSTER que recogen las presentaciones del ARTISTA, incluidas las grabaciones audiovisuales, y que se suelen reconocer como Costos de Grabación en la industria fonográfica, tales como todos los gastos

22

incurridos en relación con la producción, mezcla y masterización de máster sonoros o visuales y todos los pagos o anticipos realizados al ARTISTA en virtud del presente, así como los pagos a todos los músicos (incluyendo sin limitación, instrumentistas, líderes, arreglistas, orquestadores, copistas y contratistas), vocalistas y productores, si los hay, que presten servicios asociados a cualquier grabación en virtud del presente, pagos a los fondos sindicales de pensión y bienestar, costos de traslado y contratación de instrumentos, alquiler de estudios o salas, costos de edición, impuestos sobre la nómina y otros pagos a terceros en nombre del ARTISTA que se relacionen con costos de grabación, honorarios de productores externos o ARTISTAS secundarios, cargos por repetición o licencia de muestreo y los demás gastos razonables en que incurra la EMPRESA al producir los MÁSTER; los costos, impuestos o pagos a terceros en relación con la producción de los MÁSTER producidos según este contrato.

"**VIGENCIA**" se referirá a la duración del CONTRATO, lo que incluye el PERÍODO INICIAL y los PERÍODOS OPCIONALES subsiguientes y todas las extensiones o modificaciones que extiendan la duración del contrato.

"**Gastos de Gira**" se referirá al pago de todos los gastos aprobados por la empresa para asistir o producir una Presentación en Vivo, por ejemplo y de manera enunciativa, los costos de producción, promoción o gastos de talento asociados con la interpretación, viajes, alojamiento y operación en los que incurrirá el ARTISTA en relación con la Presentación en Vivo. Todos los costos asociados por indemnización, viajes, alojamiento u operación que la EMPRESA le pague a un empleado o representante de la misma que colabore en la gira o en la producción de una Presentación en Vivo del ARTISTA, siempre y cuando dichos costos se limiten a aquellos equivalentes que realizaría el ARTISTA por un gasto igual o similar.

"**Territorio**" se referirá al Universo.

"**Álbumes, Máster, Discos**", "**fonogramas**", "**grabaciones**" y "**grabaciones de sonidos**": Todas las formas de grabación y reproducción con las cuales se pueda grabar sonido, que se conozcan actualmente o que conozcan en el futuro, que se fabriquen o vendan principalmente para uso doméstico, en rocola o en un medio de transporte, incluyendo sin limitación a lo anterior, cintas de grabación magnética, películas, grabaciones electrónicas de vídeo y otros medios o dispositivos para la producción de las interpretaciones del ARTISTA que se fabrique o venta principalmente para uso doméstico, en máquina de discos o en medios de transporte, ya sea que incluya (i) solo sonido o (ii) sonido sincronizado con imágenes visuales, por ej., dispositivos "visuales y auditivos".

"**Valor de Marca**" se referirá al valor intangible que acumula un ARTISTA como consecuencia de los esfuerzos exitosos de la EMPRESA para establecer la marca del ARTISTA **en la industria del entretenimiento a través del desarrollo del artista y del producto, y la promoción digital, por radio y por televisión.**

10.   **AVISOS**

23

A.    Todos los avisos al ARTISTA serán por escrito y se podrán dirigir al ARTISTA personalmente, por telegrama prepagado o por envío prepagado por correo registrado o certificado, con acuse de recibo, dirigido al ARTISTA a su dirección escrita al inicio del presente. La EMPRESA se encargará de enviar una copia de cortesía de cada aviso enviado al ARTISTA a _____, Esq. en _____, pero si la EMPRESA no envía dicha copia de cortesía, no constituirá un incumplimiento de este contrato ni afectará la eficacia del aviso.

B.    Todos los avisos a la EMPRESA serán por escrito y se deberán enviar por envío prepagado por correo registrado o certificado, con acuse de recibo, dirigido a la dirección de la EMPRESA escrita al inicio, con una copia simultánea enviada de igual manera a George L. Prajin, Esq. Lopez & Prajin, 500 Newport Center Dr. Suite 600, Newport Beach, Ca 92660.

## 11.    SUSPENSIONES E INCUMPLIMIENTO:

A.    En el caso de que el ARTISTA por alguna razón no cumpla oportunamente con sus compromisos de grabación y entrega en virtud del presente, de acuerdo con los términos de este contrato, entonces, además de los otros derechos o recursos que la EMPRESA pueda tener, la EMPRESA tendrá derecho a, previo aviso por escrito al ARTISTA antes de la expiración del período actual, (i) rescindir este contrato sin mayores obligaciones hacia el ARTISTA en cuanto a los máster sin grabar o sin entregar, (ii) reducir el número mínimo de máster que se deben grabar y entregar en el Período actual al número que ha sido grabado y entregado en dicho Período, o (iii) extender el Período de la VIGENCIA por lo que dure dicho incumplimiento más ciento cincuenta (150) días con los plazo para el ejercicio de la EMPRESA de sus opciones de extender la VIGENCIA y las fechas de inicio de los Períodos subsiguientes que se consideren extendidos conforme a ello). La EMPRESA acuerda que siempre y cuando ARTISTA haya comenzado la grabación de los MÁSTER con suficiente antelación a la fecha en que dichos MÁSTER se deben entregar en virtud del presente para entregarlos a tiempo, y siempre y cuando la grabación de dichos MÁSTER esté completa, el ARTISTA tendrá cuarenta y cinco (45) días a partir de la fecha en que la EMPRESA notifique al ARTISTA del término de este contrato, de acuerdo con el subpárrafo 10(a)(i) según el cual, para cumplir con los requisitos de producción y entrega, este contrato rescindirá al final de dicho período de cuarenta y cinco (45) días. Se entiende específicamente que la EMPRESA puede ejercer cualquiera o todos sus derechos en relación con la Sección 11, subpárrafos A (i), (ii) y (iii) en cualquier momento previo a la fecha en que de otra manera la VIGENCIA expiraría. Las obligaciones de la EMPRESA en virtud del presente se suspenderán por la duración de cualquier incumplimiento. No obstante dicha suspensión, la EMPRESA continuará pagando al artista regalías cuando se deba, al menos que dicha suspensión se deba a actos u omisiones bajo el control del ARTISTA. Las disposiciones de este subpárrafo no provocarán la extensión de la VIGENCIA por un período que supere el permitido por la ley vigente, si la hubiera, para el cumplimiento de contratos de servicios personales.



B.    La EMPRESA se reserva el derecho, a su elección, de suspender la operación de este contrato por la duración de cualquiera de las siguientes eventualidades, si a causa de una de

dichas eventualidades se ve impedida para cumplir con sus obligaciones según este contrato o se atrasaran sus operaciones normales de negocios o se volvieran imposibles o comercialmente impracticables: Caso fortuito, incendio, catástrofe, desacuerdo laboral, acciones de gobierno, sus organismos o funcionarios, cualquier orden, reglamento, norma o acción de un sindicato o asociación de artistas, músicos, compositores o empleados que afecten a la EMPRESA o la industria de la que forma parte, atrasos en la entrega de materiales y suministros u otra causa que escapara del control de la EMPRESA. Toda suspensión debida a controversias laborales que involucren solo a la EMPRESA, se limitará a un período de seis (6) meses.

C.    Si la voz del ARTISTA o su capacidad para interpretar como instrumentista se viera material o permanentemente afectada, entonces, además de los otros derechos o recursos que la EMPRESA pueda tener, la EMPRESA tendrá derecho a, previo aviso por escrito al ARTISTA, rescindir este contrato y se liberará de toda responsabilidad relacionada con los máster sin grabar.

## 12.   REPARACIÓN DE INCUMPLIMIENTOS:

Ninguna de las partes será considerada como infractora a menos que la otra parte notifique de incumplimiento y la parte notificada no subsane dicho incumplimiento dentro de treinta (30) días (quince [15] días, en el caso de pagos de dinero) tras recibir la notificación; siempre y cuando, si el presunto incumplimiento no implica pagos de dinero y su naturaleza es tal que no puede ser subsanado por completo dentro de treinta (30) días, no se considerará como infractora a la parte notificada si comienza la reparación del presunto incumplimiento en el plazo de treinta días y procede a terminarla con la debida diligencia en un plazo razonable a partir de entonces.

## 13.   MANIFESTACIONES Y GARANTÍAS:

A.    Durante la VIGENCIA, el ARTISTA no interpretará con el propósito de grabar discos para nadie que no sea la EMPRESA y no autorizará el uso de su nombre, figura u otra identificación del ARTISTA con el propósito de distribuir, vender, publicitar o explotar discos dentro del Territorio para nadie que no sea la EMPRESA.

B.    El ARTISTA no interpretará ninguna selección grabada en virtud del presente con el fin de crear discos para nadie que no sea la EMPRESA (i) por un espacio de cinco (5) años tras la fecha inicial de lanzamiento del disco respectivo que contenga dicha selección o (ii) durante un período de dos (2) años después de la expiración u otra forma de término de este contrato, lo que ocurra más tarde ("Restricción a nuevas grabaciones de trabajos anteriores").

C.    El ARTISTA renuncia a todos los denominados "derechos morales" que pueda tener el ARTISTA en cualquier MÁSTER, discos, álbumes o composiciones controladas en virtud del presente y a cualquier otro derecho similar que surja en cualquier parte del Territorio y que pueda afectar la capacidad de la EMPRESA o de las filiales o los licenciatarios de la EMPRESA para explotar al máximo todas las Grabaciones Originales.

D.    El ARTISTA reconoce que la venta de discos es especulativa y conviene en que el

25

juicio de la EMPRESA será vinculante y concluyente para el ARTISTA con respecto a cualquier asunto que afecte la venta, autorización bajo licencia, distribución y explotación de dichos discos. Ningún contenido de este Contrato obligará a la EMPRESA a realizar, vender, autorizar bajo licencia o distribuir discos fabricados a partir de los MÁSTER regulados por el presente, salvo lo que se estipule de otro modo de manera expresa en el subpárrafo 6(b) del presente.

E.    Con la condición de que el ARTISTA no esté incumpliendo este Contrato y si la EMPRESA recibe suficientes MÁSTER comercialmente satisfactorios completos, totalmente editados y mezclados que abarquen cada Álbum recién grabado que se requiere en virtud del presente, en que se recojan las presentaciones  en estudio recién grabadas Requeridas del ARTISTA con material inédito del ARTISTA, listos para que la EMPRESA fabrique discos a partir de los mismos, junto con todos los materiales para ese fin, la EMPRESA conviene en lanzar comercialmente a través de canales minoristas normales, por ejemplo, digitales, cada Álbum o grabación de máster individual entregado de acuerdo con este documento en los Estados Unidos en un plazo de ciento veinte (120) días tras la entrega por parte del ARTISTA y la aceptación del Álbum o grabación de máster correspondiente por parte de la EMPRESA.

F.    Se entiende y se conviene en que si la EMPRESA no lanzara ningún LP de este tipo en los Estados Unidos, dentro de los sesenta (60) días siguientes a la expiración de dicho periodo de ciento veinte (120) días, el ARTISTA tendrá derecho a notificar a la EMPRESA por escrito sobre dicha falta de la EMPRESA y del deseo del ARTISTA de que la VIGENCIA de este Contrato finalice si la EMPRESA no lanza comercialmente el LP correspondiente en los Estados Unidos dentro de setenta y cinco (75) días después de que la EMPRESA reciba tal notificación del ARTISTA. Se entiende y se conviene de modo específico que si la EMPRESA incumpliere cualquier compromiso de lanzamiento, la EMPRESA no tendrá ninguna responsabilidad civil en lo absoluto con el ARTISTA (salvo la obligación de la EMPRESA de contabilizar y pagar las regalías por vencer, si las hay, en virtud del presente) y que el único recurso del ARTISTA será poner fin a la VIGENCIA de este Contrato mediante una notificación por escrito a la EMPRESA en un plazo de quince (15) días tras expirar dicho período de setenta y cinco días (75).

G.    El ARTISTA garantiza y manifiesta que el ARTISTA no tiene ninguna incapacidad, restricción o prohibición, contractual o de otro tipo, que afecte el derecho del ARTISTA de ejecutar este contrato y cumplir con sus términos y condiciones. Sin perjuicio de lo anterior, el ARTISTA garantiza y manifiesta que el ARTISTA no ha asumido ni celebrado con anterioridad obligaciones, contratos o convenios de ningún tipo que vayan a interferir de alguna manera en el cumplimiento íntegro de este contrato por parte del ARTISTA ni en el derecho del ARTISTA a grabar todas y cada una de las selecciones reguladas por el presente. El ARTISTA garantiza y manifiesta que, salvo los MÁSTER consignados en el Anexo "A" que se adjunta e integra al presente, en la actualidad no hay en existencia ningún MÁSTER inédito anterior que incluya interpretaciones del ARTISTA y que el ARTISTA no lanzará, autorizará ni permitirá el lanzamiento de tales MÁSTER dentro del Territorio. Además, el ARTISTA garantiza y manifiesta que no requerirá que la EMPRESA efectúe pago alguno de ninguna naturaleza por concepto de o en relación con la prestación de los servicios del ARTISTA o la adquisición, el ejercicio o la explotación de derechos por parte la EMPRESA en virtud del presente contrato, salvo lo dispuesto

26

de manera específica en lo que antecede.

**H.** El ARTISTA garantiza y manifiesta que ningún material o uso de los mismos quebrantará ley alguna ni infringirá o vulnerará derechos de ningún tercero. En la presente sección 13, "Materiales" incluirá: (i) todas las composiciones musicales y demás materiales que contengan los MÁSTER regulados por el presente, (ii) todos los nombres usados por el ARTISTA en relación con los MÁSTER grabados en virtud del presente y (iii) la totalidad de demás materiales, ideas, otras propiedades intelectuales o elementos que proporcione o seleccione el ARTISTA y contengan o se utilicen en relación con cualquier MÁSTER grabado en virtud del presente o los envoltorios, la venta, la distribución, la publicidad, la difusión en público u otra explotación de los mismos.

14. **SERVICIOS ÚNICOS**

El ARTISTA reconoce de manera expresa que los servicios del ARTISTA tratados en el presente poseen un carácter especial, único e intelectual que les otorga un valor peculiar y que, en caso de un incumplimiento real o potencial del ARTISTA frente a cualquier término, condición o pacto del presente, la EMPRESA sufrirá daños inmediatos irreparables. El ARTISTA acepta de manera expresa que la EMPRESA tendrá derecho a perseguir medidas cautelares y reparaciones en equidad, según lo permitido por la ley, para impedir un incumplimiento real o potencial de este contrato o de cualquier parte del mismo por parte del ARTISTA y que tales recursos serán adicionales a cualquier otro derecho o recurso por daños y perjuicios u otros que se encuentren a disposición de la EMPRESA.

15. **INDEMNIDAD:**

El ARTISTA acepta mantener a la EMPRESA indemne, a salvo y exenta de responsabilidad ante toda y cualquier pérdida y daño (incluidos costas judiciales y honorarios razonables de abogados) que surjan de o en relación con o como resultado de cualquier omisión, falta o incumplimiento real o potencial del ARTISTA con respecto a cualquier garantía, manifestación, acuerdo, compromiso o pacto del presente contrato, incluyendo sin limitación reclamación de terceros en relación con lo anterior y por este medio la mantiene indemne, a salvo y exenta de responsabilidad. Además de cualquier otro derecho o recurso con que cuente la EMPRESA a causa de tal omisión, falta o incumplimiento real o potencial o de cualquier reclamación, el ARTISTA reembolsará a la EMPRESA, solicitud mediante, todos los pagos que la EMPRESA efectúe en cualquier momento después de la fecha del presente con respecto a cualquier pérdida, daño o responsabilidad civil resultante de los mismos y, de manera adicional a lo anterior, la EMPRESA tendrá derecho a restar a todo el dinero pagadero al ARTISTA en virtud de este o cualquier otro CONTRATO las sumas equivalentes a tal pérdida, daño o responsabilidad civil, lo cual incluye costos judiciales y honorarios razonables de abogados tanto previstos como reales. La EMPRESA notificará al ARTISTA de manera oportuna sobre cualquier reclamación de terceros en que aplique la indemnidad anterior y el ARTISTA tendrá derecho a participar en la defensa de dicha reclamación a través de un abogado elegido ARTISTA y costeado por el propio ARTISTA. Mientras se determina dicha reclamación, la EMPRESA podrá retener el pago de todo

27

el dinero adeudado en virtud de este o de cualquier otro contrato en sumas concordantes con dicha reclamación. El ARTISTA tendrá derecho a establecer una fianza por un monto equivalente a la suma retenida por la EMPRESA con respecto a cualquier reclamación mediante una fianza válida y suficiente aprobada por la EMPRESA, siempre y cuando dicha garantía comprometa por escrito y en forma incondicional el pago de todos los costos, honorarios, daños, etc., en que incurra la EMPRESA con motivo de dicha reclamación.

## 16.   APROBACIONES

Toda vez que se requiera la aprobación o el consentimiento del ARTISTA en este contrato, no se podrá retener injustificadamente tal aprobación o consentimiento. La EMPRESA puede requerir que el ARTISTA otorgue o rehúse tal autorización o consentimiento de manera formal mediante una notificación por escrito al ARTISTA en la cual se solicite tal autorización o consentimiento y con la entrega al ARTISTA de la información o el material para los que se pide la aprobación o el consentimiento. El ARTISTA notificará por escrito a la EMPRESA sobre su aprobación o desaprobación dentro de diez (10) días tras el recibo de la notificación anterior. El ARTISTA no obstaculizará ni retrasará el lanzamiento programado de ningún disco regulado por el presente. En caso de una desaprobación o falta de consentimiento, se indicarán las razones respectivas. La falta de notificación a la EMPRESA conforme a lo antedicho se considerará como consentimiento o aprobación.

## 17.   CESIÓN:

La EMPRESA tendrá derecho a ceder este contrato en su totalidad o en parte a cualquier sociedad subsidiaria, sociedad matriz, filial o a cualquier tercero que adquiera una parte sustancial de los activos o las acciones de la EMPRESA sin el consentimiento del ARTISTA. Los términos de cualquier cesión estipularán que el cesionario asumirá las obligaciones de la EMPRESA establecidas en el presente.

## 18.   CONTRATISTA INDEPENDIENTE:

Ningún contenido de este documento constituirá una asociación o unión temporal de empresas entre la EMPRESA y el ARTISTA. Se entiende de manera específica que el ARTISTA actúa en el presente como un contratista independiente.

## 29.   PLENA INTEGRACIÓN

Este contrato establece el acuerdo íntegro entre las partes con respecto al objeto del mismo. Ninguna modificación, enmienda, renuncia, cancelación o denuncia de este Contrato será vinculante para la EMPRESA a menos que esté refrendada mediante un instrumento por escrito firmado por un funcionario de la EMPRESA. Ninguna modificación o enmienda al presente Contrato será vinculante para el ARTISTA menos que esté refrendada mediante un instrumento

por escrito firmado en nombre del ARTISTA. La renuncia por parte de la EMPRESA a cualquier término o condición de este Contrato en alguna instancia no será considerada o interpretada como una renuncia a tal término o condición en el futuro ni como una dispensa a cualquier incumplimiento posterior de tal término o condición. Todos los derechos y recursos con que cuenta la EMPRESA en este Contrato serán acumulativos y ninguno de ellos limitará ningún otro recurso o derecho con que cuente la EMPRESA. Si un tribunal de foro competente anula, invalida o revoca alguna disposición de este Contrato, tal decisión no afectará a ninguna otra disposición del mismo y el resto de este Contrato seguirá tan vigente como si aquella disposición anulada, invalidada o revocada no hubiera formado parte del Contrato. Se conviene en que todas las contabilidades y todos los pagos que requiere el presente, así como todos los otorgamientos concedidos en el presente, subsistirán y perdurarán después de la expiración o del término anticipado de este Contrato. Ningún incumplimiento de este Contrato por parte de la EMPRESA se considerará como un incumplimiento grave, a menos la EMPRESA no subsane ese incumplimiento, si lo hay, en un plazo de cuarenta cinco (45) días tras recibir una notificación por escrito que especifique la naturaleza del incumplimiento de parte del ARTISTA, quien la enviará dentro de treinta (30) días tras tomar conocimiento sobre la existencia de tal incumplimiento.

## 20.   MISCELÁNEOS

### A.   NULIDAD DE TÉRMINOS:

Si cualquier cláusula, oración, párrafo o parte de este Contrato o si alguna Aplicación a alguna persona de cualquier cláusula, oración, párrafo o parte de este Contrato es declarada nula por algún motivo en un tribunal de foro competente, dicha decisión judicial limitará y restringirá su efecto a la cláusula, oración, párrafo o parte de las anteriores que esté directamente involucrada en la controversia que derivó en tal decisión judicial y a la persona involucrada.

### B.   SEGURO DE VIDA:

A su elección, la EMPRESA tendrá el derecho de contratar con costo y gasto para la EMPRESA un seguro de vida u otro seguro para el ARTISTA, lo cual incluye, de manera no taxativa, un seguro contra la falta de prestación de los servicios consignados en el presente Contrato por parte del ARTISTA, por las cantidades o los tipos de cobertura que la EMPRESA determine y, si corresponde, a beneficio de la EMPRESA. Con excepción de lo que acepte la EMPRESA de manera expresa por escrito, ni el ARTISTA ni alguno de los afiliados del ARTISTA tendrá derecho, título o interés alguno en dicho seguro. A petición de la EMPRESA, el ARTISTA y los afiliados del ARTISTA colaborarán y ayudarán a la EMPRESA o a su representante (como lo ordene la EMPRESA) en la obtención y el mantenimiento de cualquier tipo de cobertura, incluida la asistencia del ARTISTA a exámenes físicos u otros y la entrega de tal información y de los registros médicos que requiera cualquier aseguradora existente o propuesta y la realización de todos los demás actos o cosas, y en la ejecución de todos los documentos o instrumentos adicionales necesarios para que la EMPRESA gestione dichos seguros contemplados en esta Sección **21 B**.

**C. DERECHO APLICABLE:**

Este contrato fue celebrado en Fresno CA. _____ y su
validez, interpretación y efectos jurídicos se regirán por las leyes del condado de Los
Ángeles, estado de California, aplicables a los contratos celebrados y ejecutados totalmente
dentro del condado de Los Ángeles, estado de California, con respecto a la determinación
de cualquier reclamación, controversia o discrepancia que pueda surgir de la interpretación,
el cumplimiento o el incumplimiento de este contrato. Cualquier controversia,
reclamación, mediación o litigio que surja de este contrato se tramitará en el condado de
Los Ángeles, California.

**D.     HONORARIOS DE ABOGADOS**

Si se interpone alguna acción legal para exigir el cumplimiento forzoso de los
derechos de cualquiera de las partes del presente, la parte favorecida con el resultado de esa
acción legal tendrá derecho a reembolso de **honorarios de abogados** y costos judiciales, además
de cualquier otra reparación que reciba.

**E.     SUCESOR SOBRE LOS BIENES:**

Este contrato redundará en beneficio y será vinculante para cada una de las
partes del presente y sus respectivos sucesores, cesionarios y representantes autorizados. Por su
propia elección, la EMPRESA podrá ceder este contrato o cualquiera de sus derechos en virtud
del mismo.

**F.     DERECHO A REPRESENTACIÓN LEGAL:**

**El ARTISTA declara y garantiza que el ARTISTA leyó este Contrato y que
el ARTISTA entiende que se trata de un documento legal importante. Por este medio, el
ARTISTA manifiesta y garantiza que ha sido informado de su derecho a contar con un
abogado independiente en cuanto a la negociación y ejecución de este contrato y que ha
contratado y ha sido representado por dicho asesor legal o ha renunciado de manera
consciente y voluntaria a su derecho a dicho asesor legal y que desea celebrar este contrato
con el beneficio de una representación legal independiente.**

**SIGUE PAGINA DE FIRMA**

Este contrato no entrará en vigencia hasta ser ejecutado por todas las partes.

EN TESTIMONIO DE LO CUAL, las partes del presente han ejecutado este contrato en el día y año que figuran al comienzo.

DOB

DOB:

DOB:

EMPRESA: HYPHY MUSIC, INC.

Representada por:

José Martinez

# 360 RECORDING AGREEMENT WITH MULTIPLE EXCLUSIVE RIGHTS

This Agreement (the "AGREEMENT") is entered into on 12/10/22 by and between Hyphy Music, Inc., located at 2727 N. Grove Industrial Drive, #155, Fresno, California 92727 (hereinafter the "COMPANY"), and DOMINGU TORRES (individually and collectively professionally known as "Los Originales de San Juan," located at 2378 Lorena Ave. Sanger, CA (individually and collectively hereinafter referred to as the "ARTIST") on the exclusive provision of the ARTIST entertainment services (the "ENTERTAINMENT SERVICES") to COMPANY by the ARTIST.

## 1. HIRING

### A. RECORDING SERVICES

The COMPANY hereby engages the ARTIST for the exclusive provision of services to the COMPANY as a musical performer in the making of Original Recordings (the "MASTER") and the ARTIST hereby accepts such engagement and agrees to render such services exclusively to the COMPANY within the territory during the term, and all extensions and renewals hereof.

### B. BRAND VALUE

(1)     Hereby the ARTIST hires the COMPANY to (1) provide several brand image development services, for example and without limitation, artist and product development, public relations and promotion in press, radio, online media, digital media, social media and television, and music video production; and to (2) use its best efforts to participate in and support the type of activities necessary to advance the ARTIST's career in the entertainment industry.



(2)     The COMPANY hereby accepts such hiring and in exchange the ARTIST engages to grant and assign to the COMPANY a percentage, as defined herein, of the income from or arising from or in connection with any of the ARTIST's activities in the entertainment industry, including but not limited to the following activities (collectively, "COVERED ACTIVITIES"): (A) music publishing, (B) bookings for tours and live performances, (C) ARTIST services (or any of its members) as an actor or performer (in any media, including but not limited to, film, television, cable, digital, internet, IP TV), (D) use of the name or image of the ARTIST (or the name and image of any of its members) and like kind or logos on merchandise (except records) and (E) endorsements, sponsorships, appearances, and strategic alliances, as established herein.

**C.   TERRITORY**

The rights herein conferred to the COMPANY and the obligations of the ARTIST will be valid in the Universe (the "TERRITORY").

**D.   VALIDITY**

(1)  The TERM of this AGREEMENT shall be for an initial time period of one (1) year from the date hereof ("INITIAL TERM"). The ARTIST hereby grants the COMPANY six (6) independent consecutive options to extend this validity for additional time periods of one (1) year each ("OPTIONAL TERMS"), each such time period will be governed by terms and conditions equal to those applicable to the INITIAL TERM, unless otherwise stipulated hereinafter. The INITIAL TERM and each OPTIONAL TERM exercised by the COMPANY will be collectively referred to hereinafter from time to time as the "TERM".

(2)  Each optional term will be exercised, if applicable, by giving the ARTIST notice at any time prior to the date where the TERM would expire.

However, if the COMPANY does not make use of the option to extend the term on time, the COMPANY will still have the right to exercise it, unless the ARTIST gives the COMPANY a written notice of non-exercise of the optional term and, after that, the COMPANY does not exercise it within thirty (30) business days following receipt of said notice.

**2.   RECORDING SERVICES**

**A.   RECORDING COMMITMENTS**

(1)     During the INITIAL TERM, the ARTIST as a whole shall record and deliver to the COMPANY sufficient original sound recordings ("masters") equal to a minimum of one (1) album with a maximum of two (2) full-length albums (the "ALBUM"), where each Album will include at least 30 minutes of playing time and contain at least ten (10) musical compositions consistent with the style and form of the masters previously recorded by the ARTIST.

(2)     During each OPTIONAL TERM, the ARTIST as a whole will record and deliver to the COMPANY sufficient masters equivalent to a minimum of one (1) album with a maximum of two (2) full-length albums (the "ALBUM") where each Album will include at least 30 minutes in playing time and will contain at least ten (10) musical compositions, which will include Compositions not previously recorded by the ARTIST (the "ALBUM") and will be consistent with the style and form of the masters previously recorded by the ARTIST.

(3)    The first Album required to be delivered during the INITIAL TERM will be delivered within sixty (60) days following the corresponding request from the COMPANY. The additional Albums required to be delivered during any OPTIONAL TERM will be delivered to the COMPANY within sixty (60) days following the relevant request by the COMPANY. It is understood that the ARTIST will not deliver any Album within the nine (9) months following the delivery date of the previous Album. Notwithstanding anything in this AGREEMENT to the contrary, COMPANY shall have at least sixty (60) days after the date of delivery by ARTIST and acceptance by COMPANY, as per all the terms and conditions hereof, to exercise the option to extend the immediately following TERM, pursuant to paragraph D, Section 1 hereof, and all subsequent Terms shall be deemed extended accordingly.

(4)    The MASTERS encompassing each Album required to be recorded and delivered hereunder shall be occasionally referred to as "First Album", "Second Album", "Third Album", "Fourth Album" and "Fifth Album", respectively, hereinafter referred to in the order as accepted by the COMPANY hereunder.

A.    **RECORDING BUDGET:**

(1)    For the first ALBUM to be delivered following the INITIAL TERM and each Committed ALBUM after delivery of the first ALBUM, the **COMPANY** and the ARTIST will meet and prepare a recording budget (the "BUDGET"). The COMPANY will give final approval to the BUDGET. The COMPANY will retain the services of all necessary personnel and will procure all necessary equipment and other services in connection with the recording of the MASTERS to be produced hereunder. However, the COMPANY may authorize the ARTIST to incur costs associated with the recording of one or more MASTERS. However, the ARTIST will not incur any cost associated with the MASTER(s), unless the COMPANY approves such costs. All approved Recording Costs (as that term is defined below) will be paid by the COMPANY, as per the provisions of section 3, paragraph B (2) below.

(2)    If the ARTIST directly incurs any pre-approved cost on the MASTER(s), the ARTIST will deliver or arrange for the delivery to the COMPANY of copies of each invoice, receipt, voucher, and similar supporting documentary evidence evidencing Recording Costs and if ARTIST fails to do so, COMPANY's obligation to pay such costs shall be suspended until such delivery takes place. To the extent that any Recording Costs associated with any MASTER produced hereunder exceed the corresponding approved BUDGET, ARTIST shall be solely responsible for paying such excess costs. Nothing contained herein shall force the COMPANY to permit continuation of any recording session if the COMPANY reasonably anticipates that the associated Recording Costs will be higher than those specified in the approved BUDGET or that the MASTERS being recorded will not be satisfactory for the COMPANY in a technical and commercial sense.

3

If the COMPANY, of its own free will, pays any such cost in excess (without obligation to the COMPANY), the ARTIST will promptly reimburse the COMPANY upon request. Furthermore, COMPANY shall have no obligation to pay (i) any recording costs on any MASTER that is not recorded as per all the terms and conditions hereof, (ii) no recording charges or arrangement charge in excess of the union fee, unless the BUDGET proposed and approved by the COMPANY specifies such excess and the proposed beneficiary thereof or (iii) penalties, fines, late fees, or other costs incurred due to late payment of recording costs, if said late payment(s) is (are) not the COMPANY's fault. If COMPANY pays any costs or charges described in the preceding paragraph (without COMPANY having an obligation to do so), ARTIST will be deemed responsible for the costs or royalties thus paid by COMPANY and ARTIST will reimburse COMPANY promptly by request. At the option of the COMPANY and without thereby restricting the other rights or remedies of the COMPANY, any sum paid by the COMPANY and not reimbursed by the ARTIST in a timely manner as stipulated in paragraph B (2) of this Section may be discounted by the COMPANY to any royalties or other amounts payable to the ARTIST as per this Agreement.

(3)     **"RECORDING COSTS"** shall be considered as Advances for the purposes hereof and shall include all costs incurred on the production of the MASTERS that include the ARTIST's presentations, including audiovisual recordings, and which are usually recognized as Recording Costs in the phonographic industry, such as all expenses incurred in connection with the production, mixing and mastering of sound or visual masters and all payments or advances made to the ARTIST hereunder, and payments to all musicians (including but not limited to, instrumentalists, leaders, arrangers, orchestrators, copyists and contractors), vocalists and producers, if any, providing services associated with any recording hereunder, payments to pension and welfare funds, relocation costs and instrument hire, studio rental or rooms, publishing costs, payroll taxes and other payments to third parties on behalf of the ARTIST related to recording costs, fees of external producers or secondary ARTISTS, replay costs or sampling license, and other reasonable expenses incurred by the COMPANY when producing the MASTERS; costs, taxes or payments to third parties in relation to the production of the MASTERS produced hereunder.

## C.   RECORD PRODUCTION

(1)     MASTERS recorded by ARTIST hereunder shall be recorded in a recording studio selected by COMPANY at such times as ARTIST and COMPANY mutually designate or approve. Each MASTER delivered hereunder shall consist of the ARTIST's performances of the material selected by the ARTIST and COMPANY, recently recorded in a studio, and not previously recorded by the ARTIST. Each MASTER will be conditional as commercially satisfactory on the approval of the COMPANY. The ARTIST will deliver to the COMPANY a stereo master with two tracks for each MASTER. Each MASTER will be completely finished, edited, and mixed before it is delivered to the COMPANY in a way suitable for the production of the necessary parts to digitally manufacture and distribute commercial records. When requested by the COMPANY, the ARTIST will re-record any selection, until a commercially satisfactory MASTER has been generated. Each MASTER will be delivered to the COMPANY at the place designated or approved by the COMPANY. The COMPANY approves that its own offices in San Jose, California will be for delivery of MASTERS as hereunder.

(2)     If, for any reason, the ARTIST does not attend any recording session of which the ARTIST has been notified in writing without the ARTIST notifying the COMPANY forty-eight (48) hours in advance of his inability to attend, then the ARTIST will be personally responsible for reimbursing to the COMPANY the cost incurred by the COMPANY due to such ARTIST's absence within thirty (30) days after the invoice was sent.

**D.      GRAPHIC MATERIAL:**

The COMPANY will own the copyright of all graphic material created for and incorporated into the packaging of the ARTIST Audiovisual Products released hereunder or used by the COMPANY in marketing or promotional materials ("GRAPHIC MATERIAL"). All costs to prepare such GRAPHIC MATERIAL or all the costs paid by the COMPANY for the preparation and rights of the GRAPHIC MATERIAL will be considered as Advances, as established hereunder. The COMPANY agrees to consult with the ARTIST regarding the preparation of the GRAPHIC MATERIAL. The ARTIST must approve the GRAPHIC MATERIAL. However, in case of disagreement, the COMPANY's decision will prevail.

**E.      AUDIOVISUAL RIGHTS:**

During the TERM hereof, the COMPANY shall have the exclusive worldwide right to produce, manufacture, and distribute the ARTIST's audiovisual programs and videos ("VIDEOS") for commercial or promotional purposes, which includes any commercial sale or other commercial exploitation of Extended Videos, as well as the exclusive worldwide right to license others to produce, manufacture and distribute Videos. All recording and production costs directly or indirectly incurred on the creation of VIDEOS must be approved and paid by the COMPANY and will be considered as Advances, as established hereunder. ARTIST grants COMPANY a timing license for the right to use any Controlled Composition in a VIDEO and waives the right to be paid a separate timing fee for use of the Controlled Composition incorporated into a VIDEO as well as any mechanical license for the distribution and sale of the Video.

**F.      MECHANICAL LICENSE:**

The COMPANY is hereby authorized in perpetuity to use under license all the compositions or musical materials recorded under this AGREEMENT or "Controlled Compositions", according to this document (compositions or musical materials written or composed in whole or in part by the ARTIST or owned or under the direct or indirect control of the ARTIST or any producer of a subordinate MASTER) appearing on MASTERS and released on Audio Products hereunder licensed. This use authorization is conferred to the COMPANY within the TERRITORY and on the Controlled Compositions appearing in the Audio Products published by the COMPANY.

5

COMPANY will be responsible for paying all mechanical royalties owed to third parties for composition (the "Composition"), including co-authors of co-authored Controlled Compositions, and payment of such mechanical royalties will be considered an Expense. ARTIST agrees not to record any Controlled Composition or Composition already recorded and delivered to COMPANY hereunder for five (5) years from the date this agreement is terminated.

g.     **COPYRIGHT OWNERSHIP**

(1)     During VALIDITY, all MASTERS recorded and delivered by the ARTIST and any VIDEO such as those described hereunder, from the start of their recording, and all plays derived from such recordings, together with the interpretations included in them, shall be considered a work "performed for hire" for the COMPANY from the beginning of creation, as defined in the United States Copyright Law. If it is determined that a particular MASTER or VIDEO does not correspond to this, then such MASTER or such VIDEO, along with all rights thereto, shall be deemed to be assigned and irrevocably transferred hereby to the COMPANY (including sound recording copyrights and Audio and Video copyrights and all renewal rights). From the beginning of their creation or delivery, all MASTERS and Videos produced hereunder will be wholly owned by the COMPANY in perpetuity throughout the world and will be exempt from any claim by the ARTIST or any person deriving rights or interests of or through Producer. Without limiting the foregoing, COMPANY and COMPANY's licensees and designees shall have the sole and exclusive right in perpetuity and throughout the world to:

(2)     Without limiting the foregoing, COMPANY and COMPANY's licensees and designees shall have the sole and exclusive right in perpetuity and throughout the world to:

(i)     manufacture, advertise, sell, license, distribute, or otherwise make use of the MASTERS, VIDEOS and discs derived therefrom in any or all fields of use by any method or means now or hereafter known, as well as the discs containing the MASTERS regulated by this document, all of the above according to the terms and conditions chosen by the COMPANY or, at its discretion, may decide to refrain from this;

(ii)     alter, change, modify, or edit any of the MASTERS, VIDEOS and all of the discs and reproductions thereof. Notwithstanding the foregoing,

6



(iii) release discs and VIDEOS containing the performances to be recorded hereunder under any name, trademark or COMPANY as may be chosen from time to time by the COMPANY or the COMPANY's subsidiaries, affiliates, or licensees.

(iv) make the MASTERS and VIDEOS publicly and allow their execution in public by any method known now or in the future;

(v) use and edit, as well as allow others to use and edit, the name *(including all professional, group, fanciful or fictitious names adopted or used now or in the future)* and the photographs and similar of the ARTIST, as well as the biographical material related to the ARTIST in the promotion, exploitation, and sale of discs resulting from the MASTERS and VIDEOS. If so requested by the COMPANY, the ARTIST will promptly provide the COMPANY with approved photographs and biographies concerning the ARTIST upon the relevant request of the COMPANY;

(vi) procure copyrights and their renewals in sound recordings (as opposed to musical compositions incorporated as above) and in VIDEOS recorded by the ARTIST during the TERM, on behalf of the COMPANY as owner through a valid written assignment or valid outsourcing of such sound recordings and VIDEOS.

## 3   BRAND VALUE

COMPANY shall be entitled to receive, and ARTIST shall pay to COMPANY, as per paragraph F of Section 4 below, the amount ("COMPANY SHARE") defined below as Covered Income. "COVERED INCOME" means all monies (including, without limitation, royalties, advances, profits, fees, audit settlements, and legal recoveries) payable to ARTIST (or any Person representing ARTIST) during the TERM or pursuant to any agreement, undertaking, or contract entered into or secured during the TERM arising out of or in connection with any of ARTIST's activities in the entertainment industry, including but not limited to the following COVERED ACTIVITIES:

**A.   <u>GRANTING OF MUSIC PUBLISHING RIGHTS:</u>**

7

(1)      Subject to the requirements or restrictions set forth herein, ARTIST hereby grants, sells, and transmits to COMPANY the entire portion (100%) of its interest in the copyright of ARTIST on all songs that are individually or jointly authored by the ARTIST and written by the ARTIST during the TERM hereof, (hereinafter collectively referred to as "Controlled Compositions") and the COMPANY will have the exclusive rights of administration of the participation of the ARTIST in Controlled Compositions throughout the existence of copyright in each case within the Territory.

(2)      The COMPANY and the subsidiaries, affiliates, and licensees of the COMPANY abroad have the broadest exclusive rights to manage and exploit the Controlled Compositions; print, edit, sell, perform, create derivative works from, use, and license all uses of the Controlled Compositions; execute in its own name all licenses and all agreements of any kind that affect the Controlled Compositions, for example and without limitation, licenses for mechanical reproduction, public performance, derivative works, dramatic uses, synchronization uses, and subediting; and to assign or license such rights to third parties; use the name of the ARTIST and the like in connection with the above; and process copyright registration applications (and other routine copyright documents) on behalf of the ARTIST and on behalf of the ARTIST's attorney-in-fact (whose appointment is linked to an entry and is therefore irrevocable).

(3)      ROYALTY COLLECTION FOR INTERPRETATION:

To the extent permitted by law, minor performance rights in Controlled Compositions will be assigned and licensed by the performing rights company to which both parties belong. Such company is hereby authorized to collect and receive all monies received for the public performance of the Controlled Compositions and said company is hereby ordered to pay directly to the COMPANY one hundred percent (100%) of the record company's portion of the royalties for public performance of the Controlled Compositions on which the ARTIST has no right to receive any income. The performing rights company with which the ARTIST is affiliated will pay the ARTIST one hundred percent (100%) of the composer's portion that is payable, and the COMPANY will have no right to receive any income from this composer's portion.

(4)      ROYALTY COLLECTION BY SOUND EXCHANGE AND AWARDING OF PROFITS:

To the extent permitted by law, small rights for performance in public digital performances, including distribution and transmission of the MASTERS delivered hereunder shall be assigned and licensed by Sound Exchange, a rights company of digital interpretation to which both parties belong.

8

Sound Exchange is hereby authorized to collect and receive all monies received from the public digital performance of the MASTERS and Sound Exchange is hereby instructed (1) to pay COMPANY directly one hundred percent (100%) of the COMPANY's portion of the royalties for digital interpretation in public of MASTERS in which the ARTIST has no right to receive any income, and (2) to pay directly to the ARTIST or to the COMPANY one hundred percent (100%) of the ARTIST's portion in the royalties for digital interpretation in public of the MASTERS for which the ARTIST is entitled to receive seventy percent (70%) of the ARTIST's portion and that it hereby confers and assigns irrevocably to the COMPANY and for which the COMPANY has the right to receive, collect, and keep an amount equivalent to thirty percent to (30%) of the income from the portion of the ARTIST at the COMPANY's own expense, during the entire existence of the copyright in the MASTERS and during any extension thereof.

(5)     GRANTING OF LICENSES AND COLLECTION OF MECHANICAL ROYALTIES:

Mechanical royalties on Controlled Compositions for the United States and Canada may be collected by The Harry Fox Agency, Inc., or any other designated collection agent. If the COMPANY directly issues any mechanical license, it must do so at the regulatory rate in effect at that time (with discounts for special types of sales or distribution that the COMPANY regularly grants to unaffiliated record labels).

(6)     SUB-PUBLISHING AGREEMENTS:

The COMPANY may enter into sub-publishing or collection agreements with any person, company, or corporation within the Territory, as well as license or assign this agreement and any of the rights therein or delegate any of its obligations hereunder to any person, company, or corporation within the Territory.

**B.     DISTRIBUTION OF PROCEEDS FROM TOURS AND LIVE PERFORMANCES**

(1)     The ARTIST hereby irrevocably confers and assigns to the COMPANY and the COMPANY accepts the right to receive, collect, and keep for itself an amount equal to forty percent (40%) of the gross proceeds of the tours of the ARTIST during the TERM and the ARTIST will pay or order to pay to the COMPANY. "ARTIST gross tour proceeds" in the preceding sentence shall mean all gross monies, however characterized (including, but not limited to, ticket sales revenue, private event proceeds, and performance fees, and excluding tour merchandise otherwise governed by the Recording Agreement in connection with all ALBUM ARTWORK and section 3, paragraph D below) as payable to ARTIST (or any other entity otherwise controlled in part or entirely by ARTIST) on ARTIST's services or efforts as a vocal musician or performer in connection with one or more live performances or engagements, broadcasts, webcasts, films, one-off concerts, tours, private events or otherwise, and as carried out by the ARTIST to making an album under the Recording Agreement or otherwise (collectively "Concerts") and as carried out by the ARTIST to making an ALBUM under the Recording Agreement or otherwise, both independently or with one or more persons and in connection with a single Concert or a series of Concerts.

(2)     Nothing contained herein shall limit the rights of the COMPANY, during the TERM of the Recording Agreement, to record, film or tape record, in whole or in part and otherwise if the COMPANY so decides, the concerts in public stage performances of all kinds, webcasts, endorsements, TV broadcasts or cable broadcasts (including pay-per-view TV broadcasts), movies, one-off concerts, private events, concert tours, IP TV and others independently or in conjunction with others (including but not limited to backstage footage and rehearsals). The totality of those recordings, of that filmed material or of those tapes will be considered VIDEOS governed by paragraph (E), Section 3.

(3)     ARTIST will cooperate in COMPANY's advertising and promotional efforts to support sales of Audio Products by making appearances or performances from time to time at COMPANY's request. After its completion, but prior to the release of an ALBUM hereunder, the ARTIST and the COMPANY shall consult on the ALBUM release through Live Performances and appearances by the ARTIST. ARTIST will cooperate with COMPANY in planning a series of Live Performances and appearances during each Agreement Term ("Album Support Term"). ARTIST shall cooperate and use their best efforts to schedule, or authorize their booking agent, ARTIST's representative, to schedule sufficient Live Performances during the ALBUM Support Term and agree to appear at those Live Performances scheduled during the Album Support Term. If the ARTIST requests that the COMPANY pay the Tour Expenses, prior to the start of Album Support, the COMPANY and the ARTIST must consult and mutually agree on the amount that the COMPANY must pay as Tour Expenses during the ALBUM Support Term, if any. If it is necessary to travel outside the city where the ARTIST resides for an advertising or promotional effort at the COMPANY'S request for which the ARTIST is not paid, the COMPANY shall pay the costs of transportation and lodging, if necessary. The COMPANY must pay said costs prior to the ARTIST's trip. However, if the costs approved by the COMPANY in writing are paid by the ARTIST, the COMPANY shall reimburse the ARTIST for such costs related to travel and lodging within fourteen (14) business days after submitting such fuel and transportation costs. If the ARTIST needs to travel by air for a publicity or promotional appearance or performance at the COMPANY'S request, the COMPANY must pre-pay for such travel and lodging for the full extent of such promotional effort. The expenses of Live Presentations where the ARTIST has to attend at the COMPANY's request are considered Expenses under this agreement. All other Tour Expenses not recovered from the ARTIST's Show and Tour Gross Proceeds will be considered a Down Payment.

C.     **DISTRIBUTION OF PROCEEDS FROM PERFORMANCE SERVICES**

The ARTIST hereby irrevocably confers and assigns to the COMPANY and the COMPANY accepts the right to receive, collect, and keep for itself an amount equal to forty 40%) of the gross proceeds of the ARTIST performances during the TERM and the ARTIST will pay or order to pay to the COMPANY such amount as stipulated under subparagraphs F, Section 4 below.

In the preceding sentence, "Gross Proceeds from ARTIST Performances" shall mean all gross proceeds however described payable to ARTIST for services in which he participates as a creator, performer, or himself (or works in a creative capacity as director, producer, scriptwriter) in any dramatic or non-dramatic television series (or one or more episodes thereafter), motion pictures, reality television series, videos, and any other visual, audio, and audiovisual material presented by ARTIST, COMPANY, or by third parties for uploading and exploitation on any or all social networking platforms now in existence or developed in the future, such as, but not limited to, YouTube (or any successor service), or similar productions (excluding Audiovisual Recordings made by the COMPANY as per the Recording Agreement) or productions on stage for public audiences or performances in any of all the media known now or to be created (but excluding commercials or product endorsements that would be covered by paragraph (E) below). Notwithstanding the foregoing, the ARTIST will not provide such services or accept commitments requiring the ARTIST to do so in a manner that would or does interfere with the performance of the ARTIST's obligations under the Recording Agreement. For the avoidance of doubt, to calculate Gross Proceeds from Artist Performances, all amounts received or credited by ARTIST (or its affiliates) and the economic value of other non-monetary considerations received must be included, both if they were received before or after the TERM (which includes residual accounts), as long as the agreement in relation to the Gross Proceeds of the ARTIST's Performances has been entered during or has been in negotiation prior to the expiration or end of the TERM stipulated.

**D.   LICENSE RIGHTS OF MERCHANDISE WITH NAME, IMAGE, AND LIKENESS**

(1)    The ARTIST hereby irrevocably confers and assigns to the COMPANY and the COMPANY accepts the right to receive, collect, and keep for itself an amount equal to fifty percent (50%) the gross proceeds of the ARTIST performances during the TERM and the ARTIST will pay or order to pay to the COMPANY such amount as stipulated under subparagraphs F, Section 4 below. In the preceding sentence, "ARTIST Gross Merchandise Proceeds" shall mean all gross monies of any nature payable to ARTIST (or any entity ARTIST controls in whole or in part) on the reproduction or commercial exploitation of the Name, the Image, and Likeness of the ARTIST in any manner and by any means, now known or unknown, including but not limited to the manufacture, distribution, or sale of reproductions of the Name, Image, and Likeness of the ARTIST in any of all the products, for example, t-shirts, posters, badges, etc. ("Merchandise"). However, the ARTIST will not authorize such exploitation or reproduction that would interfere or could interfere with the ARTIST's compliance with his other obligations stipulated in the Recording Agreement. For the avoidance of doubt, to calculate Gross Proceeds from Artist Merchandise, all amounts received or credited by ARTIST (or its affiliates) and the economic value of other non-monetary considerations received must be included, both if they were received before or after the TERM (which includes residual accounts), as long as the agreement in relation to the Gross Proceeds of the ARTIST's Merchandise has been entered during or has been in negotiation prior to the expiration or end of the TERM stipulated.

11

(2)     The COMPANY shall have the exclusive right to commercially exploit and to authorize others to commercially exploit the Merchandise created from any element belonging to the COMPANY hereunder, such as photographs, cover artwork or other designs graphics created and incorporated into ALBUM ARTWORK or Audio Products distributed and sold hereunder or used by COMPANY in marketing or promotional materials. Regarding any Merchandise design created and sold containing the GRAPHIC MATERIAL, the COMPANY will account for and pay the ARTIST a royalty as per Section 5 (C) hereof.

E.     **DISTRIBUTION OF PROCEEDS FROM ENDORSEMENTS, BRANDING, APPEARANCES, AND SPONSORSHIPS**

The ARTIST hereby irrevocably confers and assigns to the COMPANY and the COMPANY accepts the right to receive, collect, and keep for itself an amount equal to fifty percent (50%) the gross proceeds of the ARTIST from endorsements, branding, appearances, and sponsorships during the TERM and the ARTIST will pay or order to pay to the COMPANY such amount as stipulated under subparagraphs F, Section 4 below. In the preceding sentence, "gross proceeds from ARTIST endorsements, branding, appearances and sponsorships" shall mean all gross proceeds of whatever nature payable to or related to ARTIST (or any other entity otherwise controlled by in whole or in part by ARTIST) without limitation, the use, licensing, exploitation, reproduction, publication or display of ARTIST's names, image, and likeness (including but not limited to all names or fictitious trademarks or fantasy names, professional names or group names of the past, present, or future used by the ARTIST) and the related personality rights in conjunction or separately or in conjunction with other elements, for purposes of endorsements, special to third parties, sponsorships (including sponsorships of tours) or products, services, placements, appearances, branding, or creation, direction, and maintenance of ARTIST "fan club" sites, use of ARTIST-related intellectual property in connection with non-fiction books, magazines, and other non-fiction publication materials, in games, including video games, and dramatizations including but limited to cartoons and dubbing.

F.     **PAYMENT FROM THE ARTIST TO THE COMPANY FROM BRAND VALUE PROCEEDS**

(1) Without limitation to the foregoing, if ARTIST receives the COMPANY PORTION of Covered Proceeds earned during the TERM, ARTIST will account for and pay COMPANY the COMPANY PORTION within ten (10) days after receiving such payment by the ARTIST.

Without any limitation to the generality of the preceding sentence, ARTIST will irrevocably indicate, pursuant to a written letter substantially in the form attached under Exhibit A hereto, to ARTIST's current business representative and any subsequent business representative or Talent Agent that accounts for and pays the COMPANY PORTION directly to the COMPANY as per the preceding sentence and in accordance with the terms and conditions hereof. ARTIST will promptly notify COMPANY of the change in identity of the current or subsequent business representative or ARTIST's Talent Agent. ARTIST will provide COMPANY with a copy of each agreement with any Person ("Third Party") from whom ARTIST, ARTISTS or other Person is entitled to receive Covered Proceeds (each, a "Covered Proceeds Agreement"), within ten (10) days after such contracts have been executed. Each accounting statement sent to the COMPANY will include the specific calculation of the COMPANY Portion for the relevant TERM in reasonable detail, including but not limited to an itemization of all Covered Proceeds and all expenses. All accounting statements and payments in this subparagraph F will be sent to the COMPANY at the address indicated above, addressed to the CEO. ARTIST will ensure that COMPANY has the right to examine the books and records of each Third Party under each Covered Proceeds Agreement in the same manner as it applies to accounting reports to the ARTIST, the ARTIST or the applicable Person receiving Covered Proceeds on behalf of the ARTIST or ARTISTS. Regardless of the foregoing, COMPANY shall have the right to examine ARTIST and ARTIST's books and records solely as to the computation of the COMPANY PORTION (but not more than once every twelve (12) months and upon notice to the ARTIST with reasonable time and only once per accounting period) at the offices of the ARTIST where the records in question are to be kept. (Such review may include, without limitation, an examination of all Covered Proceeds Agreements and any status received by ARTIST, ARTISTS, or other Person under such agreements). If COMPANY objects to the statement, COMPANY will notify ARTIST of that objection within 3 years of the date COMPANY receives the ARTIST's accounting statement for the committed accounting period. Nothing herein shall relieve ARTIST of his obligation as an ARTIST to pay COMPANY the COMPANY PORTION, if such payment is not received by COMPANY through the appropriate business representative and ARTIST shall be liable to COMPANY for all payments not made to COMPANY as required by this subparagraph F **(1).** ARTIST shall sign such documents as are reasonably requested by COMPANY to execute and secure COMPANY's rights under subparagraph F (1), Section 4. (2) ARTIST warrants and represents that: ARTIST shall not grant rights or otherwise affect COMPANY'S PORTION of Covered Proceeds and (2) ARTIST shall be solely responsible for all costs and liabilities in connection with Covered Activities. ARTIST further acknowledges that COMPANY is not a licensed employment agent, theatrical agent, or talent agent under this Agreement. ARTIST agrees to consult a licensed talent agent regarding matters ordinarily managed by a talent agent and shall be solely responsible for payment of all necessary fees to such talent agents and to recruiting agencies or the like.

4. **ROYALTIES:**

Conditioned by the complete and faithful compliance of each and every one of the material terms presented herein, the COMPANY must pay the ARTIST the following royalties subject to this agreement: COMPANY agrees to pay the following royalties ("Royalties or ARTIST Royalties") to ARTIST:

**A.** **Exploitation of MASTERS and Sales of Audio and Video Products:** COMPANY will pay the ARTIST in the form of royalties twenty-five percent (25%) of the Net Recording Profits that the COMPANY receives from all sales of Audio Products resulting from the MASTERS or otherwise and from the exploitations of the MASTERS, including, but not limited to sales and licenses of MASTERS, sales and licenses of Audio Products, such as Digital Formats, flat rate licenses, etc., and the license to sell or exploit VIDEOS, (hereinafter, referred to as "Recording Royalties") capped at 3% for free assets used solely for promotional purposes.

      i.  As used hereinafter, the term "Net Proceeds" means all gross proceeds COMPANY receives from such exploitation, minus all costs and expenses COMPANY incurs in connection with such Album exploitation ("Expenses"). Expenses include but are not limited to Recording Costs, independent promotion, merchandising, advertising, cooperative advertising, freebies, postage, manufacturing, distribution, and publishing costs.

      ii.  No royalties will be paid to ARTIST until such time as all Down Payments and other amounts repayable hereunder or otherwise, including but not limited to Recording Costs, have been refunded or paid to COMPANY.

      iii.  Regarding Discs that do not consist solely of MASTERS produced hereunder, ARTIST royalties payable hereunder shall be measured based on the total number of such MASTERS that are on such Album and containing the ARTIST's performances hereunder compared to the total number of MASTERS on such Album.

      iv.  The ARTIST's royalties hereunder are "All-inclusive", which means that royalties include all royalties due to the ARTIST as well as any other ARTIST, producer, engineer, or other third-party performing services for the ARTIST and whom the ARTIST has hired in connection with the MASTERS or this agreement. ARTIST will be solely responsible for paying those third parties.

      b.    **Publishing Proceeds:** Except for royalties received by the performing rights company of COMPANY for the recording label's portion of the performance rights, as set forth under Section 3, paragraph A hereof, COMPANY shall pay ARTIST, as the author of the song, fifty percent (50%) of the Net Publishing Proceeds received by the COMPANY for any exploitation or license issued by the COMPANY for the Controlled Compositions and shall keep the remaining amount for itself.

**Exploitation of Special Rights and on Merchandise:** COMPANY will pay the ARTIST twenty-five percent (25%) of the Net Marketing Proceeds received by the COMPANY as a result of the exploitations and licenses issued by the COMPANY for the Marketing Rights or for a Special License of GRAPHIC MATERIAL.

D.      **Covered Proceeds:** Without limitation to the foregoing, if COMPANY receives the ARTIST Portion in connection with Covered Proceeds earned during the TERM, Company will account for and pay ARTIST the ARTIST Portion within thirty (30) days after the COMPANY has received such payment.

E.      **Mechanical Royalties:**

   i.   All Controlled Compositions appearing in the MASTERS and released for sale as Audio Products in Digital Format for Digital Broadcasting will be and are hereby permanently licensed to the COMPANY within the TERRITORY in exchange for a Mechanical Royalty of the selection equivalent to Seventy-five percent (75%) of the statutory mechanical rate per selection (in relation to playing time, effective from the date of the initial commercial release of MASTERS in the US, hereinafter sometimes referred to as the "Selection Fee".

   ii.  All Controlled Compositions appearing in the MASTERS and released for sale as physical setups of Audio Products (e.g., CDs, vinyl records, etc.) or Audiovisual Products hereunder shall be and hereby are permanently authorized to the COMPANY within the TERRITORY in a Mechanical Royalty for selection equivalent to Seventy-five percent (75%) of the statutory mechanical rate for selection (in relation to playing time, effective as of the date from the initial commercial release in the US of the MASTERS, hereinafter sometimes referred to as the "Selection Fee".

   iii. Notwithstanding the foregoing, the maximum total Mechanical Royalty that the COMPANY shall be required to pay in connection with any single, E.P., or L.P. in an Audio Product in any physical format, regardless of the number of compositions contained therein shall not exceed Double (2), Fivefold (5) or Tenfold (10) the "Selection Fee", respectively. For the avoidance of doubt, this restriction will not apply to Audio Products sold in a Digital Format via Digital Broadcasting.

   iv.  All Mechanical Royalties payable hereunder shall be paid based on the net Audio Products sold hereunder, for which royalties are payable to ARTIST as per this AGREEMENT.

   v.   ARTIST agrees not to record any Controlled Composition or any other song under this AGREEMENT without the COMPANY's written consent, for the latest of i) five (5) years after the date the COMPANY released any Controlled Composition or song recorded hereunder or ii) two (2) years after the expiration or termination of the TERM hereof.

vi. Payments made for Mechanical Royalties as per this AGREEMENT are considered Expenses.

## 5. MINIMUM WARRANTY:

A. Pursuant to the California Civil Code § 3423, the following provision shall apply regarding the guaranteed minimum remuneration for ARTIST. During the TERM and any extension hereof, the COMPANY guarantees that the ARTIST will receive the following guaranteed minimum compensation, which will consist of the settlement of royalties, the payment of any amount owed to the ARTIST as per this contract and any complementary payment made by the COMPANY to the ARTIST so that the ARTIST receives the guaranteed minimum amount in the corresponding year:

(a) The amount of nine thousand ($9,000) for the first year hereof.

(b) The amount of twelve thousand ($12,000) for the second year hereof.

(c) The amount of fifteen thousand ($15,000) in the third year hereof and for each subsequent year hereof (up to and including the seventh year).

(d) If during any year hereof ARTIST receives less than the corresponding minimum amount, ARTIST must inform the COMPANY no less than 15 days and no more than 30 days before the last day of the corresponding year; after informing the COMPANY, the COMPANY will have a period of 30 days to solve it.

(e) If during any year of the VALIDITY hereof, the ARTIST receives more than the minimum amount for that year, said excess will be applied to the following years during the Contractual period to reduce the minimum amount applicable to any subsequent year.

(f) Non-payment of the guaranteed minimum will not be considered a substantial breach of the COMPANY's obligations of the COMPANY resulting thereof.

**6.** **SEMI-ANNUAL ROYALTY ACCOUNTING:**

A. COMPANY will report to ARTIST ARTIST's Royalties or Mechanical Royalties (collectively, "Royalties" for purposes of this paragraph) payable hereunder in semi-annual periods each year on June 30 and December 31, respectively, during which Recordings, for which royalties are paid hereunder, are sold, paid for, and not returned.

B. Within ninety (90) days after the last day of each semi-annual period, COMPANY will provide ARTIST with a royalty report specifying the royalties earned by ARTIST, if any, during the semi-annual period, and each royalty report shall be accompanied by payment of all amounts due according to the report, after deductions of any and all applicable down payments or other deductions that the COMPANY may be entitled to obtain hereunder.

C. COMPANY shall be entitled to maintain a royalty reserve for the expected earnings to be generated by the Albums hereunder. Such reserve for royalties will not be established for any Album during any semi-annual accounting period in an amount greater than twenty-five percent (25%) of the number of Albums dispatched. Said reserve will be kept for two periods and will then be settled at the end of the accounting period when the reserve has been released to the COMPANY.

D. Royalties (including mechanical royalties) paid in connection with Discs, which are then returned, shall be considered an overpayment. If COMPANY makes any overpayment (as per the preceding sentence or otherwise hereunder) or COMPANY pays any amount on behalf of ARTIST or incurs any cost as a result of the Company's failure to comply with the terms hereof by artist, then, without limiting any of the other COMPANY's rights and remedies, such amounts shall represent a direct debt of ARTIST to COMPANY and ARTIST shall reimburse COMPANY for such amounts, and COMPANY shall have the right to deduct such amounts of any money otherwise payable to ARTIST under this or any other agreement.

E. No royalties will be payable to ARTIST in connection with the sale of Records or MASTERS by any COMPANY licensee or distributor until payment has been received by COMPANY in the US for such sales and such sales shall be deemed to have occurred within the semi-annual accounting period during which the licensee or distributor has rendered accounts and payments to the COMPANY for said sales.

17

F.     COMPANY will maintain ledgers in connection with sales of Audio Products hereunder. ARTIST or a certified public accountant, on behalf of ARTIST, may, at his own expense, examine the COMPANY books in connection with sales of Audio Products hereunder, solely for the purpose of verifying the accuracy thereof, only during the COMPANY's normal business hours and with reasonable written notice. COMPANY's books relating to any particular royalty account may be examined as above only within two (2) years after the date of release and COMPANY shall have no obligation to authorize ARTIST to examine such COMPANY books related to any particular royalty account more than once.

G.     Royalties associated with the sale of Audio Products outside of the United States will be calculated in the national currency with which COMPANY's licensees pay COMPANY, will be credited to the ARTIST's royalty account hereby at the same exchange rate with which the COMPANY is paid and will be subject, proportionally, to any transfer tax or the like, which may be imposed on the COMPANY's proceeds.

H.     ARTIST shall be deemed to have accepted all royalty accounts and all other accounts rendered by COMPANY hereunder and each such royalty account or other account shall be final and binding, shall constitute a statement of account and shall not be subject to any objection of any nature, unless it is a specific written objection establishing the basis thereof and that is presented by ARTIST to COMPANY within two (2) years after the date of release.

7.     **NAME AND LIKENESS, TRADEMARKS, AND WEBSITES:**

A.     During the TERM hereof and for as long as the COMPANY is entitled to the rights granted to it by virtue hereof, such as the sale of Audio Products or the sale or distribution of Merchandise or exploitation of the Controlled Compositions of ARTIST, ARTIST hereby grants to COMPANY the exclusive right and grants others the non-exclusive right to use the name, approved figure, voice, approved biographical material, or other identification of ARTIST in association with any promotion, marketing or advertising, in any medium now known and existing or created in the future.

B.     However, during the TERM hereof, ARTIST will not grant permission or consent to the use of ARTIST's Name and likeness for, or in connection with, the recording or exploitation of Audio Products pursuant to this agreement by any other than the COMPANY. This paragraph will not limit the rights that have been granted to the COMPANY herein in relation to the Marketing Rights or Special License established in this agreement.

B. ARTIST will request and obtain, on its own behalf and at the expense of ARTIST, the federal registration of a trademark and/or service mark of the professional name or logo of ARTIST, in relation to its use in all areas of the entertainment industry, including but limited to and in connection with the recording and sale of phonograph records, the establishment of fan clubs, the conduct of concerts and live performances, and the sale of clothing and other merchandise. If ARTIST does not apply for or obtain federal registration for any such trademark or service mark, COMPANY shall thereafter have the right to apply for and obtain federal registration for such trademark or service mark on behalf of ARTIST, the costs of which shall be considered a Down Payment, and ARTIST hereby appoints COMPANY as its duly authorized attorney for purposes of applying for and obtaining said registration. Such authority is related to an interest and is therefore irrevocable.

C.     COMPANY or its appointees have the exclusive and perpetual right to create and maintain a website ("Website") to promote ARTIST and to sell ARTIST's Audio Products. COMPANY will have the right to the Name and Image of ARTIST on the Website. COMPANY will be owner of all materials containing the ARTIST's Name and Image, created, and incorporated on the Website of ARTIST, subject to the approval of ARTIST, as established herein. COMPANY will have the right to register as its own any domain name incorporating the use of ARTIST's name or any variation of the ARTIST's name. COMPANY shall have the right to designate any ARTIST Website as the "official" website. However, ARTIST shall have the right to create one (1) Website related to the ARTIST's services as a recording and performance ARTIST. However, ARTIST shall not be limited in creating any number of social networking sites (e.g., MySpace, Facebook, etc.).

### 8.     EXCLUDED SERVICES

**COMPANY HAS INFORMED ARTIST THAT COMPANY IS NOT A TALENT REPRESENTATIVE OR AN EMPLOYMENT AGENT. ARTIST ACCEPTS THAT COMPANY DOES NOT HAVE AND SHALL NOT HAVE ANY OBLIGATION AND HAS NOT OFFERED OR HAS NOT ATTEMPTED TO OBTAIN, SEEK, OR PROCURE EMPLOYMENT OR CONTRACTING FOR ARTIST AND, EXCEPT TO THE EXTENT PERMITTED BY LAW, COMPANY HAS NO PERMISSION, OBLIGATION, AUTHORIZATION, OR EXPECTATION TO DO SO. HOWEVER, IT IS UNDERSTOOD AND AGREED THAT COMPANY MAY, AS REQUIRED BY LAW, ACT AT THE REQUEST OF AND IN CONJUNCTION WITH LICENSED TALENT REPRESENTATIVES IN SEVERAL MATTERS FOR ARTIST, FOR EXAMPLE AND INCLUDING BUT NOT LIMITED TO THE ACQUISITION OR INTENT TO ACQUIRE, THE ACCEPTANCE OF APPLICATIONS AND NEGOTIATION OF EMPLOYMENT CONTRACTS FOR ARTIST IN DETERMINED AREAS IN ORDER TO PROMOTE ARTIST'S CAREER AND ARTIST WILL MANAGE THE LICENSED TALENT REPRESENTATIVE WITH WHOM ARTIST AGREES IN WRITING TO AUTHORIZE AND REQUEST COMPANY TO ACT IN CONJUNCTION WITH SUCH LICENSED TALENT REPRESENTATIVE IN THE AREAS WHERE THE COMPANY IS EXPECTED TO PROVIDE SUCH SERVICES.**

**9.** SAL **DEFINITIONS:**

For purposes hereof, the terms below shall have the following meanings:

**"Down Payment"** means a payment in advance of Royalties, Recording Costs, Music Video costs, GRAPHIC MATERIAL costs. Unless otherwise specified herein, no Down Payment is an Expense and is refundable from ARTIST's Royalties payable hereunder.

**"Audio Products"** mean all sound reproduction formats, known or to be known, in or by means of which sound may be recorded for later transmission to listeners, incorporating sound, including without limitation discs of any speed or capacity, vinyl discs, compact discs, reel tapes, capsules, cassettes, audiovisual recordings, Digital Formats, Digital Transmissions, etc.

**"Music Video" ("Videos")** means the devices playing audio recording performances of ARTIST in conjunction with a visual image for home use or otherwise incorporating ARTIST's Performances.

o

**"Compositions"** mean any individual musical composition, regardless of length, including all spoken words, an interlude, and a medley.

**"Agreement Term"** means any agreement term where an obligation may be applicable either in the INITIAL TERM or in any subsequent OPTIONAL TERM.

**"Controlled Compositions"** mean all Musical Compositions or material recorded hereunder, which are written or composed, in whole or in part, or which are directly owned or controlled by ARTIST or by any MASTER producer subject to them.

**"Delivery"** means the receipt by the COMPANY of the newly recorded and technically satisfactory Master to constitute the Disc that must be delivered to COMPANY as per this agreement (mixed and mastered), together with all licenses, approvals, consents, and permissions necessary, and all ARTWORK to be used in connection with the production and distribution of Audio Products resulting from the Original Recording hereunder.

**"Digital Format"** means a digital configuration of a Master Recording used in support of delivery of the Original Recording via Digital Transmission, for example, but not limited to digital files such as MP3, MPEG, WAV, RAM, etc. or any other digital file currently known or created in the future.

**"Digital Transmissions"** mean the transmission and distribution to the consumer of the Digital Formats or other configurations other than physical Audio Products, whether sound only, sound in conjunction with an image or sound in conjunction with data, in any form, for example and not limited to downloading or otherwise transferring the ARTIST's performance in the MASTER or in Audiovisual Recordings recorded hereunder by telephone, satellite, cable, direct cable or over-the-air transmission and online computers, whether charged or not, a charge for receiving the transmission.

**"Entertainment Services"** mean the exclusive services of artist provided in the music industry, currently existing or to be developed in the future, for example and not limited to the areas of Recording Rights, Publishing, Marketing, Performance Services and Presentations Live, as set forth herein.

**"Expenses"** means all expenses made as per this agreement, except for Recording Costs, Music Video costs and ARTWORK costs, as those terms are defined herein; distribution rights; license fees and other payments to third parties on behalf of ARTIST; Unpaid Tour Expenses from Gross Proceeds collected by COMPANY from Live Performances; Extraordinary expenses related to the creation, production or manufacture of Merchandise not paid from the Gross Proceeds from Marketing Rights; legal or accounting fees payable to ARTIST's legal counsel or accountant hereunder (if such payments are made by COMPANY), customary artwork, taxes, mechanical royalties payable to third parties or payable to ARTIST hereunder; manufacturing or packaging costs, payable on behalf of ARTIST or fees associated with copyright processing fees; attorneys' or accountants' fees or other administrative expenses paid for the creation, enforcement, licensing, or exploitation of ARTIST(S)' rights granted hereby to company and any other costs, fees, charges, or expenses directly related to the representation or exploitation of ARTIST, as per the terms hereof; royalties paid by COMPANY to ARTIST as his share of publishing royalties as author; operating and administrative expenses of COMPANY related to the Controlled Compositions, including but not limited to copyright registration fees, promotional and advertising expenses directly related to Controlled Compositions, transcription costs of the main scores and production costs of demo recordings and any other cost, fee, charge, or expense directly related to the performance or exploitation of ARTIST's rights granted to COMPANY herein, including those expenses paid to ARTIST or on behalf of ARTIST by the COMPANY before the effective date hereof. .

**"Gross Proceeds"** mean any and all profits, income, and monies resulting from and actually received by COMPANY from the exploitation of ARTIST Entertainment Services and from the rights granted to COMPANY by ARTIST hereunder.

**"Album" ("Album")** means a Disc with at least ten (10) Compositions and at least forty (30) minutes in length.

**"Original Recording" ("Master" or "Masters")** means any original recording recorded hereunder together with any derivative thereof. Any reference to the Master, Masters or Original Recording will include Previously Recorded Masters.

**"Name and Image"** mean the individual names of ARTIST (the professional name and the legal name, either the one currently used or the one that ARTIST will use in the future) image, figure, logos, and other identification and bibliographic material related to ARTIST, and any trade names, trademarks or service marks used by individual members of ARTIST (collectively, "Name and Image").

**"Net Merchandise Proceeds"** mean the Gross Proceeds received by COMPANY under the terms hereof for the Merchandise Rights or Special Licenses after deducting all expenses attributed to the authorizations of the same or the cost of creating, producing, manufacturing, or distributing the ARTIST's Merchandise. If Expenses attributable to Merchandise Rights or Special Licenses are not recovered from Net Merchandise Proceeds, COMPANY may treat such unrecovered amount as a recoverable expense hereunder from Gross Proceeds.

**"Net Performance Proceeds"** mean all Gross Proceeds received by ARTIST or COMPANY on behalf of ARTIST from Live Performances, minus Touring Expenses and fees deducted by ARTIST's booking agent.

**"Net Proceeds per Edition"** mean the Gross Proceeds received by COMPANY under the terms hereof attributable to the exploitation of the edition of the ARTIST's songs recorded hereunder, after deducting any and all Expenses.

**"Net Recording Proceeds":** mean all Gross Proceeds received by COMPANY under the terms hereof attributable to the exploitation of Original Artist Recordings recorded or licensed hereunder and from the sale of Audio Products resulting from ARTIST's Original Artist Recordings, after deducting any and all expenses.

22

**"Recording costs"** shall be considered as Advances for the purposes hereof and shall include all costs incurred on the production of the MASTERS that include the ARTIST's presentations, including audiovisual recordings, and which are usually recognized as Recording Costs in the phonographic industry, such as all expenses incurred in connection with the production, mixing and mastering of sound or visual masters and all payments or advances made to the ARTIST hereunder, and payments to all musicians (including but not limited to, instrumentalists, leaders, arrangers, orchestrators, copyists and contractors), vocalists and producers, if any, providing services associated with any recording hereunder, payments to pension and welfare funds, relocation costs and instrument hire, studio rental or rooms, publishing costs, payroll taxes and other payments to third parties on behalf of the ARTIST related to recording costs, fees of external producers or secondary ARTISTS, replay costs or sampling license, and other reasonable expenses incurred by the COMPANY when producing the MASTERS; costs, taxes or payments to third parties in relation to the production of the MASTERS produced hereunder.

**"VALIDITY"** means the term hereof, including the INITIAL TERM and any subsequent OPTIONAL TERMS and any extensions or modifications extending the term hereof.

**"Tour Expenses"** mean the payment of all company-approved expenses to attend or produce a Live Performance, including, but not limited to, costs of production, promotion, or talent expenses associated with performing, traveling, lodging, and operating the ARTIST in connection with Live Performances. All costs associated with compensation, travel, accommodation, or operation that COMPANY pays to an employee or representative of COMPANY who collaborates in the tour or in the production of a Live Performance of ARTIST, as long as said costs are limited to those ARTIST would make for the same or similar expense.

**"Territory"** means the Universe.

**"Albums, Masters, Records", "recordings", and "sound recordings":** All forms of recording and playing by which sound can be recorded, now or hereafter known, manufactured, or sold primarily for home use, on a jukebox, or on any medium, including but not limited to magnetic recording tapes, films, electronic video recordings, and other media or devices for the production of ARTIST's performances manufactured or sold primarily for home, jukebox, or playing use, whether including (i) sound only or (ii) sound synchronized with visual images, e.g. "visual and auditory" devices.

**"Brand Value"** means the intangible value that an ARTIST accumulates as a result of COMPANY's successful efforts to establish ARTIST's brand **within the entertainment industry through artist and product development, and digital, radio and television promotion.**

10.    **NOTICES**

23

A.    All notices to ARTIST shall be in writing and may be addressed to ARTIST personally, by prepaid telegram, or by prepaid mailing by registered or certified mail, return receipt requested, addressed to ARTIST at his address as listed at the beginning hereof. COMPANY will be in charge of sending a courtesy copy of each notice sent to ARTIST to _____, Esq. in _____ , but failure of COMPANY to send such a courtesy copy will not represent a breach hereof or affect the effectiveness of such notice.

B.    All notices to COMPANY shall be in writing and must be sent prepaid by registered or certified mail, return receipt requested, addressed to COMPANY at its address listed above, with a concurrent copy mailed also to George L. Prajin, Esq. Lopez & Prajin, 500 Newport Center Dr. Suite 600, Newport Beach, Ca 92660.

## 11.    SUSPENSIONS AND NON-COMPLIANCE:

A.    If ARTIST for any reason fails to timely comply with its recording and delivery commitments hereunder, as per the terms hereof, then, in addition to any other rights or remedies that COMPANY may have, COMPANY shall have the right, upon prior written notice to ARTIST before expiration of the current term, (i) to terminate this agreement without further obligation to ARTIST for unrecorded or undelivered masters, (ii) to reduce the minimum number of masters that must be recorded and delivered in the current Term to the number that has been recorded and delivered in said Term, or (iii) extend the VALIDITY Term for the duration of said breach plus one hundred fifty (150) days for the exercise of COMPANY of its options to extend the TERM and the start dates of the subsequent Terms that are considered extended accordingly). COMPANY agrees that as long as ARTIST has commenced recording MASTERS sufficiently in advance of the date such MASTERS are hereby due to be delivered on time, and as long as recording such MASTERS is complete, ARTIST will have forty-five (45) days from the date COMPANY notifies ARTIST of the termination hereof according to subparagraph 10(a)(i), with this agreement terminating at the end of said forty-five (45) day period. It is specifically understood that COMPANY may exercise any or all of its rights in relation to Section **11,** subparagraphs A (i), (ii) and (iii) at any time prior to the date on which the TERM would otherwise expire. COMPANY's obligations hereunder shall be suspended for the duration of any breach. Regardless of said suspension, COMPANY will continue to pay artist royalties when due, unless said suspension is due to acts or omissions under ARTIST's control. The provisions of this subparagraph will not cause the extension of the TERM for a period exceeding that allowed by current law, if any, for the fulfillment of personal service contracts.

B.    COMPANY reserves the right, at its discretion, to suspend the operation hereof for the duration of any of the following eventualities, if due to one of said eventualities it is prevented from complying with its obligations hereunder or its normal business operations are delayed or become impossible or commercially impracticable: An Act of God, fire, catastrophe, labor disagreement, government actions, agencies or officials, any order, regulation, norm or action of a union or association of artists, musicians, composers, or employees affecting COMPANY or the industry to which it belongs, delays in the delivery of materials and supplies, or any other cause beyond the COMPANY's control. Any suspension due to labor disputes involving the COMPANY only will be limited to a six (6)-month period.

C.    If ARTIST's voice or ability to perform as an instrumentalist is materially or permanently affected, then, in addition to any other rights or remedies COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST, to terminate this agreement and will release all liability related to unrecorded masters.

## 12.    REMEDIATION OF NON-COMPLIANCE:

Neither party shall be in non-compliance unless the other party gives notice of breach and the notified party fails to cure such breach within thirty (30) days (fifteen [15] days, in the case of money payments) after notice has been received; provided that, if the alleged breach does not involve payments of money and is such in nature that it cannot be fully cured within thirty (30) days. The notified party shall not be deemed in breach if it commences remedy of the alleged breach within thirty days and proceeds to complete it with due diligence within a reasonable time thereafter.

## 13.    REPRESENTATIONS AND WARRANTIES:

A.    During the TERM, ARTIST will not perform for anyone other than the COMPANY for the purpose of recording discs and will not authorize the use of his name, image, or other identification of ARTIST for the purpose of distributing, selling, advertising, or exploiting discs within the Territory for anyone other than COMPANY.

B.    ARTIST will not perform any selection recorded hereunder for the purpose of creating discs for anyone other than COMPANY (i) for a period of five (5) years after the initial release date of the relevant disc containing such selection or (ii) for a period of two (2) years after the expiration or other form of termination hereof, whichever is later ("Restriction on Re-Recording of Previous Works").

C.    ARTIST waives all so-called "moral rights" that ARTIST may have in any MASTERS, records, albums, or compositions controlled hereunder and any other similar rights arising anywhere in the Territory that may affect the ability of ARTIST to COMPANY or COMPANY's affiliates or licensees to fully exploit all Original Recordings.

D.      ARTIST accepts that the sale of records is speculative and agrees that COMPANY's judgment shall be binding and conclusive on ARTIST on any matter affecting the sale, licensing, distribution, and exploitation of such records. Nothing herein shall bind COMPANY to make, sell, license, or distribute discs made from the MASTERS governed hereby, except as otherwise expressly provided in subparagraph 6(b) hereof.

E.      Provided that ARTIST does not breach anything hereof and COMPANY receives enough commercially satisfactory complete, fully edited, and mixed MASTERS encompassing each newly recorded Album required hereunder, including newly recorded studio performances required from ARTIST with previously unreleased ARTIST material, ready for COMPANY to manufacture records, together with all materials for that purpose, COMPANY agrees to release commercially through normal retail channels, e.g., digital, each individual Album or master recording delivered hereunder in the United States within one hundred twenty (120) days after delivery by ARTIST and acceptance of the applicable Album or master recording by COMPANY.

F.      It is understood and agreed that if COMPANY does not release any such LP in the United States within sixty (60) days after expiration of said one hundred and twenty (120) day period, ARTIST shall be entitled to notify COMPANY in writing of such breach by COMPANY and of ARTIST's desire that the TERM hereof be terminated if COMPANY does not commercially release the applicable LP in the United States within seventy-five (75) days after the COMPANY receives such notification from ARTIST. It is specifically understood and agreed that if the COMPANY breaches any release commitment, COMPANY shall have no civil liability whatsoever to ARTIST (other than the obligation of COMPANY to account for and pay due royalties, if any) and that the ARTIST's sole remedy shall be to terminate TERM hereof by giving written notice to COMPANY within fifteen (15) days after expiration of said seventy-five (75) day period.

G.      ARTIST warrants and represents that ARTIST has no disability, restriction, or prohibition, contractual or otherwise, affecting the right of ARTIST to execute this agreement and comply with its terms and conditions. ARTIST also guarantees and represents that ARTIST has not previously assumed or entered into obligations, contracts or agreements of any kind that are going to interfere in any way the full compliance hereof by ARTIST or ARTIST's right to record each and every one of the selections governed hereby. ARTIST guarantees and represents that, except for the MASTERS listed under Exhibit "A" hereto, there are currently no previous unpublished MASTERS in existence that include interpretations of ARTIST and that ARTIST will not release, authorize, or allow the release of such MASTER within the Territory. In addition, ARTIST warrants and represents that it will not require COMPANY to make any payment of any nature for or in connection with the provision of ARTIST's services or the acquisition, exercise, or exploitation of rights by COMPANY hereunder, except as specifically provided above.

26

H.     ARTIST guarantees and represents that no material or use thereof will violate any law or infringe or violate the rights of any third party. In this Section 13, "Materials" shall include: (i) all musical compositions and other materials contained in the MASTERS governed hereunder, (ii) all names used by ARTIST in connection with the MASTERS recorded hereunder, and (iii) all other materials, ideas, other intellectual property or items provided or selected by ARTIST contained in or used in connection with any MASTER recorded hereunder or packaging, sale, distribution, advertising, public broadcast, or other exploitation thereof .

14.    **UNIQUE SERVICES**

ARTIST expressly accepts that ARTIST's services discussed herein have a special, unique, and intellectual character that gives them a peculiar value and that in the event of a real or potential breach by ARTIST of any term, condition, or agreement hereof, COMPANY will suffer immediate irreparable damage. ARTIST expressly accepts that COMPANY shall have the right to pursue injunctive relief and equitable relief, as permitted by law, to prevent an actual or potential breach or of any part hereof by ARTIST and that such remedies will be additional to any other right or remedy for damages or otherwise available to COMPANY.

15.    **INDEMNITY:**

ARTIST agrees to hold COMPANY harmless from any and all losses and damages (including court costs and reasonable attorneys' fees) arising out of or in connection with or resulting from any actual omission, default, or real or threatened breach of ARTIST on any guarantee, representation, agreement, commitment, or covenant hereof, including but not limited to a third party claim on the foregoing and hereby holds it harmless, safe and exempt from liability. In addition to any other right or remedy available to COMPANY as a result of such actual or potential omission, default or breach or any claim, ARTIST shall reimburse COMPANY, upon request, for all payments made by COMPANY at any time thereafter from the date hereof for any loss, damage, or civil liability resulting therefrom and, in addition to the foregoing, COMPANY shall be entitled to subtract from all monies payable to ARTIST hereunder or any other CONTRACT the amounts equal to such loss, damage, or liability, including actual and expected court costs and reasonable attorneys' fees. COMPANY will notify ARTIST in a timely manner of any third-party claim in which the above indemnity applies, and ARTIST will have the right to participate in the defense of said claim through a lawyer chosen by ARTIST and paid for by ARTIST himself. While said claim is settled, COMPANY may withhold payment of all monies due hereunder or from any other contract in amounts consistent with said claim.

ARTIST shall be entitled to establish a bond in an amount equal to the amount withheld by COMPANY regarding any claim by means of a valid and sufficient bond approved by COMPANY, provided that said bond pledges in writing and unconditionally the payment of all costs, fees, damages, etc., incurred by COMPANY as a result of said claim.

## 16.    APPROVALS

Whenever ARTIST's approval or consent is required herein, such approval or consent may not be unreasonably withheld. COMPANY may require ARTIST to formally grant or withhold such authorization or consent by providing written notice to ARTIST requesting such authorization or consent and providing ARTIST with the information or material for which such approval or consent is requested. ARTIST will notify COMPANY in writing of his approval or disapproval within ten (10) days after receiving the notice above. ARTIST will not interfere with or delay the scheduled release of any Disc governed hereunder. In case of disapproval or lack of consent, relevant reasons will be disclosed. Failure to notify COMPANY as above will be considered as a consent or approval.

## 17.    ASSIGNMENT:

COMPANY shall have the right to assign this agreement in whole or in part to any subsidiary, parent company, affiliate, or to any third party purchasing a substantial part of COMPANY's assets or shares without the ARTIST's consent. The terms of any assignment will provide that the assignee will assume the obligations of COMPANY set forth herein.

## 18.    INDEPENDENT CONTRACTOR:

Nothing herein contained will represent an association or temporary union of companies between COMPANY and ARTIST. It is specifically understood that ARTIST is hereby acting as an independent contractor.

## 29.    FULL INTEGRATION

This agreement establishes the entire agreement between the parties on the object hereof. No modification, amendment, waiver, cancellation, or termination hereof will be binding on COMPANY unless endorsed by a written instrument signed by a COMPANY's officer. No modification or amendment hereto shall be binding on ARTIST unless endorsed by a written instrument signed on behalf of ARTIST.

Waiver by COMPANY of any term or condition hereof in any instance will not be considered or construed as a waiver of such term or condition in the future or as a waiver of any subsequent breach of such term or condition. All rights and remedies available to COMPANY herein shall be cumulative and none of them shall limit any other remedy or right available to COMPANY. If any provision hereof is annulled, invalidated, or revoked by a court of competent authority, such decision will not affect any other provision hereof and the remainder of this Agreement will continue as effective as if the annulled, invalidated, or revoked provision had not been part hereof. It is agreed that all accounting and payments required hereunder, as well as all grants hereunder, shall survive and persist after expiration or early termination hereof. No breach hereof by COMPANY shall be deemed a material breach unless COMPANY fails to cure such breach, if any, within forty-five (45) days after receiving written notice specifying the nature of the breach on the part of ARTIST, who will send it within thirty (30) days after becoming aware of the existence of such non-compliance.

## 20.   MISCELLANEOUS

### A.   NULLITY OF TERMS:

If any clause, sentence, paragraph, or part hereof or if enforcement of any clause, sentence, paragraph, or part hereof to any person is declared void for any reason in a court of competent jurisdiction, said judicial decision will limit and restrict its effect on the clause, sentence, paragraph, or part as above that is directly involved in the dispute that led to such judicial decision and the person involved.

### B.   LIFE INSURANCE:

At discretion, COMPANY shall have the right to contract at COMPANY's cost and expense, life insurance or other insurance for ARTIST, which includes, but is not limited to, insurance against non-provision of the services herein described by ARTIST, in the amounts or types of coverage that the COMPANY determines and, if applicable, for the benefit of COMPANY. Except as expressly agreed to by COMPANY in writing, neither ARTIST nor any of ARTIST's affiliates shall have any right, title, or interest in such insurance. At COMPANY's, ARTIST and ARTIST's affiliates will collaborate and assist COMPANY or its representative (as directed by COMPANY) in obtaining and maintaining any type of coverage, including ARTIST attendance of physical examinations or otherwise and the delivery of such information and medical records required by any existing or proposed insurer and the performance of all other acts or things, and execution of all additional documents or instruments necessary for COMPANY to manage such contemplated insurance as detailed in this Section **21 b.**

29

**C.** **APPLICABLE LAW:**

This agreement was entered into in Fresno CA. _____and its validity, construction, and legal effect shall be governed by the laws of Los Angeles County, State of California, applicable to contracts entered into and performed entirely within Los Angeles County, State of California, with respect to the determination of any claim, dispute or discrepancy that may arise from the construction, execution or breach hereof. Any dispute, claim, mediation, or litigation arising out of this Agreement shall be conducted in Los Angeles County, California.

**D.** **ATTORNEY'S FEES**

If any legal action is filed to enforce the rights of any of the parties hereto, the prevailing party of such legal action shall be entitled to a refund of **attorney's fees** and court costs, plus any other relief thereto.

**E.** **SUCCESSOR TO ASSETS:**

This Agreement will inure to the benefit of and be binding on each party hereto and their respective successors, assigns, and authorized representatives. At the COMPANY's discretion, it may assign this agreement or any of its rights hereunder.

**F.** **RIGHT TO LEGAL REPRESENTATION:**

**ARTIST represents and warrants that ARTIST has read this Agreement and that ARTIST understands that it is an important legal document. ARTIST hereby represents and guarantees that he has been informed of his right to have independent legal counsel regarding the negotiation and execution hereof and that he has hired and has been represented by such legal advisor or has knowingly waived his right to such legal counsel and that he wishes to enter into this agreement with the benefit of independent legal representation.**

**SIGNATURE PAGE FOLLOWS**

This agreement will not enter into force until executed by all parties.

IN WITNESS WHEREOF, the parties hereto have executed this agreement on the day and year listed above.

[Signature] _____
DOB

_____
DOB:

_____
DOB:


COMPANY: HYPHY MUSIC, INC.

By:

[Signature] _____
Jose Martinez

**JAIME SALVADOR GARCÍA GONZÁLEZ**
Attorney at Law/ Federal Public Attester Number 61 of Mexico City
Certified Private Mediator Number 253 of Mexico City
&
Official Translator of English-Spanish of the Superior Court of Justice of Mexico City
Dakota 204 Despacho 104
Nápoles
Benito Juárez
03810, Mexico City
55-55-36-76-84 / 55-55-43-84-52
55-52-05-95-43 / 55-11-07-60-47
info@formatuempresa.com.mx
www.formatuempresa.com.mx

-------------------------------------------------- **Certification** --------------------------------------------------

-------------------------------------------------- **Translation** --------------------------------------------------

-------------- **4,334/2022 (four thousand three hundred thirty-four /two-thousand twenty two)** -----------

--------- Mexico City, December 14, 2022. --------------------------------------------------------------------

--------- I, **Jaime Salvador García González,** Attorney at Law/Public Broker (Federal Public Attester) number 61 (sixty-one) in Mexico City and Official Spanish-English Expert Translator of the Supreme Court of Justice of Mexico City (as published on page **twenty-eight**, Notice Section from the *Boletín Judicial* (Judicial Gazette) of the Supreme Court of Justice of Mexico City of **March 8th, 2021**), hereby certify the following: ----------------------------------------------------------------------------------------

--------- That this translation from **Spanish into English**, is a true and correct rendering to the best of my knowledge. ----------------------------------------------------------------------------------------------


**Jaime Salvador García González**

Attorney at Law/ Federal Public Attester Number 61 (sixty one) of Mexico City

&

Official Translator of English-Spanish of the Superior Court of Justice of Mexico City

JAIME SALVADOR GARCÍA GONZÁLEZ
Corredor Público número 61 de la Ciudad de México / Mediador Privado Certificado 253 de la Ciudad de México
Traductor Inglés- Español
Dakota 204 Despacho 104
(Casi esq. con Filadelfia, a lado del WTC)
Nápoles
Benito Juárez
03810, Ciudad de México
55-55-36-76-84 / 55-55-43-84-52
55-52-05-95-43 / 55-11-07-60-47
info@formatuempresa.com.mx
www.formatuempresa.com.mx

------------------------------------------------ Certificación ------------------------------------------------

------------------------------------------------ Traducción ------------------------------------------------

-------------------- 4,334 /2022 (cuatro mil trescientos treinta y cuatro /dos mil veintidós) ------------------

--------- **Ciudad de México**, a catorce de diciembre del dos mil **veintidós**. ------------------------------------

---------**Jaime Salvador García González**, Corredor Público número sesenta y uno de la <u>Ciudad de</u> <u>México</u> y Perito Traductor Inglés-Español, Auxiliar de la Administración de Justicia del Tribunal Superior de Justicia de la <u>Ciudad de México</u> (según consta mediante publicación realizada en la página **veintiocho**, Sección de Avisos, del *Boletín Judicial del Tribunal Superior de Justicia de la <u>Ciudad de México</u>* del **ocho de marzo del dos mil veintiuno**), en ejercicio de mi carácter de Perito Traductor, certifico y hago constar lo siguiente: ---------------------------------------------------------------------------------------------------------

---------Que la presente traducción del Idioma **Español al Inglés**, es fiel y completa a mi leal saber y entender del original que tuve a la vista. -----------------------------------------------------------------------------

**Jaime Salvador García González**

Corredor Público número sesenta y uno de la Plaza del Distrito Federal (hoy **Ciudad de México**)

y

Perito Traductor Inglés-Español del Tribunal Superior de Justicia de la **Ciudad de México**

# EXHIBIT 2

# 360 EXCLUSIVE MULTI RIGHTS RECORDING AGREEMENT

This Agreement ("AGREEMENT") made and entered into as of this _12_ day of _October_, 20 _22_ by and between Hyphy Music, Inc., located at 2727 N. Grove Industrial Drive, #155, Fresno, California 93727 (hereinafter "COMPANY"), and _Alfonso Vargas_ and _____, professionally known as _Los Originale de SAN Juan_, located at _5275 ave you Dinuba CA 93618_ (hereinafter "ARTIST") with respect to ARTIST exclusively rendering ARTIST'S entertainment services ("ENTERTAINMENT SERVICES") for COMPANY.

In consideration of the foregoing, the agreements and mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## 1. ENGAGEMENT

### A. RECORDING SERVICES

COMPANY hereby engages ARTIST to render exclusively to COMPANY services as a musical performer in the making of Master Sound Recordings ("MASTERS"), and ARTIST hereby accepts such engagement and agrees to render such services exclusively in the territory, to COMPANY during the term of this AGREEMENT and all extensions and renewals.

### B. BRAND EQUITY

(1)     ARTIST hereby engages COMPANY to (1) provide various branding services, including, but not limited to, artist and product development, record production, music video production, public relations, and media promotion (print, radio, online, digital, social media, television promotion); and (2) to use best efforts to actively participate and support such activities necessary for the furtherance of ARTIST'S career in the entertainment industry.

(2)     COMPANY hereby accepts such engagement in exchange for ARTIST'S grant and assignment to COMPANY a percentage, as defined herein, of revenue from and/or arising out of or in connection with any of the ARTIST'S activities in the entertainment industry, including, without limitation, the following activities (collectively, "COVERED ACTIVITIES"):(A) music publishing, (B) touring and other live performance engagements, (C) the services of the ARTIST (or any member thereof) as an actor or performer (in any and all media, including without limitation, film, television, cable, digital, internet, social media, IP TV), (D) the use of the ARTIST'S name, image (or the name and image of any member thereof), and any of their likeness and/or logos on merchandise (other than Records), and (E) endorsements, appearances, sponsorships and strategic partnerships, as set forth in this Agreement.

1

## C.   <u>TERRITORY</u>

The rights herein granted to COMPANY and the obligations of ARTIST shall be for the Universe ("TERRITORY").

## D.   <u>TERM</u>

(l)   The Term of this AGREEMENT shall be for an initial period of one (1) year commencing on the date hereof ("INITIAL PERIOD"). Additionally, ARTIST hereby grants to COMPANY six (6) consecutive separate options to extend the term for further periods of one (1) year each ("OPTION PERIODS"), each upon the same terms and conditions applicable to the INITIAL PERIOD, except as otherwise hereinafter set forth. The INITIAL PERIOD and every OPTION PERIOD for which COMPANY has exercised its option are hereinafter sometimes referred to together as the "TERM."

(2)   Each option shall be exercised, if at all, by notice to ARTIST at any time prior to the date the TERM would otherwise expire.

Notwithstanding, if COMPANY fails to timely exercise an option to extend, COMPANY shall nevertheless have the right to exercise that option unless ARTIST provides written notice to COMPANY that the option has not been exercised and COMPANY then fails to exercise the option within thirty (30) business days after receipt of that notice.

## 2.   RECORDING SERVICES

## A.   DELIVERY COMMITMENTS

(l)   Upon execution of AGREEMENT, ARTIST shall deliver and hereby irrevocably assigns and transfers to COMPANY all rights (including the sound recording copyright and Audio Video copyright and all renewal rights) in the sound recordings listed on Exhibit A, which is attached hereto and incorporated by reference

## B.   RECORDING COMMITMENTS

(l)   During the INITIAL PERIOD, ARTIST shall jointly record and deliver to COMPANY sufficient audio masters ("MASTERS") the equivalent to a minimum of one (1) long playing album ("ALBUM"), each Album embodying no less than 30 minutes in playing time and containing no less than ten (10) musical compositions, consistent with the style and manner of the masters previously recorded by ARTIST.

(2)   During each OPTION PERIOD, ARTIST shall jointly record and deliver to COMPANY sufficient audio masters the equivalent to a minimum of one (1) long playing Album, each Album embodying no less than 30 minutes in playing time and containing no less than ten (10) musical compositions, embodying Compositions not heretofore recorded by ARTIST ("Album") and consistent with the style and manner of the masters previously recorded by Artist.

2

(3)    The First Album required to be delivered during the INITIAL PERIOD shall be delivered within sixty (60) days following COMPANY's request therefor. The additional Albums required to be delivered during the INITIAL PERIOD and any OPTION PERIOD shall be delivered to COMPANY within sixty (60) days following COMPANY's request therefor. It is understood that ARTIST shall not deliver any Album within nine (9) months from the date of delivery of a prior Album. Notwithstanding anything to the contrary contained in this AGREEMENT, COMPANY shall have no less than sixty (60) days following the date of ARTIST'S delivery to and acceptance by COMPANY of Album, in accordance with all of the terms and conditions of this AGREEMENT, within which to exercise its immediately succeeding option to extend the TERM pursuant to section 1 paragraph D hereof, and all subsequent Periods shall be deemed extended accordingly.

(4)    The MASTERS comprising each Album required to be recorded and delivered hereunder shall hereinafter sometimes be referred to as the "First Album," the "Second Album," the "Third Album," the "Fourth Album," and the "Fifth Album," respectively, in the order in which same are accepted by COMPANY hereunder.

## C.    **RECORDING BUDGET:**

(1)    With respect to the first ALBUM to be delivered under the INITIAL PERIOD, and each Committed ALBUM, following delivery of the first ALBUM, COMPANY and ARTIST shall consult and prepare a recording budget (the "BUDGET.") COMPANY shall have final approval of BUDGET. COMPANY shall engage the services of all necessary personnel and obtain all necessary equipment and other services in connection with the recording of the MASTERS to be produced hereunder. Notwithstanding, COMPANY may authorize ARTIST to incur costs in association with the recording of MASTER(s). However, ARTIST shall not incur any costs in connection with the MASTER(s) unless COMPANY has approved the costs therefor. All approved Recording Costs (as such term is hereinafter defined) shall be paid by COMPANY, subject to the provisions of section 2 paragraph C (2) below.

(2)    If ARTIST directly incurs any pre-approved costs in connection with the MASTER(s), ARTIST will deliver, or cause to be delivered, to COMPANY copies of all substantiating invoices, receipts, vouchers and similar satisfactory documentary evidence of Recording Costs and if ARTIST fails to do so, COMPANY's obligation to pay such costs shall be suspended until delivery thereof. To the extent, if any that the Recording Costs in connection with any MASTER(s) produced hereunder exceed the approved BUDGET therefor, ARTIST shall be solely responsible for payment of such excess costs. Nothing contained in this AGREEMENT shall obligate COMPANY to permit the continuation of any recording session if COMPANY reasonably anticipates that the Recording Costs therefor will exceed those specified in the approved BUDGET or that the MASTERS being recorded will not be technically and commercially satisfactory to COMPANY. If COMPANY, in its sole discretion, pays any such excess costs (which COMPANY shall not be obligated to do), ARTIST shall promptly reimburse COMPANY therefor upon demand. Moreover, COMPANY shall have no obligation to pay (i) any recording costs with respect to any MASTERS which are not recorded in accordance with all of

the terms and conditions of this AGREEMENT, (ii) any recording fees or arranging fees which exceed union scale unless such excess and the proposed recipient thereof are specified in the proposed BUDGET and approved by COMPANY, or (iii) any penalties, fines, late charges or other costs incurred for late payment of recording costs if such late payment(s) is/are not the fault of COMPANY. If COMPANY pays any costs or fees described in the preceding sentence (which COMPANY shall not be obligated to do), ARTIST shall be deemed responsible for such costs or fees so paid by COMPANY, and ARTIST shall promptly reimburse COMPANY therefor upon demand. Any sums paid by COMPANY and not promptly reimbursed by ARTIST as provided in this paragraph C (2) of this section may, at COMPANY's election and without limiting COMPANY's other rights or remedies, be applied by COMPANY in reduction of any royalties or other sums payable to ARTIST under this Agreement.

(3)     **"RECORDING COSTS"** shall be considered Advances under this Agreement and shall mean all costs incurred with respect to the production of MASTERS embodying the ARTIST'S performances, including audio visual recordings, and which are customarily recognized as Recording Costs in the phonograph record industry including but not limited to all expenses incurred in connection with the production, mixing and mastering of audio and/or visual masters and all payments and/or advances to ARTIST hereunder, as well as payments to all of the musicians (including without limitation, instrumentalists, leaders, arrangers, orchestrators, copyists and contractors) vocalists and producers, if any, rendering services in connection with any recordings hereunder, payments to union pension and welfare funds, costs of cartage and instruments hire, studio or hall rentals, editing costs, payroll taxes and other payments to third parties on ARTIST'S behalf related to recording costs, fees to third party producers or side ARTISTs, fees for replay or a sampling license, and other reasonable expenses incurred by COMPANY for the purpose of production of the MASTERS; costs, taxes and/or third party payments in connection with the production of the MASTERS produced under this AGREEMENT.

## D.     **RECORD PRODUCTION**

(1)     The MASTERS recorded hereunder by ARTIST shall be recorded in a recording studio selected by COMPANY at such times as ARTIST and COMPANY may mutually designate or approve. Each MASTER delivered hereunder shall consist of ARTIST'S newly recorded studio performances of material mutually selected by ARTIST and COMPANY and not previously recorded by ARTIST. Each MASTER shall be subject to COMPANY's approval as commercially satisfactory. ARTIST shall deliver to COMPANY a two-track stereo master of each MASTER. Each MASTER shall be completed, fully edited and mixed prior to delivery to COMPANY, in the proper form for the production of the parts necessary for the manufacture and digital distribution of commercial records. Upon the request of COMPANY, ARTIST shall re-record any selection until a commercially satisfactory MASTER shall have been obtained. Each MASTER shall be delivered to COMPANY at a place designated or approved by COMPANY. COMPANY approves its offices in Anaheim, California for the delivery of MASTERS hereunder.

(2)     Should ARTIST fail to appear at any recording session of which ARTIST has been given written notice, for any reason, without ARTIST giving forty-eight (48) hour notice to COMPANY of an inability to appear as scheduled, then ARTIST shall be personally responsible

to repay COMPANY within thirty (30) days of COMPANY's presentation of an invoice for the cost incurred by COMPANY for ARTIST'S failure to appear without providing such notice.

E.    **ARTWORK:**

COMPANY shall be the owner of the copyright in all artwork created for and incorporated into packaging of ARTIST'S Audio and Visual Products released pursuant to this Agreement or used by COMPANY in marketing or promotion materials ("ARTWORK.") All costs of preparation of such ARTWORK or paid by COMPANY for preparation and rights to ARTWORK shall be considered Advances as set forth in this Agreement. COMPANY agrees to consult with ARTIST in connection with the preparation of the ARTWORK. ARTIST shall approval over the ARTWORK. However, in the event of a dispute, the decision of COMPANY shall control.

E.    **VIDEO RIGHTS:**

During the TERM hereof, COMPANY shall have the exclusive worldwide right to produce, manufacture, and distribute audiovisual programs and music videos ("VIDEOS") of ARTIST for commercial and/or promotional purposes including any commercial sale, streaming, or other exploitation, including but not limited to, social media and channel uploading such as YouTube, or authorize others to do so. All recording and production costs directly or indirectly incurred in connection with the creation of VIDEOS shall be approved and paid by COMPANY and considered Advances as set forth in this Agreement. ARTIST grants COMPANY a synchronization license for the right to use any Controlled Composition in a VIDEO and waives the right to be paid a separate synchronization fee for the use of the Controlled Composition embodied in a VIDEO or any mechanical license for the distribution and sale of the Video.

G.    **MECHANICAL LICENSE**:

All musical compositions or material recorded pursuant to this AGREEMENT, which are written or composed, in whole or in part, or owned or controlled directly or indirectly by ARTIST or any producer of MASTERS subject thereto (herein "Controlled Compositions") appearing on the MASTERS and released on Audio Products hereunder, shall be and are hereby perpetually licensed to COMPANY for the TERRITORY for Controlled Compositions appearing on Audio Products released by COMPANY. COMPANY shall be responsible for paying any mechanical royalties owed to third parties for a composition ("Composition"), including co-authors of co-written Controlled Compositions, and such mechanical royalty payment shall be considered an Expense. ARTIST agrees not to record any Controlled Composition or Composition recorded and delivered to COMPANY hereunder five (5) years from the date of termination of this Agreement.

H.    **COPYRIGHTS OWNERSHIP**

(l)    All MASTERS recorded and delivered by ARTIST and any VIDEOS as described herein, during the TERM from the inception of the recording thereof and all reproductions derived therefrom, together with the performances embodied thereon, shall from the inception of its creation, be considered a work "made-for-

hire" for COMPANY within the meaning of the U.S. Copyright Act. If it is determined that a particular MASTER and/or VIDEO does not so qualify, then such MASTER and/or VIDEO, together with all rights therein (including the sound recording copyright and Audio Video copyright and all renewal rights), shall be deemed irrevocably assigned and transferred to COMPANY by this AGREEMENT. All MASTERS and Videos produced hereunder shall, from the inception of their creation and/or delivery, be entirely the property of COMPANY in perpetuity, throughout the world, free of any claim whatsoever ARTIST or by any persons deriving any rights or interests from or through Producer. Without limiting the generality of the foregoing, COMPANY, its licensees and designees, shall have the sole and exclusive right in perpetuity and throughout the world:

(2)     Without limiting the generality of the foregoing, COMPANY, its licensees and designees, shall have the sole and exclusive right in perpetuity and throughout the world:

(i)     To manufacture, advertise, sell, license, distribute, or otherwise dispose of the MASTERS, VIDEOS, and records derived therefrom, in any or all fields of use by any method and/or medium now or hereafter known, records embodying the MASTERS subject hereto, all upon such terms and conditions as COMPANY may elect, or at its discretion, to refrain therefrom;

(ii)    To alter, change, modify or edit any of the MASTERS, VIDEOS, and all records and reproductions made therefrom. Notwithstanding the foregoing,

(iii)   To release records and VIDEOS embodying the performances to be recorded hereunder under any name, trademark or COMPANY which COMPANY or its subsidiaries, affiliates or licensees may from time to time elect;

(iv)    To perform the MASTERS and VIDEOS publicly and to permit the public performance thereof by any method now or hereafter known;

(v)     To use and publish, and permit others to use and publish, ARTIST'S name *(including all professional, group and assumed or fictitious names now or hereafter adopted or used)*, and photographs and likenesses of and biographical material concerning ARTIST in connection with the promotion, exploitation and sale of records derived from the MASTERS and VIDEOS. If so requested by COMPANY, ARTIST shall provide COMPANY with approved photographs of and biographies concerning ARTIST promptly upon COMPANY's request therefor;

(vi)     To obtain copyrights and renewals thereof in sound recordings (as distinguished from the musical compositions embodied thereon) and VIDEOS recorded by ARTIST during the TERM, in COMPANY's name as owner via a valid written assignment and/or employer-for hire of such sound recordings and VIDEOS.

## 3.    BRAND EQUITY

COMPANY will be entitled to receive, and ARTIST shall pay, in accordance with this section subparagraph F below, to COMPANY an amount (the "COMPANY SHARE") as defined below of Covered Revenues. "COVERED REVENUES" means any and all monies (including, without limitation, royalties, advances, revenues, fees, audit settlements and legal recoveries) otherwise payable to the ARTIST (or to any Person on the ARTIST'S behalf) during the TERM or pursuant to any agreements, commitments or engagements entered into or securing during the TERM arising out of or in connection with any of the ARTIST'S activities in the entertainment industry, including, without limitation, the following COVERED AREAS:

## A.    __GRANT OF MUSIC PUBLISHING RIGHTS__:

(1)     Subject to those requirements and/or restrictions set forth herein, ARTIST hereby grants, sells and conveys to COMPANY one hundred percent (100%) share of ARTIST'S copyright interest in all songs written or co-written by ARTIST during the TERM of this Agreement, (collectively referred to below as "Controlled Compositions") and COMPANY shall have the exclusive rights to administration of ARTIST'S interest in the Controlled Compositions for the life of copyright in each instance in the Territory and pay ARTIST share pursuant to section 5 subparagraph B.

(2)     COMPANY and COMPANY's foreign subsidiaries, affiliates and licensees have the fullest possible exclusive rights to administer and exploit the Controlled Compositions, to print, publish, sell, dramatize, create derivative works, use and license any and all uses of the Controlled Compositions, to execute in its own name any and all licenses and agreements whatsoever affecting the Controlled Compositions, including but not limited to licenses for mechanical reproduction, public performance, derivatives, dramatic uses, synchronization uses and sub-publication, and to assign or license such rights to others, to utilize ARTIST'S name and likeness in connection therewith and to execute copyright registration applications (and other routine copyright documents) in ARTIST'S names and on ARTIST'S behalf as attorney-in-fact (which appointment is coupled with an interest and is therefore irrevocable).

(3)     COLLECTION OF PERFORMANCE ROYALTIES:

Small performing rights in the Controlled Compositions, to the extent permitted by law, shall be assigned to and licensed by the performing rights society to which both parties belong.

Said society shall be and is hereby authorized to collect and receive all monies earned from the public performance of the Controlled Compositions and shall be and is hereby directed to pay directly to COMPANY one hundred percent (100%) of the publisher's share of public performance fees for the Controlled Compositions for which ARTIST shall not be entitled to any income therefrom. ARTIST shall be paid one hundred percent (100%) of the writer's share payable by its affiliated performance rights society and COMPANY shall not be entitled to any income therefrom.

(4) COLLECTION OF SOUND EXCHANGE ROYALTIES AND GRANT OF REVENUE:

Small performing rights in the digital public performance, including distribution and streaming, of MASTERS delivered pursuant to this AGREEMENT to the extent permitted by law, shall be assigned to and licensed by Sound Exchange, a digital performing rights society to which both parties belong. Sound Exchange shall be and is hereby authorized to collect and receive all monies earned from the digital public performance of MASTERS and shall be and is hereby directed to (1) pay directly to Company one hundred percent (100%) of COMPANY'S share of digital public performance fees for MASTER, for which ARTIST shall not be entitled to any income therefrom; and (2) pay directly to ARTIST or COMPANY one hundred percent (100%) of ARTIST'S share of digital public performance fees for MASTER for which ARTIST shall be entitled to receive zero percent (0%) of ARTIST share and hereby irrevocably grant and assign to COMPANY and COMPANY is entitled to receive, collect, and keep for COMPANY'S own account for the life of the copyright in MASTER, and any extensions thereof, an amount equal to thirty percent (30%) income therefrom ARTIST'S share.

(5) LICENSING AND COLLECTION OF MECHANICAL ROYALTIES:

Mechanical royalties for the Controlled Compositions for the United States and Canada may be collected by The Harry Fox Agency, Inc. or any other collection agent which may be designated. If any mechanical licenses are issued directly by COMPANY, it shall do so at the then current statutory rate (with such reduced rates for special types of sales or distribution for which COMPANY customarily grants reduced rates to nonaffiliated record companies).

(6) SUB-PUBLISHING AGREEMENTS:

COMPANY may enter into sub-publishing or collection agreements with, and license or assign this Agreement and any of its rights hereunder and delegate any of its obligations hereunder to, any persons, firms or corporations in the Territory.

**B.** **GRANT OF TOURING AND LIVE PERFORMANCES REVENUES.**

(1)     ARTIST hereby irrevocably grants and assigns to COMPANY and COMPANY is entitled to receive, collect, and keep for COMPANY's own account throughout the TERM an amount equal to zero percent (0%) of ARTIST'S Gross Touring Receipts, and ARTIST will pay or cause to be paid that amount to COMPANY as provided in this section subparagraph F below. "ARTIST'S Gross Touring Receipts" in the preceding sentence shall mean all gross monies, however characterized (including, but not limited to, ticket sales revenue, public and private event revenue, and performance fees, but excluding tour merchandise which shall be governed by the Recording Agreement in connection with any ALBUM ARTWORK and section 4 paragraph (D) below otherwise), payable to ARTIST (or any entity otherwise partly or wholly controlled by ARTIST) concerning ARTIST'S services or endeavors as musician(s), vocalist(s), or performer(s) in connection with one or more live performances or engagements, broadcast, webcasts, motion pictures, one-nighters, tours, public and private events, and/or other means (collectively "Concert(s)"), and of the foregoing, whether undertaken by ARTIST in support of a commitment ALBUM under the Recording Agreement or otherwise, either alone, or with one or more other individuals, and in connection with a single Concert or series of Concerts.

(2)     Nothing contained herein shall limit COMPANY's rights, during the TERM of the Recording Agreement, to record, film, and/or tape, in whole or in part and otherwise as COMPANY elects, any Concerts by means of public stage performances of all kinds, web-casts, sponsorships, television broadcast or cable casts (including pay-per-view telecasts), motion pictures, one-nighters, public and private events, concert tours, IP TV, and the like, alone, or in conjunction with others (including, without limitation, backstage and rehearsal footage). All such recordings, filmed footage and/or tapings will be deemed VIDEOS under Section 2 paragraph (E).

(3)     ARTIST represents it will cooperate with publicity and promotional efforts of the COMPANY to support sales of Audio Products by appearing or performing from time to time as requested by COMPANY. After the completion of, but prior to the release of any ALBUM under this AGREEMENT, ARTIST and COMPANY shall consult regarding the support of the release of the ALBUM through Live Performances and appearances by the ARTIST. ARTIST shall cooperate with COMPANY to plan a series of Live Performances and appearances during each Contract Period ("Album Support Period"). ARTIST shall cooperate and use its best efforts to book, or authorize its booking agent, ARTIST'S manager, to book sufficient Live Performances during the ALBUM Support Period and by agreeing to appear at those Live Performances booked during the ALBUM Support Period. If ARTIST requests that COMPANY pay Tour Expenses, then prior to the ALBUM Support beginning, COMPANY and ARTIST shall consult and mutually agree upon an amount to be paid by COMPANY as Tour Expenses during the ALBUM Support Period, if any. If travel is required for a publicity or promotional effort requested by COMPANY to attend, outside of the city of ARTIST'S primary residence for which ARTIST is not being paid, then COMPANY shall pay for the costs of transportation and lodging, if such be necessary. COMPANY shall pay for such costs in advance of ARTIST'S travel. However, if any costs approved by COMPANY in writing are paid by ARTIST, the COMPANY shall reimburse ARTIST for such costs related to travel and lodging within fourteen (14) business days following presentment of such fuel and transportation costs. In the event that ARTIST is required to travel by airplane, for a COMPANY requested publicity or promotion appearance or performance, COMPANY shall prepay such travel and lodging for the entire length of such promotional effort.

Tour Expenses for any promotional Live Performance that is requested by COMPANY for ARTIST to attend is an Expense under this Agreement. All other Tour Expenses not recouped from the Gross Receipts from ARTIST'S Live Performances and Tours are treated as an Advance.

## C.     GRANT OF ACTING SERVICES REVENUE.

ARTIST hereby irrevocably grant and assign to COMPANY and COMPANY is entitled to receive, collect, and keep for COMPANY's own account throughout the TERM and amount equal to forty percent (40%) of ARTIST'S Gross Acting Receipts, and ARTIST will pay or cause to be paid that amount to COMPANY as provided in this section subparagraph F below. "ARTIST'S Gross Acting Receipts" in the preceding sentence shall mean all gross monies, however characterized, payable to ARTIST for services where he is engaged as an actor or as himself to appear (or to serve in a creative capacity such as creator, director, writer, producer) in any dramatic or non-dramatic television series (or one or more episodes thereof), motion pictures, reality television series, videos and all other visual, audio, and audio-visual materials submitted by ARTIST, COMPANY, and/or third parties for uploading, and exploitation on any and all social media platforms, now in existence or hereafter known, including without limit, on the YouTube platform (or any successor service) or similar productions (excluding only VIDEOS made for COMPANY pursuant to the Recording Agreement) or stage productions, for public audiences and/or for exhibition in any and all media now known or hereafter devised (but excluding commercials or endorsements of products which would be covered under paragraph (E) hereunder). Notwithstanding the foregoing, ARTIST shall neither render such services nor accept any engagement that would require ARTIST to render such services in a manner that would or might interfere with ARTIST'S fulfillment of his other obligations under the Recording Agreement. For avoidance of doubt, doe purposes of computing the ARTIST'S Gross Acting Receipts, all sums received or credited to ARTIST (or her affiliates) and the economic value of any other non-cash consideration received shall be included, whether received before or after the TERM (including residual accountings), so long as the agreement relating to the ARTIST'S Gross Acting Receipts was entered into during, or was in negotiation prior to the expiration or termination of the TERM hereof.

## D.     NAME, IMAGE, AND LIKENESS MERCHANDISE LICENSING RIGHTS

(1)     ARTIST hereby irrevocably grants and assigns to COMPANY and COMPANY is entitled to receive, collect, and keep for COMPANY's own account throughout the TERM an amount equal to forty percent (40%) of ARTIST'S Gross Merchandise Receipts, and ARTIST will pay or cause to be paid that amount to COMPANY as provided in this section subparagraph F below. "ARTIST'S Gross Merchandise Receipts" in the preceding sentence shall mean all gross monies, however characterized, payable to ARTIST (or any entity otherwise partly or wholly controlled by ARTIST) concerning the commercial exploitation and reproduction of ARTIST'S Name, Image, and Likeness in any manner and in any medium, now known or unknown including, without limitation, in connection with the manufacture, distribution or sale of reproductions of ARTIST'S Name, Image, and Likeness on any and all products such as, but not limited to, t-shirts, posters, buttons and pins, etc. ("Merchandise.") Notwithstanding the foregoing, ARTIST shall neither authorize such exploitation nor reproduction that would or might interfere with ARTIST'S fulfillment of their other obligations under the Recording

Agreement. For avoidance of doubt, for purposes of computing the ARTIST'S Gross Merchandise Receipts, all sums received or credited to ARTIST (or their affiliates) and the economic value of any other non-cash consideration received shall be included, whether received before or after the TERM (including residual accountings), so long as the agreement relating to the ARTIST'S Gross Merchandise Receipts was entered into during, or was in negotiation prior to the expiration or termination of the TERM hereof.

      (2)     COMPANY shall have the exclusive right to commercially exploit and authorize others to commercially exploit Merchandise created from any elements of ARTWORK owned by COMPANY hereunder, such as photographs, cover art, or other graphic designs created that is incorporated into the ALBUM ARTWORK and/or Audio Products distributed and sold hereunder or used by COMPANY in marketing or promotion materials. In respect to any Merchandise design created and sold containing the ARTWORK, COMPANY shall account to and pay ARTIST a royalty as set forth in section 4 (C) of this Agreement.

**E.**     **<u>GRANT OF ENDORSEMENT, BRAND TIE-INS, APPEARANCES, AND SPONSORSHIP REVENUE</u>**

      ARTIST hereby irrevocably grant and assigns to COMPANY and COMPANY is entitled to receive, collect and keep for COMPANY's own account throughout the TERM an amount equal to forty percent (40%) of ARTIST'S Gross Endorsement, Brand Tie-Ins, Appearances, and Sponsorship Receipts and ARTIST will pay or cause to be paid that amount to COMPANY as provided in this section subparagraph F below. "ARTIST'S Gross Endorsement, Brand Tie-Ins, Appearances, and Sponsorship Services Receipts" in the preceding sentence shall mean all gross monies, however characterized, payable to ARTIST or ARTIST (or any entity otherwise partly or wholly controlled by ARTIST) concerning, without limitation, the use, licensing, exploitation, reproduction, publication, and/or exhibition of the ARTIST names, portraits, pictures and likenesses (including, without limitation, all past, present or future legal, professional, group, and other assumed or fictitious names or trademarks used by the ARTIST) and the related personality rights together or separately, or in conjunction with any other elements, for purposes of any endorsements, special with third parties, sponsorships (including tour sponsorships), or product, services and/or placement, appearances, or brand tie-ins, and/or creation, hosting and maintenance of all so-called "fan club" websites relating to ARTIST, the use of any intellectual property relating to ARTIST in connection with non-fiction books, magazines and other non-fiction publishing materials, in games, including video games, and dramatizations including, without limitation, cartoons, and voice overs.

**F.**     **<u>ARTIST'S PAYMENT OF BRAND EQUITY REVENUE TO COMPANY</u>**

      (1)     Without limiting anything above, if ARTIST receives the COMPANY SHARE with respect to Covered Revenues earned during the TERM, ARTIST will account and pay to COMPANY the COMPANY SHARE, within ten (10) days upon ARTIST'S receipt of such

payment. Without limiting the generality of the preceding sentence, ARTIST will irrevocably direct, pursuant to a written letter of direction in the form attached as Exhibit 2 hereto, ARTIST'S current business manager and any subsequent business managers, and/or Talent Agent to account and pay the COMPANY SHARE directly to COMPANY in accordance with the preceding sentence and in accordance with the terms and conditions hereof. ARTIST will notify COMPANY promptly of any change in the identity of the ARTIST'S current business manager or any subsequent business manager and/or Talent Agent. ARTIST will provide COMPANY with a copy of each agreement with any Person ("Third Party") from whom ARTIST, ARTIST or any Person is entitled to receive Covered Revenues (each, a "Covered Revenue Agreement"), within ten (10) days after the execution of such agreement. Each accounting statement sent to COMPANY shall include the specific calculation of the COMPANY SHARE for the period concerned in reasonable detail, including without limitation, an itemized breakdown of all Covered Revenues and expenses. All accounting statements and payments under this subparagraph (F) shall be sent to COMPANY at the address set forth above, to the attention of its CEO. ARTIST shall ensure that COMPANY shall have the right to examine the books and records of each Third Party under each such Covered Revenue Agreement on the same as apply to accountings to ARTIST, the ARTIST, and/or the applicable Person receiving Covered Revenues on ARTIST or ARTIST'S behalf. Without limiting the foregoing, COMPANY shall have the right to examine ARTIST and the ARTIST'S books and records solely as they relate to the calculation of the COMPANY SHARE (but not more than once per twelve (12)-month period and upon reasonable prior notice to ARTIST, and only once for a particular accounting period), at ARTIST offices where the records concerned are kept. (Such examination may include, without limitation, examination of all Covered Revenue Agreements and any statements received by ARTIST, the ARTIST, or any other Person under such agreements.) If COMPANY has any objections to a statement, COMPANY shall give ARTIST notice of that objection within three (3) years after the date of COMPANY's receipt of the accounting statement from ARTIST with respect to the accounting period concerned. Nothing herein shall relieve ARTIST of ARTIST obligation to make payments to COMPANY of the COMPANY SHARE if not paid to COMPANY by the applicable business manager, and ARTIST will be liable to COMPANY for all such payments not made to COMPANY as required by this section subparagraph F (1). ARTIST will sign any document as COMPANY may reasonably request to effectuate and secure COMPANY's rights under this section subparagraph F (1).

      (2)    ARTIST warrant and represent that: (1) ARTIST will not grant rights in or otherwise encumber the COMPANY SHARE of Covered Revenues and (2) ARTIST shall be solely responsible for all costs and liabilities in connection with the Covered Activities. ARTIST further acknowledge that COMPANY is not an employment agent, theatrical agent, or licensed talent agent under this agreement. ARTIST agree to consult with a licensed talent agent regarding matters that are customarily handled by a talent agent, and shall be solely responsible for payment of all necessary commissions to such talent agents and to booking or similar agencies.

**4. ROYALTIES:**

Conditioned upon ARTIST'S full and faithful performance of each and all of the material terms hereof, COMPANY shall pay ARTIST the following royalties subject to this Agreement: COMPANY agrees to pay royalties ("Royalties or ARTIST'S Royalties") to ARTIST as follows:

A. **Exploitation of Masters and Sales of Audio Products and Videos**: COMPANY shall pay to ARTIST as a royalty, 0 (zero)percent (0.00%) of the Net Recording Profits received by COMPANY, from all sale of Audio Products derived from the MASTERS or other and exploitations of the MASTERS, including but not limited to sales and licenses of the MASTERS, sales and licenses of Audio Products including Digital Formats, flat fee licenses, etc, and the sale license, and/or exploitation of VIDEOS, (hereinafter referred to as "Record Royalties") subject to a 3% ceiling on free goods used solely for promotional purposes.

      i. As used herein, the term "Net Profits" means all gross income actually received by COMPANY form such exploitation, minus all costs and expenses incurred by COMPANY in connection with such exploitation of the Album ("Expenses.") Expenses include, without limitation, Recording Costs, independent promotion, marketing, publicity, co-op advertising, free-goods, postage, shipping, manufacturing, distribution, and publishing costs.

      ii. No royalties shall be payable to ARTIST until such time as all Advances and other recoupable amounts hereunder or otherwise, including but not limited to Recording Costs, have been recouped or repaid to COMPANY.

      iii. With Respect to Records not consisting entirely of Masters delivered hereunder, ARTIST royalties payable hereunder shall be pro-rated on the basis of the total number of such Masters which are on such Album and which embody ARTIST'S performances hereunder compared to the total number of MASTERS which are on such Album.

      iv. ARTIST royalty hereunder is "All In", meaning the royalty included all royalties due to ARTIST as well as any other ARTIST, producer, engineer, or other third parties performing services for ARTIST and whom ARTIST agreed to hire or contract with in connection with the MASTERS or this Agreement, ARTIST shall be solely responsible for paying all such third parties.

B. **Publishing Income**: Except for royalties received by COMPANY's performance rights society for the publisher's share of performance rights as addressed in section 4 paragraph A of this Agreement, COMPANY shall pay to ARTIST as songwriter fifty percent (50%) of the Net Publishing Receipts collected by COMPANY for any exploitations or licenses issued by it for the Controlled Compositions. and shall retain the remaining amount for COMPANY's own account.

C. **Merchandise and Specialty Rights Exploitation**: COMPANY shall pay ARTIST zero percent (0.00%) of the calculated Net Merchandise Receipts received by COMPANY

13

as a result of the exploitations and licenses issued by COMPANY for the Merchandising Rights or a Specialty License of ARTWORK.

      D.    **Covered Revenues**: Without limiting anything above, if COMPANY receives the ARTIST Share with respect to Covered Revenues earned during the TERM, COMPANY will account and pay to ARTIST the ARTIST Share, within thirty (30) days upon COMPANY's receipt of such payment.

      E.    **Mechanical Royalty:**

    i.  All Controlled Compositions appearing on the MASTERS and released on Audio Products in a Digital Format for Digital Transmissions shall be and are hereby perpetually licensed to COMPANY for the TERRITORY at a Mechanical Royalty per selection equal to Seventy-five (75%) percent of the mechanical statutory per selection rate (with regard to playing time. effective on the date of initial U.S. commercial release of the MASTERS concerned hereinafter sometimes to be referred to as the "Per Selection Rate".

    ii.  All Controlled Compositions appearing on the MASTERS and released on physical configurations of Audio Products (i.e. CDs, vinyl records, etc.) or Audiovisual Products hereunder, shall be and are hereby perpetually licensed to COMPANY for the TERRITORY at a Mechanical Royalty per selection equal to Seventy-five (75%) percent of the mechanical statutory per selection rate (with regard to playing time. effective on the date of initial U.S. commercial release of the MASTERS concerned hereinafter sometimes to be referred to as the "Per Selection Rate".

    iii.  Notwithstanding the foregoing, the maximum aggregate Mechanical Royalty which COMPANY will be required to pay in respect of any single, E.P. or L.P., in any physical formatted Audio Product regardless of the total number of Compositions contained on the, shall not exceed Two (2) times, five (5) times, and Ten (10) times the "Per Selection Rate" respectively. For avoidance of doubt this restriction shall not apply to Audio Products sold in a Digital Format through a Digital Transmission.

    iv.  All Mechanical Royalties payable hereunder shall be paid on the basis of net Audio Products sold hereunder for which royalties are payable to ARTIST pursuant to this AGREEMENT.

    v.  ARTIST agrees not to record any Controlled Composition or other song recorded pursuant to this AGREEMENT without COMPANY's written consent, for the later of i) five (5) years subsequent to the date of release by COMPANY of any Controlled Composition or song recorded hereunder; or ii) two (2) years subsequent to the expiration or other termination of the TERM of this AGREEMENT.

14

vi.  Payments made for Mechanical Royalties under this AGREEMENT are considered an Expense.

### 5. <u>MINIMUM GUARANTEE:</u>

A. In accordance with Ca. Civil Code § 3423, the following provision shall apply with respect to the guaranteed minimum compensation to ARTIST. During the TERM of this Agreement and any extensions, hereto, COMPANY guarantees that ARTIST will receive the following minimum guaranteed compensation, which will consist of the liquidation of royalties, the payment of any amount due to ARTIST under this agreement, and any supplemental payment made by COMPANY to ARTIST so that ARTIST receives the minimum amount guaranteed in the corresponding year:

(a)  The amount of nine thousand ($9,000) in the first year within the TERM of the Agreement;

(b)  The amount of twelve thousand ($12,000) in the second year within the TERM of the Agreement;

(c)  The amount of fifteen thousand ($15,000) in the third year within the TERM of the Agreement; and for each subsequent year of the Agreement (up to and including the seventh year thereof.)

(d)  If in any given year of this Agreement, ARTIST receives less than the corresponding minimum amount for that year, ARTIST shall give proper notice to COMPANY, in no less than 15 days and not more than 30 days before the last day of the corresponding year, informing COMPANY of the fact, and COMPANY shall have a 30 day period to remedy.

(e)  If in any year during the TERM of this AGREEMENT, ARTIST receives more than the minimum amount for that year; such excess will be applied to the next year(s) during the Contract period to reduce the minimum amount applicable to any subsequent year.

(f)  Failure to pay a guaranteed minimum shall not be considered as a material breach of the obligations of COMPANY derived from this AGREEMENT.

### 6. <u>ROYALTY ACCOUNTING SEMI-ANUALLY:</u>

A.      Statements as to royalties, ARTIST'S Royalties or Mechanical Royalties (collectively referred to as "Royalties" for this paragraph), payable hereunder shall be sent by COMPANY to ARTIST Royalty Statement; Payment.

15

B      COMPANY will account to ARTIST for royalties due under this Agreement in semiannual periods, ending on June 30th and December 31st, respectively, of each year during which Records for which royalties are payable hereunder are sold, paid for and not returned.

C.     Within ninety (90) days after the last day of each semiannual period, COMPANY will furnish to ARTIST a royalty report specifying the royalties earned by the ARTIST, if any, during the semiannual period, and each royalty report will be accompanied by payment of all sums shown to be due by the report, after deduction of any and all advances or other proper deductions that COMPANY may be entitled to recoup under this Agreement..

D.     COMPANY shall be entitled to maintain a royalty reserve in anticipation of returns of Albums hereunder. Said royalty reserve will not be established for any Album during any semi-annual accounting period in excess of twenty- five percent (25%) of the number of Albums shipped. Each such reserve will be held for two periods, and then liquidated at the end of the accounting period when the reserve has been released to the COMPANY.

E.     Royalties (including mechanical royalties) paid on Records that are later returned, shall be considered overpayments. If COMPANY makes any overpayment (under the preceding sentence or otherwise hereunder), or if COMPANY pays any amount on ARTIST behalf or incurs any cost as a result of ARTIST'S failure to comply with the terms of this Agreement, then, without limiting any of COMPANY's other rights and remedies, such amounts shall constitute a direct debt owed by ARTIST to COMPANY; and, ARTIST shall reimburse COMPANY for such amount(s) and COMPANY shall have the right to deduct such amount(s) from any monies otherwise payable to ARTIST under this or any other agreement.

F.     No royalties shall be payable to ARTIST on sales of Records by any of COMPANY's licensees or distributors until payment on those sales has been received by COMPANY in the U.S. and such sales shall be deemed to have occurred in the semi-annual accounting period during which the licensee or distributor shall have rendered to COMPANY statements and payments for such sales.

G.     COMPANY shall maintain books of account concerning the sale of Audio Products hereunder. ARTIST, or a certified public accountant, in ARTIST'S behalf, may, at ARTIST'S sole expense, examine COMPANY's books relating to the sale of Audio Products hereunder solely for the purpose of verifying the accuracy thereof, only during COMPANY's normal business hours and upon reasonable written notice. COMPANY's books relating to any particular royalty statement may be examined as aforesaid only within two (2) years after the date rendered and COMPANY shall have no obligation to permit ARTIST to so examine COMPANY's such books relating to any particular royalty statement more than once.

16

H.      Royalties in respect of the sale of Audio Products outside of the United States shall be computed in the national currency in which COMPANY is paid by COMPANY's licensees, shall be credited to ARTIST'S royalty account hereunder at the same rate of exchange as COMPANY is paid, and shall be proportionately subject to any transfer or comparable taxes which may be imposed upon COMPANY's receipts.

I.      ARTIST shall be deemed to have consented to all Royalty statements and all other accountings rendered by COMPANY hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account state, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by ARTIST to COMPANY within two (2) years after the date rendered.

### 8.    <u>NAME & LIKENESS, TRADEMARKS AND WEBSITES:</u>

A.      During the TERM of this Agreement and for as long as COMPANY shall be entitled to the rights granted to it under this Agreement, including the sale of Audio Products or to sell or distribute Merchandise or exploit ARTIST'S Controlled Compositions, ARTIST hereby licenses to COMPANY the exclusive right, and to license others the non-exclusive right, to use ARTIST'S name, approved likeness, voice, approved biographical material or other identification for use in association with any promotion, marketing or advertising, in any medium now known and existing or that is created in the future. However, during the TERM of this Agreement, ARTIST will not license or consent to the use of ARTIST'S Name and Likeness for or in connection with the recording or exploitation of Audio Products under this Agreement by or for anyone other than COMPANY. This paragraph shall not limit COMPANY's rights it has been granted in this Agreement regarding Merchandising Rights or Specialty License set forth in this Agreement.

B.      ARTIST shall apply for and obtain in ARTIST'S name, and at ARTIST'S expense, federal registration of a trademark and/or service mark for ARTIST'S professional name and /or logo in connection with the use thereof in all areas of the entertainment industry, including, without limitation, in connection with the recording and sale of phonograph records, the establishment of fan clubs, the rendition of concerts and live performances, and the sale of clothing and other merchandise. If ARTIST fails to apply for and obtain federal registration of any such trademark or service mark, COMPANY shall thereafter have the right to apply for and obtain federal registration of any such trademark or service mark, in ARTIST'S name, for which costs shall be considered an Advance and ARTIST hereby appoints COMPANY as its attorney-in-fact, coupled for the purpose of applying for and obtaining such registration. Such authority is coupled with an interest and is therefore irrevocable.

C.      COMPANY or its designees shall have the perpetual and exclusive right to create and maintain a web site ("Web Site") for purposes of promoting ARTIST and the sale of ARTIST'S Audio Products. COMPANY shall have the right to ARTIST'S Name and Likeness in the Web Site. COMPANY shall be the owner of all materials containing ARTIST'S Name and Likeness created and incorporated into ARTIST'S Web Site subject to the approval of ARTIST as

set forth in this Agreement. COMPANY shall have the right to register as its own, any domain name that incorporates or uses ARTIST'S name or any variation of ARTIST'S name. COMPANY shall have the right to designate any ARTIST'S Web Site as the "official" web site. Notwithstanding, ARTIST shall have the right to create one (1) Web Site in connection with ARTIST'S services as a recording and performing ARTIST. However, ARTIST shall not be restricted from creating any number of social networking sites (i.e. MySpace, FaceBook, etc.).

### A.   <u>EXCLUDED SERVICES</u>

**COMPANY HAS ADVISED ARTIST THAT COMPANYS IS NOT A TALENT AGENT OR EMPLOYMENT AGENT. ARTIST ACKNOWLEDEGES THAT COMPANY IS NOT AND SHALL NOT BE OBLIGATED TO AND HAS NOT OFFERED OR ATTEMPTED TO OBTAIN, SEEK OR PROCURE EMPLOYMENT OR ENGAGEMENTS FOR ARTIST, AND THAT, EXCEPT TO THE EXTENT PERMITTED BY LAW, COMPANYS IS NOT PERMITTED, OBLIGATED, AUTHORIZED OR EXPECTED TO DO SO. IT BEING UNDERSTOOD AND AGREED HOWEVER, THAT COMPANYS MAY, AS REQUIRED BY LAW, ACT AT THE REQUEST OF, AND IN CONJUNCTION WITH, LICENSED TALENT AGENTS ON VARIOUS MATTERS FOR ARTIST, INCLUDING, WITHOUT LIMITATION, PROCURING OR ATTEMPTING TO PROCURE, ACCEPTING SOLICITATIONS OF, AND NEGOTIATING AGREEMENTS FOR, EMPLOYMENT OF ARTIST IN CERTAIN AREAS TO PROMOTE ARTIST'S CAREER AND THAT ARTIST SHALL CAUSE THE LICENSED TALENT AGENCY WITH WHICH ARTIST CONTRACTS TO AGREE IN WRITING TO AUTHORIZE AND REQUEST COMPANYS TO SO ACT IN CONJUNCTION WITH SUCH LICENSED TALENT AGENT IN SUCH AREAS AS COMPANYS IS EXPECTED TO PERFORM SUCH SERVICES.**

### 9.   <u>DEFINITIONS:</u>

For the purpose of this AGREEMENT, the following terms shall have the following meaning:

"**Advance**" shall mean a pre-payment of Royalties, Recording Costs, Music Video costs, ARTWORK costs. Unless otherwise stated specifically in this Agreement, all Advances are not Expenses and are recoupable from ARTIST'S Royalties payable hereunder.

"**Audio Products**," shall mean all forms of sound reproductions whether now known or unknown, on or by which sound may be recorded for later transmission to listeners, embodying sound, including, without limitation, discs of any speed or size, vinyl, compact disc, reel-to-reel tapes, cartridges, cassettes, audiovisual recordings, Digital Formats, Digital Transmissions, etc.

"**Music Video**" ("**Videos**") shall mean devices reproducing audio performances or recording ARTISTs together with a visual image for home use or otherwise, embodying ARTIST'S performances.

18

"**Compositions**" shall mean any single musical composition, irrespective of length, including all spoken words and bridging passages and a medley.

"**Contract Period**" shall mean any period of the Agreement wherein a term or obligation may be applicable either in the INITIAL PERIOD or any subsequent OPTION PERIODS.

"**Controlled Compositions**" shall mean all musical Compositions or material recorded pursuant to this Agreement, which are written or composed, in whole or in part, or owned or controlled directly or indirectly by ARTIST or any producer of MASTERS subject thereto.

"**Delivery**" shall mean COMPANY's receipt of newly-recorded technically satisfactory MASTERS to constitute the Record required to be given to COMPANY as per this Agreement (mixed and mastered), together with all necessary licenses, approval, consents and permissions and all ARTWORK to be used in connection with the production and distribution of Audio Products derived from the MASTERS recorded hereunder.

"**Digital Format**" shall mean a digital configuration of a Master Recording used in the furtherance of delivering the Master Recording through a Digital Transmission including but not limited to digital files such as MP3, MPEG, WAV, RAM, etc. or any other digital file now known or created in the future.

"**Digital Transmissions**" shall mean the transmission and distribution to the consumer of Digital Formats or other configurations other than physical Audio Products, whether of sound alone, sound coupled with an image or sound coupled with data, in any form including but not limited to the downloading or other conveyance of ARTIST'S performance on MASTERS or Audiovisual Recordings recorded hereunder by telephone, satellite, cable, direct transmission over wire or through the air, and on-line computers whether a direct or indirect charge is made to receive the transmission.

"**Entertainment Services**" shall mean the exclusive services of ARTIST performed in the music industry now existing or hereafter developed including but not limited to the areas of Recording, Publishing, Merchandise Rights, Acting Services, and Live Performance as set forth in this Agreement.

"**Expenses**" shall mean all expenses incurred under this Agreement, except for Recording Costs, Music Video costs, and ARTWORK costs, as those terms are defined herein, distribution fees, licensing fees, and other payments to third parties on ARTIST'S behalf, outstanding Tour Expenses not repaid from Gross Receipts collected by COMPANY attributed to Live Performances, outstanding Expenses related to the creation, production or manufacture of Merchandise not repaid from Gross Receipts attributed to Merchandising Rights, legal or accounting fees payable to ARTIST'S own legal counsel or accountant (if any such payments are actually made by COMPANY), customary artwork, taxes, mechanical royalties payable to third parties or payable to ARTIST hereunder, manufacturing, packaging charges, payable on ARTIST'S behalf, or fees associated with filing copyright fees; Attorney's or accounting fees or other administrative expenses paid for the creation, enforcement, licensing or exploitation of

ARTIST and ARTIST'S rights granted to COMPANY herein, and; any other costs, fees, or expenses directly related to the representation or exploitation of ARTIST consistent with the terms of this Agreement; royalties paid by COMPANY to ARTIST for a writer's share of publishing royalties; administrative and exploitation expenses of COMPANY with respect to the Controlled Compositions including, without limitation, copyright registration fees, advertising and promotion expenses directly related to the Controlled Compositions, the costs of transcribing for lead sheets, and the costs of producing demonstration records, and; any other costs, fees, or expenses directly related to the representation or exploitation of ARTIST'S rights granted to COMPANY in this Agreement including those expenses paid to ARTIST or on ARTIST'S behalf by COMPANY prior to the effective date of this Agreement. .

"**Gross Receipts**" shall mean any and all revenue, income and sums derived and actually received by COMPANY for the exploitation of ARTIST'S Entertainment Services and rights granted to COMPANY by ARTIST under this Agreement.

"**Album**" ("**Album**") shall mean a Record that has no less than ten (10) Compositions and being no less than forty (40) minutes in duration.

"**Master Recording**" ("**Master**" or "**Masters**") shall mean any master recording, recorded under this Agreement together with any derivatives thereof. Any reference to Master, Masters or Master Recording shall include the Previously Recorded Masters.

"**Name and Likeness**" shall mean ARTIST'S individual names (both professional and legal and whether presently or hereafter used by ARTIST) image, likeness, logos and other identification and biographical material concerning ARTIST and any trade name, trademark or service mark used by the individual members of ARTIST (collectively, "Name and Likeness").

"**Net Merchandise Receipts**" shall mean Gross Receipts received by COMPANY under the terms of this Agreement for Merchandising Rights or Special Licenses after deducting any and all Expenses attributed to the licensing thereof or for the cost of creating, producing or manufacturing ARTIST'S Merchandise. In the event Expenses attributed to Merchandise Rights or Special Licenses are not fully recouped from the Net Merchandise Receipts, COMPANY may treat such unrecouped amount as an Expense hereunder recoupable from Gross Receipts.

"**Net Performance Receipts**" shall mean Gross Receipts received by ARTIST or COMPANY on ARTIST'S behalf for ARTIST'S Live Performances less Tour Expenses and any fees deducted by ARTIST'S booking agent.

"**Net Publishing Receipts**" shall mean Gross Receipts received by COMPANY under the terms of this Agreement attributed to the publishing exploitation of ARTIST'S songs recorded hereunder after deducting any and all Expenses.

"**Net Recording Receipts**": shall mean Gross Receipts received by COMPANY under the terms of this Agreement attributed to the exploitation of ARTIST'S Master Recordings recorded

or licensed hereunder and from sale of Audio Products derived from ARTIST'S Master Recordings, after deducting any and all Expenses

"**Recording Costs**" shall be considered Advances under this Agreement and shall mean all costs incurred with respect to the production of MASTERS embodying the ARTIST'S performances, including audio visual recordings, and which are customarily recognized as Recording Costs in the phonograph record industry including but not limited to all expenses incurred in connection with the production, mixing and mastering of audio and/or visual masters and all payments and/or advances to ARTIST hereunder, as well as payments to all of the musicians (including without limitation, instrumentalists, leaders, arrangers, orchestrators, copyists and contractors) vocalists and producers, if any, rendering services in connection with any recordings hereunder, payments to union pension and welfare funds, costs of cartage and instruments hire, studio or hall rentals, editing costs, payroll taxes and other payments to third parties on ARTIST'S behalf related to recording costs, fees to third party producers or side ARTISTs, fees for replay or a sampling license, and other reasonable expenses incurred by COMPANY for the purpose of production of the MASTERS; costs, taxes and/or third party payments in connection with the production of the MASTERS produced under this Agreement.

"**TERM**" shall mean the duration of the Agreement including the INITIAL PERIOD and subsequent OPTION PERIODS and any extensions or modifications extending the duration of the Agreement.

"**Tour Expense** " shall mean the payment of all COMPANY approved expenses to attend or produce a Live Performance including but not limited to costs for production, promotion or talent expenses associated with the performance, travel, lodging and per diem expenses to be incurred by ARTIST in connection with the Live Performance., Any costs associated for compensation, travel, lodging or per diem paid by COMPANY for an employee or representative of COMPANY assisting with the touring or producing of Live Performance of ARTIST, provided such costs shall be limited to those in like kind expended by ARTIST for the same or similar expense.

"Territory" shall mean the Universe.

"**Albums, Masters. Records," "phonograph records," "recordings," and "sound recordings"**—All forms of recording and reproduction by which sound may be recorded now known or which may hereafter become known, manufactured or sold primarily for home use, juke box use, or use on or in means of transportation, including, without limiting the foregoing, magnetic recording tape, film, electronic video recordings and any other medium or device for the production of artistic performances manufactured or sold primarily for home use, juke box use or use on or in means of transportation, whether embodying (i) sound alone or (ii) sound synchronized with visual images, e.g., "sight and sound" devices.

"**Brand Equity" shall** mean the intangible value that accrues to an ARTIST as a result of COMPANY'S successful efforts to establish ARTISTS'S strong brand in the entertainment industry through artist and product development, and radio, digital, and television promotion.

## 10.   <u>NOTICES</u>

**A.**     All notices to ARTIST shall be in writing and may be served upon ARTIST personally, by prepaid telegram, or postage prepaid by registered or certified mail, return receipt requested, addressed to ARTIST at ARTIST'S address first above written. COMPANY will undertake to send a courtesy copy of each notice sent to ARTIST to_____, Esq. at_____, , but COMPANY's failure to send such courtesy copy will not constitute a breach of this Agreement or impair the effectiveness of the notice concerned.

**B.**     All notices to COMPANY shall be in writing and shall be sent postage prepaid by registered or certified mail, return receipt requested, addressed to COMPANY's addresses first above written with a simultaneous copy sent in the same manner to COMPANY as above with a copy to George L. Prajin, Esq., Lopez & Prajin, 500 Newport Center Dr. Suite 600, Newport Beach, Ca 92660.

## 11.   <u>SUSPENSIONS AND DEFAULT:</u>

**A.**     In the event that ARTIST for any reason fails to timely fulfill all of ARTIST'S recording and delivery commitments hereunder in accordance with all of the terms and conditions of this Agreement, then, in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST at any time prior to the expiration of the then current Period, (i) to terminate this Agreement without further obligation to ARTIST as to unrecorded or undelivered MASTERS, (ii) to reduce the minimum number of MASTERS required to be recorded and delivered during the then current Period to the number which have been timely recorded and delivered during such Period, or (iii) to extend the then current Period of the TERM for the duration of such default plus one hundred fifty (150) days with the times for the exercise by COMPANY of its options to extend the TERM and the dates of commencement of subsequent Periods deemed extended accordingly. COMPANY agrees that provided ARTIST shall have commenced recording of the applicable MASTERS sufficiently before the date such MASTERS are required to be delivered hereunder to have timely delivered such MASTERS, and provided that the recording of such MASTERS is substantially completed, ARTIST shall have forty-five (45) days from the date COMPANY sends notice to ARTIST terminating this Agreement pursuant to this section subparagraph (A)(i) in which to fulfill the applicable production and delivery requirements failing which, this Agreement shall terminate as of the end of such forty-five (45) day period. It is specifically understood that COMPANY may exercise any or all of its rights pursuant to section 11 subparagraphs A (i), (ii) and (iii) at any time(s) prior to the date the TERM would otherwise expire. COMPANY's obligations hereunder shall be suspended for the duration of any such default. Notwithstanding such suspension, COMPANY shall continue to pay ARTIST'S royalties as and when due unless such suspension is due to acts or omissions within ARTIST'S control. The provisions of this subparagraph shall not result in an

extension of the TERM for a period in excess of the period permitted by applicable law, if any, for the enforcement of personal service agreements.

**B.**      COMPANY reserves the right, at its election, to suspend the operation of this Agreement for the duration of any of the following contingencies, if by reason of any such contingency, it is materially hampered in the performance of its obligations under this Agreement or its normal business operations are delayed or become impossible or commercially impracticable: Act of God, fire, catastrophe, labor disagreement, acts of government, its agencies or officers, any order, regulation, ruling or action of any labor union or association of ARTISTs, musicians, composers or employees affecting COMPANY or the industry in which it is engaged, delays in the delivery of materials and supplies, or any other cause beyond COMPANY's control. Any such suspension due to a labor controversy which involves only COMPANY shall be limited to a period of six (6) months.

**C.**      If ARTIST'S voice or ARTIST'S ability to perform as an instrumentalist should be materially or permanently impaired, then in addition to any other rights or remedies which COMPANY may have, COMPANY shall have the right, upon written notice to ARTIST, to terminate this Agreement and shall thereby be relieved of any liability in connection with unrecorded MASTERS.

## 12.     <u>CURE OF BREACH:</u>

Neither party will be deemed in breach unless the other party gives notice and the notified party fails to cure within thirty (30) days after receiving notice (fifteen (15) days, in the case of a payment of money); provided, that if the alleged breach does not involve a payment of money and is of such a nature that it cannot be completely cured within thirty (30) days, the notified party will not be deemed to be in breach if the notified party commences the curing of the alleged breach within such thirty-day period and proceeds to complete the curing thereof with due diligence within a reasonable time thereafter.

## 13.     <u>REPRESENTATIONS AND WARRANTIES:</u>

**A.**      During the TERM, ARTIST shall not perform for the purpose of making records for anyone other than COMPANY and shall not authorize the use of ARTIST'S name, likeness, or other identification for the purpose of distributing, selling, advertising or exploiting records in the Territory for anyone other than COMPANY.

**B.**      ARTIST shall not perform any selection recorded hereunder for the purpose of making records for anyone other than COMPANY (i) for a period of five (5) years after the initial date of release of the respective record containing such selection or (ii) for a period of two (2) years after the expiration or other termination of this Agreement, whichever is later ("Re-recording Restriction").

**C.**      ARTIST waives any so-called "moral rights" ARTIST may have in any

23

MASTERS, Records, Albums, and/or Controlled Compositions hereunder and any other similar right arising anywhere in the Territory which may impair COMPANY, and/or COMPANY's affiliated and/or licensees' ability to exploit all Master Recordings to the fullest extent.

**D.**     ARTIST acknowledges that the sale of records is speculative and agrees that the judgment of COMPANY with regard to any matter affecting the sale, distribution and exploitation of such records shall be binding and conclusive upon ARTIST. Except as otherwise expressly provided in subparagraph 6(b) hereof, nothing contained in this Agreement shall obligate COMPANY to make, sell, license, or distribute records manufactured from MASTERS subject hereto.

**E.**     Provided ARTIST is not in material breach of this Agreement, and if COMPANY is in receipt of completed, fully edited and mixed commercially satisfactory MASTERS sufficient to comprise each newly-recorded required Album hereunder embodying ARTIST'S newly-recorded required studio performances of material not previously recorded by ARTIST ready for COMPANY's manufacture of records therefrom, together with all materials therefor, COMPANY agrees to commercially release through normal retail channels, including but not limited to digitally, each Album and/or individual master recording delivered hereunder in the United States within one hundred twenty (120) days following ARTIST'S delivery to and COMPANY's acceptance of the applicable Album and/or master recording.

**F.**     It is understood and agreed that if COMPANY shall have failed to so release any such LP in the United States, ARTIST shall have the right, within sixty (60) days following the expiration of said one hundred twenty (120) day period, to notify COMPANY in writing of COMPANY's such failure and of ARTIST'S desire that the TERM of this Agreement be terminated if COMPANY does not, within seventy-five (75) days after COMPANY receives such notice from ARTIST, commercially release the applicable LP in the United States. It is specifically understood and agreed that if COMPANY shall fail to fulfill any such release commitment, COMPANY shall have no liability whatsoever to ARTIST (other than COMPANY's obligation to account for and pay royalties becoming due, if any, hereunder), and ARTIST'S only remedy shall be to terminate the TERM of this Agreement by written notice to COMPANY within fifteen (15) days following the expiration of such seventy-five (75) day period.

**G.**     ARTIST warrants and represents that ARTIST is at least 18 years of age and under no disability, restriction or prohibition, whether contractual or otherwise, with respect to ARTIST'S right to execute this Agreement and perform its terms and conditions. Without limiting the foregoing, ARTIST specifically warrants and represents that no prior obligations, contracts or agreements of any kind undertaken or entered into by ARTIST will interfere in any manner with the complete performance of this Agreement by ARTIST or with ARTIST'S right to record any and all selections hereunder. ARTIST warrants and represents that, except for those MASTERS listed on Schedule "A" annexed hereto and made a part hereof, there are now in existence no prior unreleased MASTERS embodying ARTIST'S performances and that ARTIST shall not release nor authorize nor permit the release of such MASTERS in the Territory. ARTIST further warrants and represents that COMPANY shall not be required to make any payments of any nature for, or in connection with, the rendition of ARTIST'S services or the acquisition, exercise or exploitation

of rights by COMPANY pursuant to this Agreement, except as specifically provided hereinabove.

**H.**         ARTIST warrants and represents that no materials, or any use thereof, will violate any law or infringe upon or violate the rights of any third party. "Materials," as used in this section 13 shall include: (i) all musical compositions and other material contained on MASTERS subject hereto, (ii) each name used by ARTIST, in connection with MASTERS recorded hereunder, and (iii) all other materials, ideas, other intellectual properties or elements furnished or selected by ARTIST and contained in or used in connection with any MASTERS recorded hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

## 14.   UNIQUE SERVICES

ARTIST expressly acknowledges that ARTIST'S services hereunder are of a special, unique and intellectual character which gives them peculiar value, and that in the event of a breach or threatened breach by ARTIST of any term, condition or covenant hereof, COMPANY will be caused immediate irreparable injury. ARTIST expressly agrees that COMPANY shall be entitled to injunctive and other equitable relief, as permitted by law, to prevent a breach or threatened breach of this Agreement, or any portion thereof, by ARTIST, which relief shall be in addition to any other rights or remedies, for damages or otherwise, available to COMPANY.

## 15.   INDEMNIFICATION:

ARTIST agrees to and does hereby indemnify, save and hold COMPANY harmless from any and all loss and damage (including court costs and reasonable attorneys' fees) arising out of, connected with or as a result of any inconsistency with, failure of, or breach or threatened breach by ARTIST of any warranty, representation, agreement, undertaking or covenant contained in this Agreement including, without limitation, any claim by any third party in connection with the foregoing. In addition to any other rights or remedies COMPANY may have by reason of any such inconsistency, failure, breach, threatened breach or claim, ARTIST shall reimburse COMPANY, on demand, for any payment made by COMPANY at any time after the date hereof with respect to any loss, damage or liability resulting therefrom and in addition thereto COMPANY shall have the right to deduct from any and all monies otherwise payable to ARTIST under this or any other agreement a sum(s) equal to such loss, damage and liability (including anticipated and actual court costs and reasonable attorneys' fees). COMPANY shall give ARTIST prompt notice of any third party claim to which the foregoing indemnity applies and ARTIST shall have the right to participate in the defense of any such claim through counsel of ARTIST'S own choice and at ARTIST'S expense. Pending the determination of any such claim, COMPANY may withhold payment of all monies under this or any other agreement in any amount consistent with such claim. ARTIST shall have the right to post a bond in an amount equivalent to the sum being withheld by COMPANY in respect of any such claim with a good and sufficient surety approved by COMPANY, provided that such surety agrees unconditionally, in writing, to pay all costs, fees, damages, etc., incurred by COMPANY by reason of such claim.

## 16.   APPROVALS

Wherever in this Agreement ARTIST'S approval or consent is required, such approval or consent shall not be unreasonably withheld. COMPANY may require ARTIST to formally give or withhold such approval or consent by giving ARTIST written notice requesting same and by furnishing ARTIST with the information or material in respect of which such approval or consent is sought. ARTIST shall give COMPANY written notice of approval or disapproval within ten (10) days after such notice. ARTIST shall not hinder nor delay the scheduled release of any record hereunder. In the event of disapproval or no consent, the reasons therefor shall be stated. Failure to give such notice to COMPANY as aforesaid shall be deemed to be consent or approval.

17.   **ASSIGNMENT:**

COMPANY shall have the right without ARTIST'S consent to assign this Agreement in whole or in part to any subsidiary, parent COMPANY, affiliate, or to any third party acquiring a substantial portion of COMPANY's assets or stock. The terms of any such assignment shall provide that the assignee will assume COMPANY's obligations hereunder.

18.   **INDEPENDENT CONTRACTOR:**

Nothing contained herein shall constitute a partnership between or a joint venture by COMPANY and ARTIST. It is specifically understood that ARTIST is acting hereunder as an independent contractor.

19.   **FULL INTEGRATION**

This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, termination or discharge of this Agreement shall be binding upon COMPANY unless confirmed by a written instrument signed by an officer of COMPANY. No modification or amendment of this Agreement shall be binding upon ARTIST unless confirmed by a written instrument signed on behalf of ARTIST. A waiver by COMPANY of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof. All of COMPANY's rights and remedies in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy or right available to COMPANY. Should any provision of this Agreement be adjudicated by a court of competent jurisdiction as void, invalid or inoperative, such decision shall not affect any other provision hereof, and the remainder of this Agreement shall be effective as though such void, invalid or inoperative provision had not been contained herein. It is agreed that all accountings and payments required herein, and all grants made herein, shall survive and continue beyond the expiration or earlier termination of this Agreement. No breach of this Agreement by COMPANY shall be deemed material unless within thirty (30) days after ARTIST learns of such breach, ARTIST serves written notice thereof on COMPANY specifying the nature thereof and COMPANY fails to cure such breach, if any, within forty-five (45) days after receipt of such notice.

## 20.    RIGHT OF FIRST NEGOTIATION AND RIGHTS TO MATCH

**A.**  ARTIST agrees to negotiate in good faith with COMPANY regarding the extension or renewal of the Term for a period of ninety (90) days following the expiration of the TERM ("Exclusive Negotiation Period"). If COMPANY and ARTIST fail to reach agreement upon the terms  and conditions            of         an         extension      of        the         TERM, within the Exclusive Negotiation Period, ARTIST may negotiate with any other record label or entity, subject to COMPANY's right to match the terms of any agreement offered to ARTIST by such other record label or entertainment entity ( hereafter "Offer") prior to the acceptance of the Offer, as set forth below:

**B.**  COMPANY shall have the option to match the financial terms and conditions for six month following the expiration of the Exclusive Negotiation Period (the"Matching Period")-COMPANY shall have the option to match the financial terms and conditions of any offer made to ARTIST for any agreement that is the subject matter of this AGREEMENT. ARTIST shall not accept any offer or enter into a contract or agreement with any other record label or entertainment entity during the Matching Period without complying with  this section. Prior to acceptance of any Offer  made  during  the  Matching  Period, ARTIST shall first deliver to COMPANY a written notice  of all material  financial terms  and  conditions of the offer, including, but not limited to, the identity of the record label or entertainment entity making the offer. Such notice shall constitute an exclusive, irrevocable offer (the "ARTIST Offer") to contract with COMPANY on the same financial terms and conditions. COMPANY shall have fifteen (15) business days following receipt of the ARTIST Offer in which to accept the financial terms of the ARTIST Offer. If COMPANY does not accept the ARTIST Offer, ARTIST may then accept the offer without modification  during the ten (10) business  day period following expiration of the ARTIST Offer (the  "Contract Period"). If the offer is modified in any material way, such modification shall give rise to another ARTIST Offer on such modified terms and conditions and COMPANY  shall have the option to match  the terms of the offer, as modified in accordance with the terms and conditions  of this  section.  If ARTIST has not contracted with a third party on or before the conclusion of the Contract Period, then all rights granted to COMPANY pursuant to this section shall be automatically reinstated.

**C.**  The provisions of section above shall survive termination or expiration of this Agreement

## 21.    MISCELLANEOUS

### A.    INVALIDITY OF TERMS:

If any clause, sentence, paragraph or part of this Agreement, or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgment shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgment shall have been rendered and to the person involved.

**B.**    **LIFE INSURANCE:**

COMPANY shall have the right, at its election, to obtain, at COMPANY's cost and expense, life or other insurance upon ARTIST, including, but not limited to, insurance against the failure of ARTIST to perform services under this Agreement, in such amounts or type of coverage as COMPANY may determine, and, if applicable, for the benefit of COMPANY. Except as expressly consented to in writing by COMPANY, neither ARTIST nor any of ARTIST's Affiliates shall have any right, title or interest in such insurance. ARTIST and ARTIST''s Affiliates shall, at the request of COMPANY, cooperate with and assist COMPANY or its agent (as directed by COMPANY), in obtaining and maintaining any such coverage, including submitting to physical or other examinations of ARTIST and furnishing such information and medical records as may be required by any existing or proposed insurer and performing all further acts and things, and executing any and all additional documents or instruments necessary for COMPANY to obtain any such insurance. Contemplated by this section **21 B.**

**C.**    **APPLICABLE LAW:**

This Agreement has been entered into in the County of Los Angeles, State of California and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the County of Los Angeles, State of California applicable to contracts entered into and performed entirely within the County of Los Angeles, State of California, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this Agreement. Any dispute claim, mediation or lawsuit arising out of this Agreement shall be filed in Los Angeles County, California.

**D.**    **ATTORNEY FEES**

If any legal action is brought to enforce the rights of either party hereunder, the prevailing party shall be entitled to receive its attorneys' fees and court costs in addition to any other relief it may receive.

**E.**    **SUCCESSOR IN INTEREST:**

This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successor, permitted assigns, and representatives. COMPANY may, at its election, assign this Agreement or any of its rights hereunder

**F.**    **RIGHT TO LEGAL REPRESENTATION:**

**ARTIST represents and warrants that ARTIST has read this Agreement and ARTIST understand that this is an important legal document. ARTIST hereby represents and warrants that ARTIST has been advised of its right to seek independent legal counsel in**

28

connection with the negotiation and execution of this Agreement and that ARTIST has either retained and has been represented by such legal counsel or has knowingly and voluntarily waived its right to such legal counsel and desires to enter into this Agreement with the benefit of independent legal representation.

This Agreement shall not become effective until it is executed by all parties.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year first above written.

By:  _____
ARTIST


By:  _____
       Hyphy Music, Inc.

**ATTACHMENT 1**

WE , *Alfonso Vargas* , and *Daniel Torres*
professionally known as " *Los Originales de San Juan* " hereby
irrevocably assign and transfer the MASTERS and VIDEOS listed below, together with all rights
therein (including all copyrights, and renewal rights) to Hyphy Music, Inc.. in perpetuity,
throughout the world, free of any claim whatsoever.

30

# EXHIBIT 3



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks** > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Nov 23 03:32:23 EST 2022*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP |

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

| TSDR | ASSIGN Status | TTAB Status |  *( Use the "Back" button of the Internet Browser to return to TESS)*

## LOS ORIGINALES DE SAN JUAN

| | |
|---|---|
| **Word Mark** | LOS ORIGINALES DE SAN JUAN |
| **Translations** | The foreign wording in the mark translates into English as The Originals of San Juan. |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Audio and video recordings featuring music and musical dramatic themes; [ Audio tapes featuring music; Compact discs featuring music; Digital media, namely, pre-recorded video cassettes, digital video discs, digital versatile discs, downloadable audio and video recordings, DVDs, and high definition digital disks featuring music and musical dramatic themes; ] Downloadable musical sound recordings; [ Downloadable video recordings featuring music; DVDs featuring music and musical dramatic themes; ] Musical sound recordings; Musical video recordings; [ Prerecorded audio cassettes featuring music; Prerecorded audio tapes featuring music; Prerecorded video cassettes featuring music and musical dramatic themes; Prerecorded video tapes featuring music and musical dramatic themes ]. FIRST USE: 19910601. FIRST USE IN COMMERCE: 19910601 |
| | IC 041. US 100 101 107. G & S: [ Entertainment services, namely, non-downloadable ringtones, pre-recorded music, video and graphics presented to mobile communications devices via a global computer network and wireless networks; ] Entertainment services, namely, personal appearances by a musical group; [ Entertainment services, namely, providing a radio program in the field of music and musical dramatic themes via a global computer network; Entertainment services, namely, providing a television program in the field of music and musical dramatic themes via a global computer network; Entertainment services, namely, providing a web site featuring musical performances, musical videos, related film clips, photographs, and other multimedia materials; Entertainment services, namely, providing podcasts in the field of music; ] Entertainment, namely, live performances by a musical band [ ; Entertainment, namely, production of radio and television programs and movies; Production of sound and music video recordings ]. FIRST USE: 19910601. FIRST USE IN COMMERCE: 19910601 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 77554144 |
| **Filing Date** | August 22, 2008 |
| **Current** | 1A |

| Basis | |
|---|---|
| Original Filing Basis | 1A |
| Published for Opposition | January 13, 2009 |
| Registration Number | 3598263 |
| Registration Date | March 31, 2009 |
| Owner | (REGISTRANT) Jesus A. Chavez INDIVIDUAL MEXICO 5196 East Drummond Avenue Fresno CALIFORNIA 93725 |
| Attorney of Record | Dorothy Blake Richardson |
| Disclaimer | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SAN JUAN" APART FROM THE MARK AS SHOWN |
| Type of Mark | TRADEMARK. SERVICE MARK |
| Register | PRINCIPAL |
| Affidavit Text | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20191029. |
| Renewal | 1ST RENEWAL 20191029 |
| Live/Dead Indicator | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | Top | HELP |

| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY |



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Contacts | eBusiness | eBiz alerts | News

**Trademarks** > **Trademark Electronic Search System (TESS)**

*TESS was last updated on Wed Nov 23 03:32:23 EST 2022*

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP

Logout  Please logout when you are done to release system resources allocated for you.

# Record 1 out of 1

TSDR | ASSIGN Status | TTAB Status  *( Use the "Back" button of the Internet Browser to return to TESS)*



| | |
|---|---|
| **Word Mark** | LOS ORIGINALES DE SAN JUAN |
| **Translations** | The foreign wording in the mark translates into English as The Originals of San Juan. |
| **Goods and Services** | IC 009. US 021 023 026 036 038. G & S: Audio and video recordings featuring music and musical dramatic themes; [ Audio tapes featuring music; Compact discs featuring music; Digital media, namely, pre-recorded video cassettes, digital video discs, digital versatile discs, downloadable audio and video recordings, DVDs, and high definition digital disks featuring music and musical dramatic themes; ]Downloadable musical sound recordings; [ Downloadable ring tones, graphics and music via a global computer network and wireless devices; ][ Downloadable video recordings featuring music and musical dramatic themes; DVDs featuring music and musical dramatic themes; ] Musical sound recordings; [ Musical video recordings ][; Prerecorded audio cassettes featuring music; Prerecorded audio tapes featuring music; Prerecorded video cassettes featuring music and musical dramatic themes; Prerecorded video tapes featuring music and musical dramatic themes ]. FIRST USE: 19910601. FIRST USE IN COMMERCE: 19910601

IC 041. US 100 101 107. G & S: [ Entertainment services, namely, non-downloadable ringtones, pre-recorded music, video and graphics presented to mobile communications devices via a global computer network and wireless networks; ]Entertainment services, namely, personal appearances by a musical group; [ Entertainment services, namely, providing a radio program in the field of music and musical dramatic themes via a global computer network; Entertainment services, namely, providing a television program in the field of music and musical dramatic themes via a global computer network; Entertainment services, namely, providing a web site featuring musical performances, musical videos, related film clips, photographs, and other multimedia materials; Entertainment services, namely, providing podcasts in the field of music; ] Entertainment, namely, live performances by a musical band [; Entertainment, namely, production of radio and television programs and movies; Production of sound and music video recordings ]. FIRST USE: 19910601. FIRST USE IN COMMERCE: 19910601 |
| **Mark Drawing Code** | (3) DESIGN PLUS WORDS, LETTERS, AND/OR NUMBERS |
| **Design Search Code** | 07.13.02 - Advertising, signs, alone ; Street signs not attached to a support
07.15.04 - Beams, wood ; Lumber ; Parquet flooring ; Wood boards
09.01.13 - Braids ; Clotheslines ; Rope ; Shoe laces ; String ; Tightropes
18.13.01 - Horseshoes |
| **Trademark Search Facility Classification Code** | ART-07.13 Billboards, Signs
ART-07.15 Building materials
ART-09.01 Textiles other than clothing
ART-18.13 Equipment for animals |

Case 2:21-cv-00662-ADA-EPG Document 10 Filed 05/03/23 Page 122 of 130

environment objects such as lighting, columns, fountains; celestial objects, rainbows, flames
SHAPES-ASTRO Astronomical shapes consisting of celestial bodies, globes and geographical maps
SHAPES-BAR-BANDS Designs with bar, bands or lines
SHAPES-COLORS-3-OR-MORE Design listing or lined for three or more colors
SHAPES-GEOMETRIC Geometric figures and solids including squares, rectangles, quadrilaterals and polygons

| | |
|---|---|
| **Serial Number** | 77555064 |
| **Filing Date** | August 25, 2008 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1A |
| **Published for Opposition** | January 13, 2009 |
| **Registration Number** | **3598310** |
| **Registration Date** | March 31, 2009 |
| **Owner** | (REGISTRANT) Jesus A. Chavez INDIVIDUAL MEXICO 5196 East Drummond Avenue Fresno CALIFORNIA 93725 |
| **Attorney of Record** | Dorothy Richardson |
| **Disclaimer** | NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "SAN JUAN" APART FROM THE MARK AS SHOWN |
| **Description of Mark** | The color(s) blue, white, brown, gold, silver and black is/are claimed as a feature of the mark. The mark consists of letters in a stylized font in which the words "Los" and "de San Juan" appear in white in a smaller font above and below "Originales" respectively. The word "Originales" appears in a larger font in which the top portion is blue and the bottom portion is white. All of the letters are outlined in black and the words are surrounded by a gold border which resembles a rope, in which two silver horse shoes linked together appear at the top center. The letters appear on a brown background which resembles a wood grain. Starbursts in the color white appear among the letters "O", "R", "A", and "S" and by the horseshoes. |
| **Type of Mark** | TRADEMARK. SERVICE MARK |
| **Register** | PRINCIPAL |
| **Affidavit Text** | SECT 15. SECT 8 (6-YR). SECTION 8(10-YR) 20200724. |
| **Renewal** | 1ST RENEWAL 20200724 |
| **Live/Dead Indicator** | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP |

| HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY |

# EXHIBIT 4

 iHeart



## 50 Mentadas

Los Originales de San Juan

Jan 2014  ●  16 Songs



〈 **Los Originales de San Juan**

# Tracks    ● ● ●

| 1 | 50 Mentadas<br>Los Originales de San Juan |
|---|---|
| 2 | El Costal Lleno de Piedras<br>Los Originales de San Juan |
| 3 | Ni por Todo el Dinero del Mundo<br>Los Originales de San Juan |



**iHeart**



# 15 Corridos Inmortales

Los Originales de San Juan

Sep 2014  ●  15 Songs



‹ **Los Originales de San Juan**

# Tracks                                              ●●●

| 1 | Los Principios<br>Los Originales de San Juan |
|---|---|
| 2 | Santos Cantú<br>Los Originales de San Juan |
| 3 | El Regio Traficante<br>Los Originales de San Juan |



# EXHIBIT 5

 Music

Sign In

Search

Plus your entire music library on all your devices. 1 month free, then $10.99/month.

Try It Free

▶ Listen Now

▦ **Browse**

((•)) Radio

🔍 Search



🎵 Open in Music ↗

# 50 Mentadas
## Los Originales de San Juan
MÚSICA MEXICANA · 2014

Preview

| | | |
|---|---|---|
| 1 | 50 Mentadas | 3:13 ••• |
| 2 | El Costal Lleno de Piedras | 2:56 ••• |
| 3 | Ni por Todo el Dinero del Mundo | 3:50 ••• |
| 4 | Volver a Vivir | 2:45 ••• |
| 5 | El Ahijado de la Muerte | 3:19 ••• |
| 6 | El Fierros | 3:35 ••• |





 Music

Sign In


Search

Plus your entire music library on all your devices. 1 month free, then $10.99/month.

Try It Free


▶ Listen Now

⬜ **Browse**

((•)) Radio

🔍 Search

🎵 Open in Music ↗



# 15 Corridos Inmortales
## Los Originales de San Juan

MÚSICA MEXICANA · 2014

Preview

| 1 | Los Principios | 2:21 | ••• |
|---|---|---|---|
| 2 | Santos Cantú | 3:04 | ••• |
| 3 | El Regio Traficante | 3:42 | ••• |
| 4 | Se Les Peló Baltazar | 2:35 | ••• |
| 5 | Juan Martha | 3:44 | ••• |
| 6 | El Rayo de Sinaloa | 2:49 | ••• |





 Music

Sign In

Search


Try It Free

Plus your entire music library on all your devices. 1 month free, then $10.99/month.

 Listen Now

**Browse**

 Radio

 Search

Open in Music ↗



# Celebrando 39
## Los Originales de San Juan

MÚSICA MEXICANA · 2015

Preview

| | | | |
|---|---|---|---|
| 1 | El Día Que Me Dejaste | 3:13 | ••• |
| 2 | Tragos Amargos | 2:50 | ••• |
| 3 | Los Consejos | 2:48 | ••• |
| 4 | Tomando Licores | 2:34 | ••• |
| 5 | Mujer Bonita | 3:12 | ••• |
| 6 | Enséñame a Olvidar | 3:40 | ••• |

